UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECTOR RESOURCES LTD., <br><br>              Petitioner, <br><br> v. <br><br> ETHOS ASSET MANAGEMENT, LLC, and EAST WEST BANCORP INC. a/k/a EAST WEST BANK, <br><br>              Respondents. | **EMERGENCY PETITION AND COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION IN AID OF ARBITRATION** <br><br> C.A. No.: |

Petitioner Sector Resources Ltd. ("Sector") brings this Petition and Complaint for Injunctive Relief in Aid of Arbitration, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Section 7502(c) of the New York Civil Practice Law and Rules ("CPLR"), against Respondents Ethos Asset Management, LLC ("Ethos"), and East West Bank ("EWB"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1.      This case arises out of Ethos' egregious breach of the March 2023 Loan Agreement ("Agreement"), as modified by the June 2023 Amendment ("Amendment"), between Sector and Ethos, and Ethos' efforts to abscond with Sector's collateral, which is worth more than $8 million. A true and correct copy of the Agreement and the Amendment are attached as Exhibits 1 and 2 to the Declaration of William Dell'Orfano ("WD Dec."), respectively.  Pursuant to the Agreement, Ethos agreed to loan $50 million to Sector to operate gold mines in British Columbia, Canada (the "Canadian Mines"), and Tolima, Colombia (the "Colombian Mines") (collectively, the "Mines"). Ex. 1 at ¶ 3.1; WD Dec. at ¶ 3.  Ethos was contractually obligated to deliver the $50 million in five

1

tranches of $10 million, which were due on July 20, 2023, August 31, 2023, October 16, 2023, November 29, 2023, and January 12, 2024. Ex. 2, Ex. B. In exchange for the loan, Sector agreed to provide more than $8 million of collateral to Ethos, in the form of a $3.25 million cash deposit and a Standby Letter of Credit ("SBLC") in the amount of approximately $5.05 million.

2.     Sector fully performed its obligations under the Agreement. However, Ethos has not delivered any of the first three tranches of $10 million payments. Worse yet, Ethos has refused to return Sector's collateral despite its obligation to do so. Ex. 1 at ¶¶ 7.4, 7.6. It is thus clear that Ethos has breached the Agreement and that Sector is very likely – if not certain – to prevail on the merits of its claim at the arbitration to which the parties have agreed and which Sector intends to bring. Ex. 1 ¶ at 9.13. However, because Ethos breached its obligation to deliver the funding, and has wrongfully retained Sector's collateral, Sector has been forced to shutter the Canadian Mines and it will be forced to close the Colombian Mines if it does not immediately regain control of its collateral. WD Dec. at ¶¶ 40, 58; Ex. 3 at 1(a), 21. Further, over the past few months, Ethos has engaged in a pattern of misrepresentation and obfuscation which compels the conclusion that Ethos is likely to dissipate Sector's collateral while the parties arbitrate. If Ethos is allowed to retain *wrongful control of Sector's $8 million* in collateral during the pendency of the arbitration, Sector's business will be destroyed and Ethos will dissipate Sector's collateral before any award can be rendered. Accordingly, Sector seeks a temporary restraining order and preliminary injunction to prevent irreparable harm and to ensure that the arbitration is not rendered ineffectual.

## THE PARTIES

3.     Petitioner, Sector Resources Ltd., which is incorporated in the Cayman Islands and is headquartered in Manchester, New Hampshire, is a citizen of New Hampshire and the Cayman Islands. 28 U.S.C. § 1332(c).

4.      Respondent, Ethos Asset Management, LLC, is incorporated in and maintains its principal place of business in California and is a citizen of California.  28 U.S.C. § 1332(c).

5.      Respondent, East West Bank, is incorporated in and maintains its principal place of business in California and is a citizen of California.   28 U.S.C. § 1332(c).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction because there is complete diversity of citizenship between Petitioner, Sector, and Respondents, Ethos and EWB, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332.

7.      The Court has personal jurisdiction over Respondent, Ethos, because it is a party to the Agreement, which is governed by New York state law and Ethos has agreed to arbitrate any dispute related to the Agreement in New York City, New York.  Ex. 1 at ¶¶ 9.13, 9.14.  Ethos has thus consented to the jurisdiction of this Court.  In addition, the Court has personal jurisdiction over Ethos pursuant to CPLR § 302(a)(1) because it has transacted business within the State of New York.

8.      The Court has personal jurisdiction over Respondent, EWB, pursuant to CPLR § 302(a)(1) and 302(a)(4), because EWB has at least five branches in the state of New York and the Southern District of New York, and thus, transacts business in the state of New York and uses real property within the state of New York.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 112(b);1391(b)(2), because it concerns a dispute concerning a Standby Letter of Credit issued by Sector's bank, JP Morgan Chase ("JPM"), which is headquartered in New York, New York, and a request for an injunction in aid of arbitration which Sector and Ethos must take place in New York City, New York, and because Ethos and EWB are subject to personal jurisdiction in the Southern District of New York.

## STATEMENT OF FACTS

### A.   Background

10.    Sector was founded in 1994 and, since that time, has been in the business of acquiring, developing, and operating gold and silver mines in British Columbia, Canada, and Tolima, Colombia.  WD Dec. at ¶ 2.

11.    The process of acquiring, developing, and operating the Mines has been a lengthy, complex, and expensive endeavor for Sector, which required the commitment of highly skilled individuals and the investment of considerable financial and human resources over a long period of time.  W.O. Dec. at ¶ 7.  Over the course of many years, Sector has invested extensive capital to: (1) lease the Mines; (2) engage personnel and machinery to explore the Mines; (3) build the infrastructure required to engage in mining and process excavated ore; and (4) obtain and maintain the permitting from the relevant government authorities in Canada and Colombia.  *Id.*

12.    Over the past three years, Sector has invested approximately $5 million operating the Canadian Mines and approximately $1.8 million operating the Colombian Mines.  WD Dec. at ¶ 17.

13.    Sector must operate the Mines as a condition of its leases.  WD Dec. at ¶¶ 5, 19-20. Therefore, if Sector lacks the funds to operate the Canadian Mines and the Colombian Mines, the relevant government authorities have the right to terminate the leases.  *Id.* at ¶¶ 19-20.  In other words, if Sector cannot operate the Mines, it does not simply face the risk of lost revenue, it faces the possibility that its business will be entirely destroyed and it will lose the entire value of its investment as well as the goodwill of its employees, business partners, banks, and the government authorities that oversee its businesses.  *Id.* at ¶¶ 5, 19-21.

14.     Accordingly, Sector must have access to working capital.  WD Dec. at ¶¶ 5, 19-21. To that end, in March 2023, Sector executed the Agreement with Ethos, and later executed the Amendment with Ethos in June 2023. *Id.* at ¶ 22.

**B.     The Terms of the Agreement**

15.     On or about March 29, 2023, Sector and Ethos executed the Agreement, which provided financing to support Sector's efforts to operate the Mines.  Ex. 1 at ¶ 2.1; Ex. 1, Ex. C. On or about June 2, 2023, Ethos and Sector executed an Amendment to the Agreement (the "Amendment").  Ex. 2.

16.     The Agreement is controlled by New York law and requires arbitration of any dispute at the International Chamber of Commerce in New York.  Ex. 1 at ¶¶ 9.13, 9.14.

17.     Pursuant to the Agreement, Ethos agreed to loan $50 million to Sector to operate the Mines.  Ex. 1 at ¶¶ 3.1, 9.14.  In addition, Ethos was obligated to deliver the $50 million in tranches of $10 million, which were due on July 20, 2023, August 31, 2023, October 16, 2023, November 29, 2023, and January 12, 2024.  Ex. 2, Ex. B.

18.     In consideration for the loan, Sector agreed to provide two forms of collateral to Ethos.  Ex. 1 at ¶ 3.3; Ex. 2 at ¶¶ 3.3, 3.3.1, 3.3.2.  First, Sector agreed to have its bank, JPM, provide the SBLC in the amount of $5.05 million to Ethos.  *See* Ex. 1 at ¶ 4.1; Ex. 2 at ¶ 3.3.1; Ex. 7 at 5–6.  Second, Sector agreed to deposit $3.25 million in cash and gold in bank accounts identified by Ethos.  *See* Ex. 2 at ¶ 3.2.2.  Ethos and Sector later agreed that Sector would not be obligated to place any gold on deposit.  *See* Ex. 3 at 36.

19.     Under the Agreement, Ethos is in default if it fails to deliver any of the $10 million payments on the due dates and fails to cure within ten days.  Ex. 1 at ¶ 7.4.

20.     In the event of a default, the Agreement automatically terminates and Ethos must return all of Sector's collateral.  Ex. 1 at ¶ 7.6.

**C.     Sector Has Fully Performed its Obligations Under the Agreement**

21.     On April 6, 2023, Sector's bank JPM delivered the SBLC to Ethos's bank EWB via SWIFT.  Ex. 3 at 63; Ex. 7 at 1-4; WD Dec. at ¶ 27(a).

22.     On June 6, 2023, Sector's bank JPM wired $3.25 million to Ethos into Ethos' EWB account.  Ex. 3 at 61-2; WD Dec. at ¶ 27(b).  After Sector delivered the $3.25 million, Ethos directed EWB to reduce the face value of the SBLC to $5.05 million and EWB did so.  Ex. 7 at 5-6; WD Dec. at ¶ 27(c).

23.     Thus, Sector has performed every obligation it owes to Ethos.

**D.     Ethos Breached the Agreement and Acknowledged its Default**

24.     Although Sector has fully performed its obligations under the Agreement, Ethos has not delivered any of the $10 million payments, which were due on July 20, 2023, August 31, 2023, and October 16, 2023.  Ex. 2, Ex. B; Ex. 3 at 1(a); WD Dec. at ¶¶ 29-30.

25.     Ethos has admitted it is in default.  Ex. 6; WD Dec. at ¶ 45.

26.     Although Ethos has admitted it breached its obligation to deliver the first two tranches of $10 million when due, it has not cured its default.  Ex. 1(a); Ex. 6.

27.     Ethos has further refused to return to Sector's collateral.  Ex. 3 at (1)(a).

**E.     Ethos' Conduct, Which Suggests an Intent to Hide or Deplete Sector's Collateral, Is Causing Irreparable Harm to Sector**

28.      By email dated July 5, 2023, Ethos' CEO Santos stated that Ethos would deliver the first $10 million payment on or about July 14, 2023.  Ex. 3 at 58-9.  By email dated July 5, 2023, Santos stated that Ethos would deliver the first $10 million payment on or about July 14, 2023.  *Id.*

29.     Ethos did not do so.  Ex. 3 at 56-7; WD Dec. at ¶¶ 29-30.

30.     Indeed, Ethos did not deliver the $10 million on the contractual due date of July 20, 2023, or at any other time.  Ex. 3 at 1(a); 54; WD Dec. at ¶¶ 29-30.

31.     By email dated July 21, 2023, Santos claimed that he would be "instructing the wire tomorrow."  Ex. 3 at 54; WD Dec. at ¶ 31(a).  However, Ethos did not deliver the first tranche the following day as promised.

32.     On July 25, 2023, Sector advised Ethos that it had not received the first tranche.  Ex. 3 at 51.  Santos, in turn, claimed that he was "waiting the validation call," and represented that the wire would be delivered in five to seven days.  *Id.*; WD Dec. at ¶ 31(a).  In other words, Santos claimed he had *already instructed* some unnamed bank to wire the funds to Sector.

33.     By email dated July 28, 2023, Sector advised Ethos that it still had not received the $10 million, which was due on July 20, 2023.  Ex. 3 at 50.  Sector further advised that it was incurring costs on the SBLC and asked Ethos for a date certain for the delivery of the first $10 million.  *Id.*; WD Dec. at ¶ 31(b).

34.     In response, Ethos' CEO Santos claimed that Ethos had a validation call scheduled with the bank on July 31, 2023, and that the funds would be delivered.  Ex. 3 at 49; WD Dec. at ¶ 31(b).  Santos claimed that the wire transfer was delayed because he had been unavailable to verify it.  *Id.*

35.     On August 3, 2023, two weeks after the July 20, 2023 due date, Sector's CEO, Dell'Orfano, notified Ethos that it had not received the wire transfer.  Ex. 3 at 47.  Dell'Orfano asked Ethos to explain the reasons for the delay and stated that the prompt receipt of the funding required by the Agreement was critical because Sector had provided significant collateral for the

funds, and by doing so, had "removed a sizable amount of working capital that was needed to maintain normal operations." *Id.*

36.     By email dated August 4, 2023, Santos assured Dell'Orfano that Ethos would provide the funds and that "no problem exist[s] with your funding." Ex. 3 at 46.

37.     On August 8, 2023, Ethos' CEO Santos claimed that he "did the verification call today" and directed the delivery of the first $10 million tranche of funding. Ex. 3 at 44; Ex. 4 at 1; WD Dec. at ¶ 31(c). He sent a further email stating that the funds would be delivered by Friday August 11, 2023. Ex. 3 at 43; WD Dec. at ¶ 31(c)

38.     On August 10, 2023, Santos claimed by email and text message that "[a]ll is done from our side." Ex. 3 at 42, Ex. 4 at 2; WD Dec. at ¶ 31(d).

39.     However, Sector did not receive the money and therefore, by email dated August 11, 2023, Sector requested a confirmation to trace the transfer. Ex. 3 at 41.

40.     In response, Ethos claimed that the wire was coming from "Flagstar/Signature Bank," and claimed Santos had confirmed the status of the wire transfer with Ethos' bank, and that he would send "the fed wire number and receipt as soon as I have it." Ex. 3 at 40; Ex. 4 at 3; WD Dec. at ¶ 31(e).

41.     By email dated August 12, 2023, Sector's CEO Dell'Orfano reminded Ethos that Sector had provided $3.25 million of its working capital as collateral for the loan, that the first payment was four weeks late, and that Ethos' breach was "now impacting [Sector's] operations." Ex. 3 at 40.

42.     On August 13, 2023, Santos claimed that four-week delay in delivering the first $10 million payment "was a fully normal process," that Ethos had done what was required to ensure delivery of the money, "and now it is up to the bank to release the funds." Ex. 3 at 40.

43.     On August 16, 2023, Sector advised Ethos that it still had not received the $10 million payment, which was contractually due on July 20, 2023.  Ex. 3 at 37-8.  Sector again noted that it had provided collateral of $10 million for the loan, "and that the current situation was not sustainable for Sector, its banks, or the projects as all [of its] working capital has been committed as collateral."  *Id.* at 38.  Sector also reported that it had been "forced to scale back personnel and purchasing commitment," and that Ethos' "failure to fund [was] impacting Sector's reputation with its bank, its social programs in Canada, Colombia, and its personnel." *Id*.  Finally, Dell'Orfano advised Ethos that if it did not deliver the first $10 million payment, Sector would declare a default and demand the return of its collateral.  *Id.*

44.     Ethos' CEO Santos responded by email dated August 17, 2023.  Ex. 3 at 35-7. Santos claimed that the wire transfer had been delayed because that he was "in Europe solving a problem that is all over the news," which was allegedly a fight between "Credit Suisse bondholders and shareholders" and "the Central Bank of Switzerland and the Government" over the "conversion of these assets to UBS assets."  *Id.* at 36.  Santos recognized that Ethos was in default, and that Ethos was *obligated to return Sector's collateral*.  *Id.*  He asked for another chance for Ethos to perform and claimed that Ethos "may be able to deliver the wire at any moment."  *Id.*

45.     In other words, a week a*fter* Santos' August 10, 2023 email assuring Sector that "all was done" to ensure the wire transfer, Ethos admitted it had *never* initiated the wire transfer— supposedly because Santos was allegedly solving the dispute between Credit Suisse bondholders and shareholders, the Swiss Government and Central Bank, and UBS.

46.     Despite Ethos' assurances, by August 21, 2023, Ethos had still not delivered the first tranche of $10 million.  Ex. 3 at 33-4.

47.     By email dated August 22, 2023, Ethos claimed that Santos had spoken to Flagstar bank and that Ethos would deliver the $10 million.  Ex. 3 at 32.

48.     Ethos did not deliver the first or second tranche of $10 million by August 31, 2023, as required by the Agreement.  Ex. 2, Ex. B; Ex. 3 at 31; WD Dec. at ¶¶ 32-33.  Thus, by September 1, 2023, Ethos had failed to deliver $20 million in funding as required by the Agreement.  Ex. 2, Ex. B; WD Dec. at ¶ 33.

49.     On September 4, 2023, Sector's CEO Dell'Orfano advised Ethos that its bank, JPM, had asked about the status of funding.  Ex. 3 at 30-1; WD Dec. at ¶ 34.

50.     By email dated September 5, 2023, Santos stated that he could do two things that day.  First, he could "instruct Signature Bank to wire the funds to you."  Ex. 3 at 28.  He also stated that he would instruct EWB to release the SBLC.  Ex. 3 at 29; WD Dec. at ¶ 35.  Santos also offered a patently unbelievable excuse for Ethos' delays.  He claimed to be "in Thailand" because "the Prime Minister asked him to be present" for a meeting.  Ex. 3 at 28.

51.     By text dated September 8, 2023, Ethos's CEO Santos informed Sector that Ethos was initiating the wire transfer online that day.  Ex. 4 at 7-8; WD Dec. at ¶ 35.  By email dated September 10, 2023, Santos claimed it would release "part of the SBLC, like 3M USD," and it would be done "this week" to free up working capital for Sector.  Ex. 3 at 23.

52.     On September 12, 2023, Santos sent a text message claiming that Ethos had wired first $10 million tranche to Sector on September 11, 2023.  Ex. 4 at 7; WD Dec. at ¶ 38.

53.     However, Ethos did not deliver the funds.  Ex. 3 at 1, 1(a), WD Dec. at ¶¶ 3, 39, 52.

54.     By email dated September 13, 2023, Sector again advised Ethos that it had not received the first tranche.  Ex. 3 at 21-2.  Sector reported that Ethos' failure to deliver the $10

million payments, which were due on July 20, 2023, and August 31, 2023, respectively, had "caused Sector to reduce personnel in Canada" and was in the process of doing the same in Colombia.  Ex. 3 at 21; WD Dec. at ¶ 40.  Sector also notified Ethos that its failure to deliver the $20 million had caused "very costly" "contract liquidations" and "remobilization cost[s]."  Ex. 3 at 21.

55.     By email dated September 18, 2023, Ethos promised to release $3 million from the SBLC and to deliver "the first tranche" of $10 million by September 20, 2023.  Ex. 3 at 20; WD Dec. at ¶ 41.  Once again, Ethos did not deliver the first $10 million tranche or reduce the SBLC. WD Dec. at ¶ 42.

56.     On September 23, 2023, Ethos claimed it had wired the money on September 20 and was "waiting to have the fed reference number."  Ex. 3 at 18-9.  Ethos also stated that EWB "guarantee[d]" Santos that it would reduce the amount of the SLBC by $4 million.  *Id*. at 19.

57.     By email dated September 26, 2023, Ethos claimed that it had "just finished [a] call with EWB," it had directed EWB to reduce the SBLC by $4 million, and it was "waiting to receive the SWIFT copy of the release."  Ex. 3 at 18.  Ethos also stated it "was working to restore trust." *Id.*

58.     Due to Ethos' persistent failure to perform its obligations and its failure to cure, by letter dated September 26, 2023, Sector's outside counsel notified Ethos that it was in default.  Ex. 5; Ex. 3 at 17; WD Dec. at ¶ 43.  Sector's September 26, 2023 letter demanded that Ethos "immediately fund" its $20 million commitment "for Tranche #1 and Tranche #2."  Ex. 5 at 1; WD Dec. at ¶ 44.  Sector also demanded that Ethos provide documentation that it had delivered Tranches 1 and 2 and had reduced the SBLC as promised.  Ex. 5 at 1; WD Dec. at ¶ 44.  Finally,

Sector informed Ethos that if it did not perform, it would avail itself of "all available remedies." Ex. 5 at 1; WD Dec. at ¶ 44.

59.     Ethos responded by letter dated September 29, 2023, stating that Sector's "notice of default is well noted and received." Ex. 6 at 1; *see also* Ex. 3 at 16; WD Dec. at ¶ 45. Ethos claimed it was having difficulty initiating the wire transfers and that it had instructed EWB to reduce the SBLC by $4 million. Ex. 6 at 1-2; WD Dec. at ¶ 45. Ethos also stated that "within 72 hours" it would deliver "a copy of the SWIFT for the release" of the SBLC and "hopefully the release of the wire." Ex. 6 at 2; WD Dec. at ¶ 45.

60.     Ethos did not deliver the $10 million or reduce the SBLC. Ex. 3 at 9-11; WD Dec. at ¶ 46.

61.     On October 4, 2023, and October 14, 2023, Sector's CEO Dell'Orfano contacted Jeffrey Yu, Ethos's agent at EWB, to confirm that Ethos had directed EWB to reduce the SBLC. WD Dec. at ¶ 47. Yu eventually advised Dell'Orfano that Ethos had not instructed EWB to reduce the SBLC and that Sector should direct its communications to Ethos. *Id.*

62.     By email dated October 16, 2023, Sector's outside counsel notified Ethos that Sector had not received the first or second tranche of $10 million or confirmation that the SBLC had been reduced. Ex. 3 at 7-8. Sector requested written confirmation by October 17, 2023, that EWB had reduced the SBLC and that Credit Suisse and/or UBS had initiated the wire transfer of the first tranche. *Id*. at 8.

63.     Ethos' CEO Santos immediately responded and claimed that Credit Suisse had initiated the wire transfer on October 16, 2023, and that he would send a confirmation. Ex. 3 at 7.

64.     However, Ethos did not deliver the first tranche of $10 million nor reduce the SBLC as promised. Ex. 3 at 1(a); WD Dec. at ¶¶ 48-50.

65.     By email dated October 20, 2023, Santos stated that Ethos would send "confirmation and communication of [the] SBLC release" and "receipt or references of [the] SWIFT wire number." Ex. 3 at 5. He further claimed that the money was coming from Switzerland, not the United States. *Id.*

66.     By email dated October 24, 2023, Santos claimed he was going to visit Credit Suisse to follow up on the wire transfer and that EWB was in the process of releasing the SBLC, because EWB previously released the incorrect SBLC. Ex. 3 at 4. By email dated October 30, 2023, Ethos provided what it claimed was a wire transfer reference number from Credit Suisse and claimed that EWB had released the wrong SBLC. Ex. 1; WD Dec. at ¶ 51.

67.     Sector contacted its bank, JPM, which reported that it had "no record of an incoming wire transfer" nor any "record of the SBLC being reduced or released." Ex. 3 at 1(a); WD Dec. at ¶ 52. For the avoidance of confusion, Sector declared that Agreement terminated and requested that Ethos "return all of Sector's collateral immediately." Ex. 3 at 1(a); WD Dec. at ¶ 54. Ethos refused to return the collateral.

68.     In sum, Ethos breached its obligation to deliver the first, second, or third tranches of $10 million, which were due on July 20, 2023, August 31, 2023, and October 16, 2023, respectively. Ex. 2 at Ex. B. Ethos further breached the Agreement by failing to return Sector's collateral. Ex. 1 at ¶¶ 7.4, 7.6.

69.     Ethos' egregious breaches of the Agreement have caused severe and irreparable harm to Sector. Indeed, as explained in the Dell'Orfano Declaration, Sector has spent nearly twenty years and millions of dollars to develop the Mines. WD Dec. at ¶¶ 7-21. Sector needs to recover its collateral to have funds to pay its employees, its leases, and operate its businesses. *Id.* at ¶¶ 5, 19-21, 58. Significantly, Sector's leases in Canada and Colombia require Sector to actually

operate the Mines, and if cannot operate the Mines, it could lose its leases on the Mines.  *Id.* at ¶

19.  Thus, if Sector does not recover its collateral immediately, it will not simply lose revenue, it

is likely to lose its entire business operations and its goodwill with its employees, consultants, bank

and the mining authorities in Canada and Colombia.  *Id.* at ¶ 19-21.

## CLAIM FOR RELIEF

**(Temporary Restraining Order and Preliminary Injunction in Aid of Arbitration)**

70.     Sector repeats and realleges each of the preceding paragraphs of the Petition and

Complaint as if set forth fully herein.

71.     Pursuant to Rule 64(a), "[a]t the commencement of and throughout an action, every

remedy is available that, under the law of the state where the court is located, provides for seizing

a person or property to secure satisfaction of the potential judgment."  Fed. R. Civ. P. 64(a); *Iraq*

*Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 269 (2d Cir. 2022); *Bao v. Wang*, 2022 WL 704023,

at *2 (S.D.N.Y. Mar. 9, 2022).

72.     In accordance with CPLR § 7502(c), this Court may issue "a preliminary injunction

in connection with an arbitrable controversy . . . upon the ground that the award to which the

applicant may be entitled may be rendered ineffectual without such provisional relief," provided

that the party seeking the injunction demonstrates that traditional showing required to obtain

injunctive relief.  CPLR § 7502(c); *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 83 (2d Cir. 2000)

(citing *In re Cullman Ventures, Inc.*, 252 A.D.2d 222, 231 (1st Dep't 1998)).

73.     Thus, Sector must demonstrate: (1) "irreparable harm absent injunctive relief;" (2)

"either a likelihood of success on the merits, or a serious question going to the merits . . . with the

balance of hardships tipping decidedly in [petitioner's] favor;" and (3) that the public interest

"weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

74.     To the extent that Sector seeks a preliminary injunction that "alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo," it must make "a clear showing" that it "is entitled to the relief requested," or that "extreme and very serious damage will result from a denial of preliminary relief." *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*, 177 F. Supp. 3d 810, 812 (S.D.N.Y. 2016) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011)).

75.     Sector is entitled to relief under either standard.

76.     **First**, Sector is extremely likely to succeed on the merits of its claim that Ethos breached the Agreement.

77.     To prevail on a breach of contract claim under New York law, which governs the Agreement,[1] Sector must demonstrate: "(1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract by defendant; and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guaranty Tr. Co.*, 375 F.3d 168, 177 (2d. Cir. 2004).

78.     Here, there is clearly a contract between Sector and Ethos.  Exs. 1, 2.

79.     It is equally clear that Sector performed its obligations under the Agreement.  Ex. 3 at 61-3; Ex. 7.

80.     On or about April 6, 2023, Sector delivered the SBLC issued by its bank, JPM, to Ethos' bank, EWB.  Ex. 3 at 63; Ex. 7 at 1-4.  On or about June 6, 2023, Sector delivered the sum of $3.25 million in cash to Ethos' bank account at EWB.  Ex. 3 at 61-2; Ex. 7 at 5-6.

---

[1]     Ex. 1 at ¶ 9.14.

81.     Sector thus indisputably fulfilled its obligations under Paragraphs 3.3 and 3.4 of the Agreement and Paragraphs 3.3.1 and 3.6 of the Amendment.  Ex. 1 at ¶¶ 3.3, 3.4; Ex. 2 at ¶¶ 3.3.1, 3.6.

82.     Thus, Ethos was obligated to deliver the payments of $10 million on July 20, 2023, August 31, 2023, and October 16, 2023.  Ex. 1 at ¶ 3.1; Ex. 2 at ¶ 4.1.2(iii); Ex. 2 at Ex. B.

83.     Ethos did not make any of the payments of $10 million on the due date or at any time thereafter.  Ex. 3 at 1(a).

84.     Ethos thus breached its obligation to deliver these funds.  Ex. 1 at ¶ 3.1; 7.4; Ex. 2 at ¶ 4.1.2(iii); Ex. 2, Ex. B.

85.     Further, Ethos did not cure its breach by delivering the funds, despite repeatedly promising to do so.  A true and correct copy of Ethos' email communications with Sector is attached as Exhibit 3.  A true and correct copy of Ethos' CEO Santos' text messages with Sector's CEO Dell'Orfano is attached as Exhibit 4.

86.     By letter dated September 26, 2023, Sector notified Ethos that it was in default.  A true and correct copy of Sector's Notice of Default is attached as Exhibit 5.

87.     By letter dated September 29, 2023, Ethos admitted that it was in default.  A true and correct copy of Ethos' September 29, 2023 letter is attached as Exhibit 6.

88.     Ethos is thus indisputably in default.  Ex. 1 at ¶ 7.4.

89.     As a result, Ethos was contractually obligated to return Sector's collateral and cancel the SBLC.  Ex. 1 at ¶ 7.6.

90.     However, Ethos has not canceled the SBLC nor returned Sector's $3.25 million in collateral.  Ex. 3 at 1(a), 1(b).

91.     Sector has been damaged by Ethos' breach.  As a result of Ethos' breach, Sector has been forced to shut down the Canadian Mines and it has been forced to reduce operations at the Colombia Mines.  WD Dec. at ¶¶ 40, 58; Ex. 3 at 1(a), 21, 40.  Sector has thus lost tremendous revenue.   More importantly, however, Ethos' breach has damaged Sector's relationships with its workers, the relevant mining authorities in Canada and Colombia, and its bank.  *Id.* at ¶¶ 19-21. In addition, Ethos' breach has damaged Sector goodwill and reputation.  *Id.* at ¶¶ 7-21, 58, 61.

92.     ***Second***, Sector has suffered and will continue to suffer irreparable harm in the absence of requested relief.

93.     Indeed, Sector has been forced to close operations at the Canadian Mines and is curtailing operations at the Colombian Mines, which has caused Sector to suffer a "loss of reputation, goodwill, and business opportunities," which constitutes irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

94.     In addition, Sector has and will continue to suffer irreparable harm because there is danger of the *status quo* deteriorating in the time between a prejudgment remedy.  Specifically, Ethos' conduct demonstrates that it is very likely that Sector's collateral and Ethos' assets "will disappear during the proceedings and become unavailable to creditors by the time of final judgment." *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 814.

95.     For the past three months, Ethos has falsely claimed that it has initiated wire transfers to deliver the first $10 million dollar payment and directed EWB to cancel the SBLC, but Ethos did not deliver a cent to Sector or cancel the SBLC.  Ex. 3 at 1(a); WD Dec. at ¶¶ 29-52.  To make matters worse, Ethos has offered a series of increasingly preposterous excuses for its admitted failure to perform:

i.   In August 2023, Ethos' CEO Santos claimed that the wire transfer was delayed because he had to devote his attention to resolving a dispute between Credit Suisse bondholder and shareholders against the Swiss Central Bank over the conversion of Credit Suisse assets to UBS assets.  Ex. 3 at 36.

ii.   In September 2023, Santos claimed that the wire transfer and cancellation of the SBLC was delayed because the Prime Minister of Thailand requested his presence at a meeting in Thailand.  *Id.* at 28.

iii.   In October 2023, Santos claimed that Ethos had not cancelled the SBLC because EWB made a mistake and released another SBLC entirely.   *Id.* at 1(b).

96.   Ethos' repeated misrepresentations about performance and its incredible excuses when its failure to perform were discovered constitute compelling evidence that Ethos will hide or dissipate Sector's collateral if it is not enjoined from doing so.  This constitutes irreparable harm. *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 814.

97.   ***Third***, the balance of hardships between Sector and respondents, Ethos and EWB, clearly weighs in favor of Sector.

98.   As explained above, Sector will suffer irreparable harm if the Court does not enjoin Ethos and EWB from wrongfully dissipating or retaining its collateral.  In contrast, neither Ethos nor EWB will suffer any cognizable harm if the Court restrains them from dissipating Sector's collateral.

99.   Ethos was contractually obligated to return Sector's collateral when it failed to cure its breach.   Ex. 1 at ¶ 7.6.  Ethos thus has no right to retain Sector's collateral. Likewise, EWB which holds Sector's collateral as a custodian for Ethos, has no right to it. Thus, an order which compels Ethos "to comply with [its] contractual obligations" and prevents EWB from assisting

Ethos in breaching its obligations "is simply not the sort of 'damage' that is compensable at law." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010).

100.     ***Fourth,*** the public interest weighs strongly in favor of granting Sector's request for injunctive relief.

101.     "The public has an interest in the enforcement of contractual obligations and prevention of fraud." *Jet Experts, LLC v. Asian Pac. Aviation Ltd.*, 602 F. Supp. 3d 636, 645 (S.D.N.Y. 2022).  Further, there is a strong public interest "favoring the arbitration of disputes," which is undercut when parties are allowed to irreversibly alter "the status quo before the arbitrators are able to render a decision in the dispute." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990).

102.     Further, there is no countervailing public interest that weighs against an injunction directing Ethos and EWB to return Sector's collateral and preventing them from drawing on the SBLC.

103.     Ethos' conduct, which includes three months of obfuscation and false representations that it had initiated wire transfer to deliver the payments due, "borders, if it does not cross, the line of fraud." *Jet Experts*, 602 F.Supp.3d at 645.  "[T]here is no countervailing public policy favoring defendants" like Ethos "who have not acted in good faith." *Id.*  Rather, the public interest weighs strongly against allowing EWB to assist Ethos in "skirt[ing] [its] obligations at [Sector's] expense." *Rex Med. L.P.*, 754 F. Supp. at 616.

104.     ***Fifth***, injunctive relief is necessary to ensure that any arbitration award is not "rendered ineffectual."  CPLR § 7502(c).

105.     As described above, Sector will most probably prevail at an arbitration.  However, the award to which Sector is entitled is likely to be rendered ineffectual without injunctive relief

for two reasons.  First, Sector needs its collateral back immediately and faces the prospect of immediate failure and the permanent loss of goodwill, reputation, and business opportunities without access to its own collateral.  Second, as detailed above, it is likely that Ethos, which has already acted in blatant disregard of its contractual obligations, will dissipate Sector's collateral during the pendency of an arbitration and will ignore any arbitration award.

106.    Thus, this is the quintessential case where injunctive relief is necessary to ensure that the inevitable arbitration award is not rendered "ineffectual."

107.    No prior proceeding has been filed for the relief requested herein or for like relief.

## PRAYER FOR RELIEF

WHEREFORE, Sector respectfully requests that the Court issue an order which:

A.    Immediately and temporarily restrain Ethos and EWB from making any draws on the SBLC, until a hearing can be held;

B.    Immediately and temporarily restrain Ethos and EWB from making any withdrawals from any account held by Ethos at EWB until Ethos provides proof that Ethos has returned Sector's collateral;

C.    Directs Ethos and EWB to show cause why an order should not issue that:

1.    Ethos should not be directed to return Sector's $3.25 million in cash collateral;

2.    Ethos and EWB should not be directed to cancel the SBLC; and

D.    Grants such other relief as the Court deems just and proper.

Dated:  November 3, 2023

**SKARZYNSKI, MARICK & BLACK LLP**

*Janene Marasciullo*

Janene Marasciullo
John Treat
One Battery Park Plaza, 32nd Floor
New York, NY 10004
(212) 820-7700
jmarasciullo@skarzynski.com
jtreat@skarzynski.com

*Counsel for Sector Resources Ltd.*

4858-8275-9821, v. 1