UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECTOR RESOURCES LTD., <br><br> Plaintiff, <br><br> v. <br><br> ETHOS ASSET MANAGEMENT, LLC, and EAST WEST BANCORP INC. a/k/a EAST WEST BANK <br><br> Defendants. | Index No.: |

## DECLARATION OF WILLIAM DELL'ORFANO

Pursuant to 28 U.S.C. § 1746, WILLIAM DELL'ORFANO, being duly sworn deposes and says:

1. I am over eighteen years of age and have personal knowledge of the facts set forth below.

2. I am the President of and CEO of Petitioner, Sector Resources Ltd. ("Sector"), which is incorporated in the Cayman Islands and headquartered in Manchester, New Hampshire. Sector was founded in 1994 and, since that time, it has been in the business of acquiring, developing, and operating gold and silver mines in British Columbia, Canada ("the Canadian Mines"), and Tolima, Colombia ("the Colombian Mines") (collectively, "the Mines").

3. As explained below, Sector has been forced to seek injunctive relief because Respondent, Ethos Asset Management, LLC ("Ethos"), has breached Agreement EAM-SECTOR 1221-2022 ("the Agreement") and Amendment 1 thereto ("Amendment"), by *refusing to return over $8 million of Sector's collateral*, after Ethos failed to deliver three payments of $10 million in funding, which were due on July 20, 2023, August 31, 2023, and October 16, 2023. Ex. 2 at

1

Ex. B. A true and correct copy of the Agreement is attached hereto as Exhibit 1. A true and correct copy of the Amendment is attached hereto as Exhibit 2.

4. Thus, Ethos and its bank, East West Bank, ("EWB") have retained wrongful control of Sector's collateral. If Ethos and EWB are allowed to keep control of Sector's collateral, which Ethos is contractually obligated to return after Ethos breached its own obligation to deliver the contractually required funding, (Ex. 1 at ¶¶ 7.4; 7.6), Sector will suffer irreparable harm.

5. First, Sector needs to recover its collateral to have funds to operate its business. If Sector cannot operate its businesses, it will lose the executive staff, employees, and consultants who are necessary to operate Sector's business, and it will lose the ability to secure alternative financing. Moreover, if Sector is forced to cease operations, its relationships and goodwill with the relevant authorities in Canada and Colombia and its own bank, JP Morgan Chase ("JPM"), will be severely damaged, if not permanently destroyed. Further, if Sector cannot operate the Mines, it may lose its leases to the Mines.

6. Second, if Sector cannot regain control over its collateral before the resolution of its broader contract dispute with Ethos, it is likely that Ethos will dissipate or hide Sector's collateral before a decision on the merits. For the past four months, Ethos' Chief Executive Officer Carlos Santos ("Santos") has repeatedly claimed, in writing, that Ethos has initiated wire transfers to deliver the funds that Ethos is obligated to provide, and for the past two months, engaged in a pattern of misleading communications in which he claims to have initiated wire transfers of the funds Ethos owes under the Agreement. More recently, Santos has sent multiple communications claiming to have returned Sector's collateral. A true and correct copy of my

2

email communications with Ethos' Santos is attached hereto as Exhibit 3. A true and correct copy of my text communications with Santos is attached hereto as Exhibit 4.

**Background**

7. The process of acquiring, developing, and operating the Mines has been a lengthy, complex, and expensive endeavor for Sector, which required the commitment of highly skilled individuals and the investment of considerable financial and human resources over a long period of time. Over the course of many years, Sector has invested extensive capital to: (1) lease the Mines; (2) engage personnel and machinery to explore the Mines; (3) build the infrastructure required to engage in mining and process excavated ore; and (4) obtain and maintain the permitting from the relevant government authorities in Canada and Colombia.

8. For example, Sector, through a wholly owned subsidiary, began developing the Canadian Mines in 1994. From 1999 to 2009, Sector conducted an extensive historical review of the Canadian Mines and began acquiring additional leases of adjacent property in 2009. Between 2010 and 2018, Sector conducted a drilling program, which confirmed the presence of gold at the Canadian Mines. Sector then began the process of excavation, tunnelling, and installing water drainage to facilitate safe access to actually mine the ore.

9. Sector began developing the Colombian Mines in 1998. In 1998, Sector obtained several mining concessions that allowed it to conduct mining operations. Over the years, Sector built mining facilities, a processing plant, an electrical distribution grid, offices, maintenance shops, a warehouse, and laboratory facilities in Colombia.

10. In addition to employing workers at the Mines in Canada and Colombia, Sector employs several key executives.

11. For example, Sector employs Luz Esmeralda Lopez, who is both an industrial engineer and an MBA, as its Project Manager for international mining operations. Sector relies on Ms. Lopez, who has expertise in managing business relationships, cash flow, accounting, and tax expertise, to operate its Mines.

12. Sector also employs David Murry Stachan, who is a geological engineer, as a technical consultant. Sector relies on Mr. Stachan, who has expertise in mining project development and design, optimization of mineral extraction, mining operations, and personnel management, to operate its Mines.

13. In Canada, Sector also employs Carl Laarkker as the Maintenance Manager of the Canadian Mines.

14. In addition, Sector engages a variety of consultants to navigate the permitting process, which requires analysis of geotechnical, engineering, reclamation, health and safety, and water issues, and even the study of how mining operations will impact surrounding wildlife. Sector also employs workers in the Mines and related operations. Between 2021 and 2023, Sector employed 19 to 23 workers in Canada and 21 to 28 workers in Colombia to operate the Mines and process any ore that is excavated.

15. Therefore, Sector must employ and maintain good working relationships with a wide variety of highly skilled professionals, both to obtain permitting and to maintain credibility and goodwill with the governments of Canada and Colombia. During 2021, 2022, and 2023, Sector has spent approximately $2,477,175 in Canada and $648,889 in Colombia to pay salary, wages, and fees to its employees and consultants.

16. In addition, Sector must pay rent on the leases associated with the Canadian Mines and the Colombian Mines, and pay for insurance on the Mines. On an annual basis,

Sector spends approximately $50,000 in lease, insurance, and permitting fees on the Canadian Mines and approximately $50,000 in lease, insurance, and permitting fees on the Colombian Mines.

17. Sector's aggregate annual costs for 2021, 2022, and 2023 were approximately $5,022,871 in Canada and USD $1,775,971 USD in Colombia.

18. In other words, over the course of more than twenty years, Sector has invested millions of dollars in the Mines.

19. However, if Sector does not have sufficient cash flow to actually engage in operations, Sector could lose its leases in both Canada and Colombia. Sector's leases require Sector to actually operate the Mines, and, if Sector is unable to operate the Mines, which provide employment to the local communities, the Canadian and Colombian mining authorities have the authority to terminate the leases.

20. Thus, it is imperative that Sector have funds to employ its workers, consultants, and executives to ensure that Mines are operated properly, safely, and productively because if Sector does not operate the Mines, it will not simply lose revenue, it will lose its leases and its entire operation will be terminated.

21. Obviously, a termination would not simply result in the loss of millions of dollars and years of investment, it would be a fatal blow to Sector's reputation and goodwill with the governments of Canada and Colombia, its management team, and its workers. Thus, having access to the capital necessary to fund its operations, either through access to its own collateral or outside financing, is critical to Sector's operations.

**The Agreement**

22. To ensure that it had the necessary financing for its operations, in March 2023, Sector entered into the Agreement with Ethos. Ex. 1 at 1. Pursuant to the Agreement, Ethos agreed to loan $50 million to Sector. Ex. 1 at ¶¶ 3.1, 9.14. The Amendment required Ethos to make this $50 million payment in five tranches of $10 million, which were due on July 20, 2023, August 31, 2023, October 16, 2023, November 29, 2023, and January 12, 2024. Ex. 2 at Ex. B.

23. In consideration for the loan, Sector agreed to provide two forms of collateral to Ethos, which were defined in the Amendment and modified by the Amendment. First, Sector agreed to provide a Standby Letter of Credit ("SBLC") to Ethos, and second, Sector provided cash collateral to Ethos in the amount of $3.25 million. Ex. 1 at ¶ 3.3, Ex. 2 at ¶¶ 3.3, 3.3.1, 3.3.2. Although the Amendment initially called for Sector to provide a gold deposit, the parties later agreed to drop this requirement. Ex. 3 at 36.

24. In other words, under the Agreement, Sector pledged more than $8 million of its collateral – which constitutes its working capital – to obtain $50 million in financing from Ethos.

25. In the event of a default, the Agreement terminates automatically, and Ethos is *obligated to return Sector's collateral*. Ex. 1 at ¶¶ 7.4, 7.6.

26. Finally, the Agreement states that any dispute must be arbitrated at the International Chamber of Commerce in New York and that parties must mediate for sixty days before any arbitration can commence. Ex. 1 at ¶ 9.13.

**Although Sector Has Performed, Ethos Has Breached The Agreement**

27. Sector has timely fulfilled its obligations by providing two forms of collateral to Ethos:

      a.      In accordance with Paragraphs 3.3 and 4.1 of the Agreement, on April 6, 2023, Sector's bank JPM delivered the SBLC, in the amount of $10 million to Ethos' bank, East West Bank. A true and correct copy of the SBLC is attached hereto as Exhibit 7. Ex. 7 at 1. Ex. 3 at 63. In accordance with Paragraph 3.3.1 of the Amendment, and, as a result of the delivery of the cash collateral, the SBLC was reduced to $5.05 million. Ex. 2 at ¶ 3.3.1; Ex. 7 at 5.

      b.      In accordance with Paragraph 3.3.1 of the Amendment, on June 6, 2023, Sector sent a wire transfer in the amount of $3.25 million to Ethos' bank account at EWB. Ex. 3 at 60-2.

      c.      Although the Amendment initially required Sector to deposit gold in an Ethos' account, Ethos later agreed that Sector would not be obligated to place any gold on deposit. Ex. 3 at 36.

28. Thus, since March 2023, Ethos has been in possession of over $8 million of Sector's collateral.

29. Ethos, in turn, was obligated to deliver the first payment of $10 million dollars on July 20, 2023, the second payment of $10 million on August 31, 2023, and the third payment on October 16, 2023. Ex. 2 at Ex. B.

30. Ethos has not made any of these payments. Ex. 3 at 1, 1(a).

31. More disturbingly, Ethos has sent multiple false written communications, which claimed that Ethos *had initiated wire transfers to deliver the payments*, which have all proven to be untruthful. For example:

      a.      On July 21, 2023, Ethos' CEO Santos claimed that Ethos would be "instructing the wire tomorrow," and on July 25, 2023, he claimed that he was

      "waiting the validation call." Ex. 3 at 51, 54. He further claimed that "after I instruct[,] the bank can take 5 up to 7 days to validate the wire and release." Ex. 3 at 51.

    b.    In response to being notified that Sector had not received the money, by email dated Friday July 28, 2023, Santos claimed that Ethos had a validation call scheduled with the bank on Monday July 31, 2023, and that the funds would be delivered. Ex. 3 at 49.

    c.    By email dated August 8, 2023, Santos told me that he "just did the verification call today," which implied that he had not only authorized, but confirmed, the delivery of the first $10 million tranche of funding. Ex. 3 at 44. He also guaranteed delivery by Friday, which was August 11, 2023. *Id.* at 43. By text dated August 8, 2023, Santos reiterated the representation that Ethos had initiated the wire transfer of the first $10 million tranche. Ex. 4 at 1.

    d.    By email dated August 10, 2023, Santos told me that he had called Ethos' bank and that: "[a]ll is done from our side," and that "the wir (sic) department shall release any moment." Ex. 3 at 40-1; *see also* Ex. 4 at 1-2.

    e.    On August 11, 2023, Ethos claimed that the wire was coming from "Flagstar/Signature," and stated he would send "the fed wire number and receipt." Ex. 3 at 40.

32.    However, Ethos did not deliver any funds by the end of August 2023.

33.    Thus, by September 1, 2023, Ethos had missed the July 20 and August 31 deadlines to deliver the first two tranches of $10 million each, totaling $20 million.

34. On September 4, 2023, I advised Ethos that its failure to make the two payments of $10 million when due threatened Sector's continuing ability to operate, and that Sector desperately needed funds to continue its operations. Ex. 3 at 31. Ethos offered to "reduce and eventually eliminate the SBLC" to remove the "imbalance in Sector's credit facility." *Id.* at 30.

35. On or about September 5, 2023, Ethos advised me that it would instruct its bank, EWB, to reduce the SBLC by $3 million "immediately." Ex. 3 at 29-30. By text dated September 8, 2023, Ethos' CEO, Santos, informed me that Ethos was initiating the wire transfer online that day. Ex. 4 at 6-7.

36. However, Ethos did not deliver the $10 million or reduce the SBLC.

37. On September 10, 2023, Ethos *admitted* that it *had not* wired the $10 million that was due on July 20, 2023, or the $10 million that was due on August 31, 2023, nor reduced the SBLC. Ex. 3 at 22. However, Ethos again promised to reduce the SBLC. *Id.*

38. On September 12, 2023, Santos sent a text message claiming that Ethos had wired the first $10 million tranche to Sector. Ex. 4 at 8.

39. Ethos did not, however, reduce the SBLC or send the first $10 million by wire transfer.

40. In September 2023, I advised Ethos that its failure to make the required $10 million payments and its retention of Sector's collateral had forced Sector to reduce personnel in Canada and had forced Sector was considering similar action in Colombia. Ex. 3 at 21-2.

41. On September 18, September 23, and September 26, 2023, Santos claimed that Ethos had taken the actions necessary to initiate a wire transfer of the first $10 million payment. Ex. 3 at 18-20. Further, on September 26, 2023, Santos represented that he had "just finished [a] call with EWB," in which he directed EWB to reduce the SBLC by $4 million, thus he was

9

"waiting to receive the SWIFT copy of the release." *Id.* at 18.  Santos further promised to release the remaining balance of the SBLC the following week, thereby cancelling it entirely. *Id.*

42. However, Ethos did not deliver any of the $20 million (Tranches 1 and 2) that it was obligated to deliver, and it did not reduce the SBLC.

43. On September 26, 2023, Sector delivered a notice of default to Ethos. Ex. 3 at 17.  A true and correct copy of the notice is attached hereto as **Exhibit 5**.

44. Sector's September 26, 2023 notice demanded that Ethos "immediately fund" its $20 million commitment "for Tranche #1 and Tranche #2." Ex. 5 at 1.  Sector also demanded that Ethos provide documentation that it had delivered Tranches 1 and 2 and had reduced the SBLC as promised. *Id.*  Finally, Sector informed Ethos that if it did not perform it would pursue "all available remedies." *Id.*

45. Ethos responded by letter dated September 29, 2023, and stated that Sector's "notice of default is well noted and received."  A true and correct copy of Ethos' response is attached hereto as Exhibit 6.  Ethos claimed that it had instructed EWB to reduce the SBLC by $4 million. *Id.* at 1-2.  Ethos also stated that "within 72 hours" it would deliver "a copy of the SWIFT for the release" of the SBLC and "hopefully the release of the wire." *Id.* at 2.

46. However, Ethos did not deliver the $20 million that was due under the Agreement and it did not reduce the SBLC.

47. On or about October 4, 2023, I contacted Jeffrey Yu at EWB, who advised he was Ethos' banker at EWB and that he had effectuated certain prior changes to the SBLC.  I asked Mr. Yu to confirm that Ethos had directed EWB to reduce the SBLC as Ethos claimed it had done.  Mr. Yu told me that there were internal discussions about this.  I contacted Mr. Yu again

on October 13, 2023, and he advised me that he had not received instructions and I needed to direct my communications to Ethos.

48.     For the past month, Ethos has continued to send messages which claim that Ethos has initiated the transfers of the first tranches of $10 million and that Ethos is taking steps to reduce the SBLC.  Ex. 3 at 1(b), 5, 7, 9, 11-2.

49.     However, Ethos' representations were all untruthful.

50.     Ethos has not delivered any of the $10 million tranches, which were due on July 20, 2023, August 31, 2023, and October 16, 2023. Ex. 2 at Ex. B.  Likewise, Ethos has not reduced or cancelled the SBLC.  Ex. 3 at 1(a).

51.     On October 30, 2023, Ethos' Santos sent an email which advised that Ethos had initiated a wire transfer from Credit Suisse and provided what he claimed was the reference number for the wire transfer.  Ex. 3 at 1(b).  Santos further claimed that Ethos was "waiting any minute" for a SWIFT confirmation releasing the SBLC.  *Id*.  Santos also claimed that Ethos had "released the wrong SBLC."  Santos attached an SBLC, which appears to be dated June 10, 2023, that is wholly unrelated to Sector's collateral.  Ex. 3 at 1(b).

52.     However, on October 30, 2023, and November 1, 2023, Sector's bank, JPM confirmed that it did not receive a wire transfer in any amount and that the SBLC was not reduced or cancelled.  Ex. 1 at 1.

53.     In sum, Ethos has breached every obligation it had under the Agreement.  Thus, the Agreement automatically terminated and Ethos is obligated to return Sector's collateral.  Ex. 1 at ¶¶ 7.4, 7.6.  Although Ethos acknowledged this obligation on September 29, 2023, for over a month it has refused to return Sector's collateral.  Ex. 6.

54. Therefore, by email dated October 31, 2023, I advised Ethos that the wire transfer had not been received and the SBLC had not been canceled, and I explained, once again, that Sector cannot continue to operate without working capital. Ex. 3 at 1(a). I demanded that Ethos return the $3.25 million in cash collateral that Sector deposited in Ethos' bank and cancel the SBLC. *Id.* I asked that Ethos provide proof of both the wire transfer delivery of the cash collateral of $3.25 million and a copy of its instructions cancelling the SBLC. *Id.*

55. Ethos has not responded to this email.

56. It is thus clear that Ethos will not return Sector's collateral, despite its admission that it is required to do so (Ex. 6), without being compelled to do so.

57. Sector intends to file an arbitration to seek damages for Ethos' breach of contract, but as detailed above, Sector will suffer irreparable harm if it must wait until the end of an arbitration, which I understand may take a year, to obtain its collateral.

58. Indeed, Ethos' breaches have caused Sector to cease operations in Canada. Ethos's breaches, particularly its refusal to release the SBLC and return the $3.25 million in cash collateral, also threaten Sector's ability to continue its operations in Colombia, because Sector needs to draw on its line of credit at JPM to fund these operations and the SBLC has impaired its line of credit.

59. Further, there is a substantial risk that Ethos will dissipate or hide Sector's collateral if it retains control over Sector's collateral during an arbitration proceeding. Indeed, in retrospect, it appears that Ethos has engaged in an elaborate fraud. Santos has repeatedly told me, *in writing*, that Ethos has initiated wire transfers to deliver the funds it was required to deliver under the Agreement and to return Sector's collateral. However, these representations have all been untruthful.

60.     More disturbingly, Santos has offered a variety of increasingly incredible excuses for Ethos' delays.  He frequently claimed to be traveling, and as missed deadlines piled up, his excuses became more elaborate.  At point, he told me that he was too busy to validate a wire transfer because he was busy brokering a resolution between Credit Suisse bondholders and UBS Ex. 3 at 35-7, and at another point, he told me that he had to attend an event at the request of the Prime Minister of Thailand.  *Id.* at 28-30.  Further, as recently as July 23, 2023, Santos appeared on television and claimed that Ethos was prepared to invest $1 billion in India.  A company that has the ability to invest $1 billion in India certainly should have the ability to return $3.25 million in cash and to cancel the $5.05 million SBLC.  Ethos' behavior thus demonstrates that there is a real risk that Ethos will abscond with Sector's collateral if Sector must await an arbitration award to get relief.

61.     In short, Sector will suffer irreparable harm without injunctive relief because: (1) Sector cannot continue to operate the Mines without access to its collateral, which is Sector's own working capital and it is impossible to quantify or remedy the harm that will be caused if Sector loses its twenty year investment in people, infrastructure, and goodwill necessary to run the Mines; and (2) Ethos, which has ignored contractual obligations it has acknowledged, is likely to hide, transfer, or hide Sector's collateral and just as likely to ignore an arbitration award as it is to ignore its admitted contractual obligation to return the collateral.

62.     Furthermore, without  injunctive relief, I fear an arbitration award will be a hollow victory for several reasons.  First, Sector cannot survive as a going concern without immediate access to its *own collateral*.  Second, based on Ethos' conduct over the past few months, I believe that Ethos, which is a non-resident corporation run by foreign nationals, will attempt to hide Sector's assets.  Third, given Ethos' brazen indifference to its admitted

contractual obligation to return Sector's capital, I do not believe that Ethos will comply with any arbitration award.

63.     Thus, on behalf of Sector, I respectfully request that the Court grant Sector's request for injunctive relief and issue an order that: (1) enjoins EWB and Ethos from making any draws on the SBLC; (2) orders Ethos and EWB to cancel the SBLC; and (3) enjoins EWB and Ethos from making any withdrawals from any Ethos' account at EWB until Ethos provides proof that it has returned Sector's $3.25 million in cash collateral.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 2, 2023.

_____
William Dell'Orfano

4886-3657-0509, v. 1