UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SECTOR RESOURCES LTD.,

Petitioner,

v.                                              No.:

ETHOS ASSET MANAGEMENT, LLC,
and EAST WEST BANCORP, INC. a/k/a
EAST WEST BANK

Respondents.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION IN AID OF ARBITRATION**

SKARZYNSKI, MARICK & BLACK LLP
Janene Marasciullo
John Treat
One Battery Park Plaza, 32nd Floor
New York, NY 10004
(212) 820-7700
jmarasciullo@skarzynski.com

Counsel for Sector Resources, Ltd.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT.................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 3

I.      The Parties and Background ......................................................................................... 3

II.     The Terms of the Agreement......................................................................................... 4

III.    Sector Has Fully Performed its Obligations Under the Agreement ................................ 5

IV.    Ethos Has Breached the Agreement and Acknowledged its Default .................................. 5

V.      Ethos' Conduct, Which Suggests An Intent to Hide or Deplete Sector's Collateral,
        Is Causing Irreparable Harm to Sector ................................................................................ 5

ARGUMENT ................................................................................................................................ 12

I.      The Court Should Grant Sector's Motion for Provisional Relief to Ensure that Any
        Arbitration Award is Not Rendered Ineffectual................................................................ 12

        1.      Sector is Likely to Succeed on the Merits................................................................ 14

        2.      Sector Will Suffer Irreparable Harm in the Absence of Injunctive Relief ..................... 15

        3.      The Balance of Hardships Clearly Tips in Sector's Favor .............................................. 17

        4.      The Public Interest and the Balancing of the Equities Weigh Heavily in Favor
                of Injunctive Relief......................................................................................................... 18

        5.      The Arbitration Award to Which Sector Is Clearly Entitled Will Be
                Rendered Ineffectual Without Injunctive Relief............................................................ 19

        6.      The Court Should Not Require Sector to Post a Bond.................................................... 20

CONCLUSION.............................................................................................................................. 21

# TABLE OF AUTHORITIES

Page

Other Authorities

*159 MP Corp. v. Redbridge Bedford LLC*,
    33 N.Y.3d 353 (2019) ................................................................................................. 18, 19

*Avon Co. v. Fareva Morton Grove, Inc.*,
    2022 WL 2208156 (S.D.N.Y. June 21, 2022) ............................................................. 16, 18, 19

*Bao v. Wang*,
    2022 WL 704023 (S.D.N.Y. Mar. 9, 2022) ....................................................................... 12, 17

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    910 F.2d 1049 (2d Cir. 1990) .......................................................................................... 14, 19

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
    147 F.R.D. 66 (S.D.N.Y. 1993) ............................................................................................. 17

*Cacchillo v. Insmed, Inc.*,
    638 F.3d 401 (2d Cir. 2011) ................................................................................................. 13

*Clarksen Co., Ltd. v. Shaheen*,
    544 F.2d 624 (2d Cir. 1976) ................................................................................................. 20

*Dr.'s Assocs., Inc. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997) ................................................................................................. 20

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Tr. Co.*,
    375 F.3d 168 (2d. Cir. 2004) ................................................................................................. 14

*FTI Consulting, Inc. v. PricewaterhouseCoopers LLP*,
    8 A.D.3d 145 (1st Dep't 2004) .............................................................................................. 15

*In re Cullman Ventures, Inc.*,
    252 A.D.2d 222 (1st Dep't 1998) .......................................................................................... 12

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
    43 F.4th 263 (2d Cir. 2022) ............................................................................................ 12, 14

*Jet Experts*,
    602 F. Supp. 3d ............................................................................................................. 18, 19

*Jet Experts, LLC v. Asian Pac. Aviat. Ltd.*,
   602 F. Supp. 3d 363 (S.D.N.Y. 2022) ................................................................. 2

*Metro. Taxicab Bd. of Trade v. City of N.Y.*,
   615 F.3d 152 (2d Cir. 2010) ........................................................................... 13

*Register.com, Inc. v. Verio*,
   356 F.3d 393 (2d Cir. 2004) ................................................................. 2, 15, 16

*Reuters, Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990) ........................................................................... 16

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010) ........................................... 17, 18, 19, 20

*Second on Second Café, Inc. v. Hing Sing Trading, Inc.*,
   66 A.D.3d 255 (1st Dep't 2009) ..................................................................... 16

*SG Cowen Sec. Corp. v. Messih*,
   224 F.3d 79 (2d Cir. 2000) ............................................................................. 12

*Swiss Bank Corp. v. Eatessami*,
   26 A.D.2d 287 (1st Dep't. 1966) .................................................................... 14

*VisionChinaMedia Inc. v. S'holder Rep. Servs., LLC*,
   109 A.D.3d 49 (1st Dep't 2013) ..................................................................... 12

*Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*,
   177 F. Supp. 3d 810 (S.D.N.Y. 2016) .................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................... 13

9

7502(c) of the New York Civil Practice Law and Rules ............................... 1, 2, 12, 19

Fed. R. Civ. P. 64(a) ....................................................................................... 12

Rules 64 and 65 of the Federal Rules of Civil Procedure ............................... 1

## PRELIMINARY STATEMENT

Pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure and Sections 6302 *et seq.*, and 7502(c) of the New York Civil Practice Law and Rules ("CPLR"), Petitioner, Sector Resources Ltd. ("Sector") respectfully requests the Court to issue a temporary restraining order and a preliminary injunction in aid of arbitration against Respondents Ethos Asset Management, LLC ("Ethos"), and East West Bank ("EWB").  Specifically, Sector seeks an order enjoining Ethos and EWB from impairing, using, withdrawing, or otherwise dissipating *Sector's collateral*, which Sector provided in connection with a loan agreement that Ethos has *admittedly breached*.  In support of this request, Sector relies on the Declaration of its Chief Executive Officer, William Dell'Orfano ("WD Dec."), and the exhibits thereto and the Declaration of Janene Marasciullo ("JM Dec") and exhibit thereto.

As detailed below, Ethos has acknowledged its clear and unambiguous obligation to return Sector's collateral, but it has not done so.  Indeed, Ethos has made the incredible claim that EWB's "mistakes" have prevented it from doing so.  Thus, the record establishes that Sector is very likely to prevail on the merits of its forthcoming arbitration claim against Ethos.  Further, the record establishes that Sector will suffer irreparable harm without injunctive relief and that the public interest warrants injunctive relief.  The evidence also demonstrates that "the arbitration award to which [Sector] may be entitled may be rendered ineffectual without such provisional relief."   CPRL § 7502(c).

This case arises out of Ethos' egregious breach of a March 2023 Agreement ("the Agreement"), pursuant to which Ethos agreed to loan $50 million to Sector.  Sector, in turn, agreed to provide more than $8 million in collateral, in the form of a Standby Letter of Credit ("SBLC"), worth approximately $5.05 million and a cash collateral of $3.25 million.  Ex. 1 at ¶¶ 3.1, 3.3; Ex. 2 at ¶¶ 3.3; 3.3.1, 3.3.2; Ex. 2 at Ex. B.  Although Sector delivered the required

collateral several months ago, Ethos did not deliver the first three $10 million tranches of the loan, which were due on July 20, 2023, August 31, 2023, and October 16, 2023, respectively. Ex. 2 at Ex. B.  Thus, Ethos is contractually obligated to return Sector's collateral.  Ex. 1 at ¶¶ 7.4, 7.6.  However, Ethos has not done so.

Ethos' continued wrongful possession of Sector's collateral is not only causing irreparable harm to Sector, it threatens to render any arbitration award meaningless.  As explained below, Ethos' continued – and wrongful – retention of Sector's collateral is threatening Sector's existence and its goodwill with its employees, its consultants, its bank, and government agencies in Canada and Colombia.  Further, for the past few months, Ethos has engaged in a course of conduct which demonstrates a willful effort to misappropriate Sector's collateral, and suggests that Ethos will either dissipate or hide Sector's collateral.  This is the *sin qua non* of irreparable harm.  *Register.com, Inc. v. Verio*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" constitutes irreparable harm); *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc*., 177 F. Supp. 3d 810, 814 (S.D.N.Y. 2016) (injunctive relief is appropriate when assets are "likely to disappear").  Further, an injunction would clearly serve the public interest "in the enforcement of contractual obligations and prevention of fraud." *Jet Experts, LLC v. Asian Pac. Aviat. Ltd.,* 602 F. Supp. 3d 363, 645 (S.D.N.Y. 2022).  If Sector is required to wait until after an arbitration to recover *its own collateral,* it will suffer irreparable harm because its business and goodwill will be destroyed and Ethos is likely to dissipate or hide Sector's collateral.  Thus, injunctive relief is necessary because without such relief any arbitration award will "be rendered ineffectual without . . . provisional relief."  CPLR § 7502(c).

Accordingly, the Court should issue a temporary restraining order that enjoins EWB and Ethos from making any draws on the SBLC and enjoins EWB and Ethos from making any

withdrawals from any Ethos' account at EWB  until Ethos provides proof that it has returned

Sector's $3.25 million in cash collateral and an injunction directing them to cancel the SBLC.

## STATEMENT OF FACTS

### I.      The Parties and Background

Petitioner, Sector is incorporated in the Cayman Islands and is headquartered in

Manchester, New Hampshire.  Ex. 1 at 1.  Sector's Chief Executive Officer is William

Dell'Orfano.  Ex. 1 at 1; Ex. 3 at 2; WD Dec. at ¶ 2.    Ethos is incorporated in California and has

its principal place of business in California.  Ex. 1 at 1.  Ethos' Chief Executive Officer is Carlos

Santos.  Ex. 1 at 1; Ex. 3 at 7. EWB is incorporated and headquartered in California and is Ethos'

bank.  EWB holds over $8 million of Sector's collateral on behalf of Ethos, including the SBLC

worth over $5.05 million and $3.25 million in cash.

Sector was founded in 1994 and, since that time, it has been in the business of acquiring,

developing, and operating gold and silver mines in British Columbia, Canada ("the Canadian

Mines"), and Tolima, Colombia ("the Colombian Mines") (collectively as "the Mines").  The

process of acquiring, developing, and the Mines has been a lengthy, complex, and expensive

endeavor for Sector, which required the commitment of highly skilled individuals and the

investment of considerable financial and human resources over many years.  Indeed, Sector has

invested extensive capital to: (1) lease the Mines; (2) engage personnel and machinery to explore

the Mines; (3) build the infrastructure required to engage in mining and process excavated ore;

and (4) obtain and maintain the permitting from the relevant government authorities in Canada

and Colombia.   Over the past three years alone, Sector has invested millions of dollars to

operate the Canadian Mines and the Colombian Mines.  WD Dec. at ¶ 17.

Sector must operate the Mines as a condition of its leases.  WD Dec. at ¶¶ 19-21.  If

Sector lacks the funds to operate the Canadian Mines and the Colombian Mines, the relevant

government authorities have the right to terminate the leases.  WD Dec. at ¶ 19.  In other words, if Sector cannot operate the Mines, Sector does not simply risk losing revenue.  Rather, Sector risks losing its entire business, the entire value of its investment, and the goodwill of its employees, business partners, banks, and the government authorities that oversee its businesses. WD Dec. at ¶¶ 20-1.  Thus, operating capital is critical to Sector's survival.

Therefore, in March 2023, Sector executed the Agreement, which provided financing to support Sector's efforts to operate the Mines. Ex. 1 at ¶ 2.1; WD Dec. ¶ 22.  In June 2023, Ethos and Sector executed an Amendment to the Agreement (the "Amendment").  Ex. 2.

## II.    The Terms of the Agreement

Pursuant to the Agreement, Ethos agreed to loan $50 million to Sector to operate the Mines.  Ex. 1 at ¶ 3.1.  The Amendment required Ethos to deliver the $50 million in tranches of $10 million, which were due on July 20, 2023, August 31, 2023, October 16, 2023, November 29, 2023, and January 12, 2024.  Ex. 2, Ex. B.   In consideration for the loan, Sector agreed to provide two forms of collateral to Ethos.  First, Sector directed its bank, JP Morgan Chase ("JPM"), to deliver the SBLC to Ethos' bank, EWB.  Ex. 1 at ¶ 4.1; Ex. 2 at ¶ 3.3.1; Ex. 7 at 5-6. Second, Sector agreed to deposit $3.25 million in cash and gold in bank accounts identified by Ethos.  Ex. 2 at ¶ 3.2.2.  Ethos and Sector later agreed to eliminate the requirement of a gold deposit.  Ex. 3 at 36.

Under the Agreement, Ethos is in default if it fails to deliver any of the $10 million payments on the due dates and fails to cure within ten days.  Ex. 1 at ¶ 7.4.   In the event of a default, the Agreement automatically terminates and Ethos must return all collateral.  Ex. 1 at ¶ 7.6.  The Agreement is controlled by New York law and requires arbitration of any dispute at the International Chamber of Commerce in New York.  Ex. 1 at ¶¶ 9.13, 9.14.

### III.   Sector Has Fully Performed its Obligations Under the Agreement

On April 6, 2023, Sector's bank JPM delivered the SBLC to Ethos' bank EWB via SWIFT.  Ex. 3 at 63; Ex. 7 at 1-4.   On June 6, 2023, Sector's bank, JPM, wired $3.25 million to Ethos into Ethos' EWB account.  Ex. 3 at 61-2.  After Sector delivered the $3.25 million, Ethos directed EWB to reduce the face value of the SBLC to $5.05 million and EWB did so.  Ex. 7 at 5-6.  Thus, Sector has performed every obligation it owes to Ethos.

### IV.   Ethos Has Breached the Agreement and Acknowledged its Default

In contrast, Ethos has breached every obligation it had under the Agreement.  WD Dec. ¶ 53.  Indeed, Ethos has not delivered *any* of the $10 million payments, which were due on July 20, 2023, August 31, 2023, and October 16, 2023.  Ex. 3 at 11, (a); WD Dec. ¶ 50.  Ethos has admitted it is in default.  Ex. 6.  Thus, Ethos was obligated to return Sector's collateral.  Ex. 1 ¶¶ 7.4, 7.6.  Ethos has refused to do so.  Ex. 3 at (1)(a); WD Dec. ¶ 54-6, JM Dec. ¶ 3 & Ex. 1.

### V.   Ethos' Conduct, Which Suggests An Intent to Hide or Deplete Sector's Collateral, Is Causing Irreparable Harm to Sector

Sector's business and goodwill will be irreparably harmed if Ethos is allowed to retain control over Sector's collateral while Sector pursue arbitration.  Moreover, Ethos has engaged in conduct which strongly suggests that Ethos will dissipate Sector's collateral if it is allowed to retain it while the parties arbitrate.   Indeed, since receiving Sector's collateral, Ethos has made a series of promises to deliver the money it owes under the Agreement, only to offer increasingly elaborate – unbelievable – excuses for its performance failures.

For example, by email dated July 5, 2023, Ethos' CEO Santos stated that Ethos would deliver the first $10 million payment on or about July 14, 2023, before the contractual due date.  Ex. 3 at 58-9.  However, Ethos did not do so.  Ex. 3 at 56-7.  Further, Ethos did not deliver the $10 million on the contractual due date of July 20, 2023.  Ex. 3 at 54.  Undaunted, on July 21,

2023, Santos claimed that he would be "instructing the wire tomorrow." Ex. 3 at 54. When Sector advised Ethos that the first tranche had not arrived by July 25, 2023, Santas claimed he was "waiting the validation call," and represented that the wire would be delivered in five to seven days. Ex. 3 at 51.

When the first tranche of $10 million had not arrived, by email dated July 28, 2023, Sector advised that it was incurring costs on the SBLC and asked Ethos for a date certain for the delivery of the first $10 million. Ex. 3 at 50. In response, Ethos' CEO Santos claimed that Ethos had a validation call scheduled with the bank on July 31, 2023 and that the funds would be delivered. Ex. 3 at 49. Santos claimed that the wire transfer was delayed because he had been unavailable to verify the wire transfer. Ex. 3 at 49.

On August 3, 2023, two weeks after the July 20, 2023 due date, Sector's CEO, Dell'Orfano, notified Ethos that Sector had not received the wire transfer. Ex. 3 at 47. Dell'Orfano asked Ethos to explain the reasons for the delay and explained that the prompt receipt of the funding required by the Agreement was critical because Sector had provided significant collateral for the funds, and by doing so, had "removed a sizable amount of working capital that was needed to maintain normal operations." Ex. 3 at 47; *see also* WD Dec. at ¶ 24. The following day, Santos assured Dell'Orfano that Ethos would provide the funds and that "no problem exist[s] with your funding." Ex. 3 at 46. However, Ethos did not deliver the money.

By email dated August 8, 2023, Santos claimed that he "did the verification call today" and directed the delivery of the first $10 million tranche of funding. Ex. 3 at 44. He also promised that the funds would be delivered by Friday August 11, 2023. Ex. 3 at 43. On August 10, 2023, Santos claimed that "[a]ll is done from our side." Ex. 3 at 42; Ex. 4 at 2. In other words, Santos repeatedly represented, in writing, that the money was "in the mail."

However, Sector did not receive the money and therefore, by email dated August 11, 2023, Sector requested a confirmation to trace the transfer.  Ex. 3 at 41.  Santos promptly responded that the wire was coming from "Flagstar/Signature Bank, and he claimed that he would send "the fed wire number and receipt as soon as I have it."  Ex. 3 at 40; Ex. 4 at 3. Despite Ethos' detailed description of the purported wire transfer, the funds did not arrive. Ex. 1.

By email dated August 12, 2023, Dell'Orfano reminded that Ethos that Sector had provided $3.25 million of its working capital as collateral for the loan and the first payment was four weeks late, so Ethos' breach was "now impacting [Sector's] operations."  Ex. 3 at 40. Undaunted, by email dated August 13, 2023, Santos claimed that Ethos' extraordinary four-week delay in delivering the first $10 million payment "was a fully normal process," and claimed that Ethos had initiated a wire transfer "and now it is up to the bank to release the funds."  Ex. 3 at 40.  In other words, Ethos blamed its bank for its performance failure.

On August 16, 2023, Sector advised Ethos that it still had not received the $10 million payment, which had been due on July 20, 2023.  Ex. 3 at 37-8.  Sector again noted that it had provided collateral of $10 million for the loan, "and that the current situation was not sustainable for Sector, its banks, or the projects as all [of its] working capital has been committed as collateral."  Ex. 3 at 38.  By mid-August, Sector had been "forced to scale back personnel and purchasing commitment," and Ethos' "failure to fund [was] impacting Sector's reputation with its bank, its social programs in Canada, Colombia, and its personnel."  Ex. 3 at 38.  Dell'Orfano advised Ethos that Sector if Ethos did not deliver the first $10 million payment, Sector would declare a default and demand the return of its collateral.  Ex. 3 at 38.

Ethos' CEO responded by email dated August 17, 2023, with a new and dramatic excuse to distract from Ethos' delay.  Ex. 3 at 35-7.  Santos claimed that the wire transfer had been

delayed because that he was "in Europe solving a problem that is all over the news," which was allegedly a fight between "Credit Suisse bondholders and shareholders" and "the Central Bank of Switzerland and the Government" over the "conversion of these assets to UBS assets."  Ex. 3 at 36.  Santos recognized that Ethos was in default, and that Ethos was *obligated to return Sector's collateral*.  Ex. 3 at 36.  He asked for another chance for Ethos to perform and claimed that Ethos "may be able to deliver the wire at any moment."  Ex. 3 at 36.

Despite Ethos' assurances, by August 21, 2023, Ethos had still not delivered the first tranche of $10 million.  Ex. 3 at 33-4.  However, by email dated August 22, 2023, Ethos claimed that he had spoken to Flagstar bank and that Ethos would deliver the $10 million.  Ex. 3 at 32.  Once again, Ethos did not deliver the money.  Indeed, by August 31, 2023, the due date for the second payment of $10 million, Ethos had not delivered any money to Sector.  Ex. 3 at 1, 1(a), 31, WD Dec. ¶ 50.

On September 4, 2023, Sector's CEO Dell'Orfano advised Ethos that its bank, JPM, had asked about the status of funding.  Ex. 3 at 30-1.  Santos responded by email on September 5, 2023. Ex. 3 at 28.  Santos claim that the delivery of funds had been delayed because "he was obliged to extend" his time in Thailand at the request of the Prime Minister to announce an investment.  *Id.*  However, Santos promised that "now and today" he would "instruct Signature Bank to wire the funds to you."  Ex. 3 at 28.  He also stated that he would instruct EWB to release the SBLC by SWIFT.  Ex. 3 at 29.  The SWIFT system is a "vast messaging network" used by financial institutions for quick, accurate and secure international money transfers. [1]

---

[1] "SWIFT" is an acronym for the "Society for Worldwide Interbank Financial Telecommunications," which "a vast messaging network" used by financial institutions for quick, accurate and secure international money transfers. https://www.investopedia.com/articles/personal-finance/050515/how-swift-system-works.asp

By text dated September 8, 2023, Ethos' Santos informed Sector that Ethos was initiating the wire transfer online that day.  Ex. 4 at 7-8.  However, on September 10, 2023, Santos, who again claimed to be traveling, admitted that Ethos had not initiated the wire transfer, but offered to release "part of the SBLC, like 3M USD," to free up working capital for Sector.  Ex. 3 at 23.  On September 12, 2023, Santos claimed that Ethos had wired first $10 million tranche to Sector on September 11, 2023.  Ex. 4 at 7.

Once again, however, Ethos did not deliver the funds.  Ex. 3 at 1; 21-2; WD Dec. at ¶¶ 3, 52.  On September 13, 2023, Sector advised Ethos that its failure to deliver the first two $10 million payments when due had "caused Sector to reduce personnel in Canada to a maintenance level" and that a similar reduction was "underway in Colombia."  Ex. 3 at 21.  Sector also reported that it was experiencing "contract liquidations" and "remobilization cost[s]" as a result of Ethos' breaches.   Ex. 3 at 21.

By email dated September 18, 2023, Ethos promised to release $3 million from the SBLC once Sector's bank, JPM, provided the appropriate language.  Ex. 3 at 20.   Ethos also promised to deliver "the first tranche" of $10 million by September 20, 2023.  Ex. 3 at 20.  On September 23, 2023, Santos claimed Ethos had wired the money on September 20 and was "waiting to have the fed reference number."  Ex. 3 at 18-9.  Santos also stated that Ethos' bank, EWB had "guarantee[d]" him that it would reduce the amount of the SLBC by $4 million.  Ex. 3 at 19.  By email dated September 26, 2023, Ethos claimed that it had "just finished [a] call with EWB," had directed EWB to reduce the SBLC by $4 million, and was "waiting to receive the SWIFT copy of the release."  Ex. 3 at 18.

Due to Ethos' persistent failure to perform its obligations and its failure to cure, by letter dated September 26, 2023, Sector's outside counsel notified Ethos that it was in default.  Ex. 5;

Ex. 3 at 17.  Sector's September 26, 2023 letter demanded that Ethos "immediately fund" its $20 million commitment "for Tranche #1 and Tranche #2."  Ex. 5 at 1.  Sector also demanded that Ethos provide documentation that it had delivered Tranches 1 and 2 and had reduced the SBLC as promised.  Ex. 5 at 1.  Finally, Sector informed Ethos that if it did not perform, it would avail itself of "all available remedies."  Ex. 5 at 1.

By letter dated September 29, 2023, Ethos' Chief Legal Officer stated that Sector's "notice of default is well noted and received."  Ex. 6 at 1; Ex. 3 at 16.  Ethos claimed it was having difficulty initiating the wire transfers and that it had instructed EWB to reduce the SBLC by $4 million.  Ex. 6 at 1-2.  Ethos also stated that "within 72 hours" it would deliver "a copy of the SWIFT for the release" of the SBLC and "hopefully the release of the wire."  Ex. 6 at 2. However, Ethos did not deliver the $10 million or reduce the SBLC.  Ex. 3 at 9-11; WD Dec. at ¶ 46.  Further, according to EWB, Ethos' representations were not accurate.

On October 4, 2023, and October 14, 2023, Sector's CEO, Dell'Orfano, spoke with Ethos' agent at EWB, Jeffrey Yu, to determine confirm that Ethos had directed EWB to reduce the SBLC.  WD Dec. at ¶ 47.  Yu eventually advised Dell'Orfano that Ethos had not instructed EWB to reduce the SBLC and that Sector should direct its communications to Ethos.  WD Dec. at ¶ 47.   Therefore, by email dated October 16, 2023, Sector's counsel notified Ethos that Sector had not received the first or second tranche of $10 million or confirmation that the SBLC had been reduced.  Ex. 3 at 7-8.  Sector requested written confirmation by October 17, 2023, that EWB had reduced the SBLC and that Credit Suisse and/or UBS had initiated the wire transfer of the first tranche.  Ex. 3 at 8.  Ethos' CEO Santos responded and claimed that Credit Suisse had initiated the wire transfer on October 16, 2023, but that his was "flying" and he would send confirmations when landed.  Ex. 3 at 7.

However, Ethos did not deliver the first tranche of $10 million nor reduce the SBLC as promised.  Ex. 3 at 1(a); WD Dec. at ¶ 50.   By email dated October 20, 2023, Santos claimed that Ethos would send "confirmation and communication of [the] SBLC release" and "receipt or references of [the] SWIFT wire number."  Ex. 3 at 5.  He also claimed that the money was coming from Switzerland, not the United States.  Ex. 3 at 5.  Four days later, on October 24, 2023, Santos claimed he was going to visit Credit Suisse to follow up on the wire transfer and that EWB was in the process of releasing the SBLC. Ex. 3 at 4.  Santos also claimed that Ethos had been delayed in releasing the SBLC because EWB had released the wrong SBLC.

On October 27, 2023, Sector asked for a progress report.  Ex. 3 at 2.   In response, Ethos provided what it claimed was a wire transfer reference number from Credit Suisse. Ex. 3 at 1(b).  Ethos also claimed that EWB had released the wrong SBLC.  *Id.*   However, Sector's bank has "no record" of these purported transactions.  Ex. 3 at 1-1(a); WD Dec. at ¶ 52.  Therefore, Sector declared that Agreement terminated and requested the return of its collateral immediately."  *Id.*  On November 3, 2023, Ethos refused to return the collateral.  JM Dec. ¶ 3 & Ex. 1

In sum, Ethos' correspondence reflects a troubling pattern of repeated claims that its efforts to perform have been foiled by incompetent banks.  However, whether Ethos' egregious breaches reflect gross mismanagement or something more nefarious, they have caused severe and irreparable harm to Sector and threaten its continued viability.  Ex. 3 at 21, 38; WD Dec. ¶¶ 5-6, 19-21, 58, 61.

Indeed, as explained in the Dell'Orfano Declaration, Sector has spent nearly twenty years and millions of dollars to develop the Mines.  WD Dec. at ¶¶ 7-21. Sector needs to recover its collateral to have funds to pay its employees, its leases, and operate its businesses.  WD Dec. at ¶¶ 5, 19-21, 58.  Significantly, Sector's leases in Canada and Colombia require Sector to actually

operate the Mines, and if cannot operate the Mines, it could lose its leases on the Mines.  WD

Dec. at ¶ 19.  Thus, if Sector does not recover its collateral, it will not simply lose revenue, it

risks losing its entire business operations and its goodwill with its employees, consultants, bank,

and the mining authorities in Canada and Colombia.  WD Dec. at ¶¶ 19-21.

**ARGUMENT**

I.     <u>**The Court Should Grant Sector's Motion for Provisional Relief to Ensure
       that Any Arbitration Award is Not Rendered Ineffectual**</u>

Pursuant to Rule 64(a), "[a]t the commencement of and throughout an action, every

remedy is available that, under the law of the state where the court is located, provides for

seizing a person or property to secure satisfaction of the potential judgment."  Fed. R. Civ. P.

64(a); *see also Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 269 (2d Cir. 2022); *Bao v.

Wang*, 2022 WL 704023, at *2 (S.D.N.Y. Mar. 9, 2022).  In New York, CPLR 7502(c)

authorizes a court to issue "a preliminary injunction in connection with an arbitrable

controversy," upon the ground that "the award to which the applicant may be entitled may be

rendered ineffectual without such provisional relief."  CPLR § 7502(c); *see also Iraq Telecom*,

43 F.4th at 269-70; *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 83 (2d Cir. 2000).  The

decision to grant provisional relief "rests within the discretion of the court."  *Iraq Telecom*, 43

F.4th at 270 (quoting *VisionChinaMedia Inc. v. S'holder Rep. Servs., LLC*, 109 A.D.3d 49, 59

(1st Dep't 2013)).

To obtain an injunction in aid of arbitration, the movant must demonstrate that an

injunction is necessary to prevent an arbitration award from being rendered ineffectual, as well

as the traditional standards for injunctive relief.  *SG Cowen*, 224 F.3d at 83 (citing *In re Cullman

Ventures, Inc.*, 252 A.D.2d 222, 231 (1st Dep't 1998)).  The standards for injunctive relief are

well-settled.

Sector must demonstrate: (1) "irreparable harm absent injunctive relief"; (2) "either a likelihood of success on the merits, or a serious question going to the merits . . . with the balance of hardships tipping decidedly in [petitioner's] favor"; and (3) that the public interest "weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  In cases where a party seeks a preliminary injunction that "alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo," the moving party must make "a clear showing" that it "is entitled to the relief requested," or that "extreme and very serious damage will result from a denial of preliminary relief." *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 812 (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011)).

Here, Sector seeks a traditional injunction to prevent Ethos from altering the status quo pending arbitration.  However, regardless of whether the Court views Sector's request under the standard for traditional preliminary injunctions or status-altering preliminary injunctions, the Court should grant injunctive relief.

 Indeed, as explained below, Sector is very likely to succeed on the merits.  Further, Sector has demonstrated that it will suffer irreparable harm in the absence of injunctive relief because: (1) Ethos' continued wrongful retention of Sector's collateral is destroying Sector's goodwill with its employees, its bank, and its government partners in Canada and Colombia, and (2) Ethos' past conduct provides compelling evidence that Ethos is likely to dissipate Sector's collateral.  Moreover, an injunction will serve the public interest which strongly supports the enforcement of contracts and the prevention of fraud.  Finally, the arbitration award to which Sector is clearly entitled will be rendered ineffectual without injunctive relief because Ethos

13

needs its collateral to continue its operations and Ethos is likely to dissipate Sector's collateral before an arbitration is completed.  Thus, an injunction is necessary to ensure an arbitration award is not "a hollow formality."  *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990).

### 1.    Sector is Likely to Succeed on the Merits

On a petition for provisional relief in aid of arbitration, the "probability of success is 'measured in terms of the likelihood of success in arbitration.'"  *Iraq Telecom*, 43 F.4th at 269-70.  When determining whether the movant is likely to succeed on the merits, the movant "must be given the benefit of all legitimate inferences and deductions that can be made from the facts stated." *Iraq Telecom*, 43 F.4th at at 270, *citing Swiss Bank Corp. v. Eatessami*, 26 A.D.2d 287, 290 (1st Dep't. 1966).  Here, Sector is extremely likely to succeed on the merits of its claim that Ethos breached the Agreement.

To prevail on a breach of contract claim under New York law, which governs the Agreement,[2] Sector must demonstrate: "(1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract by defendant; and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guaranty Tr. Co.*, 375 F.3d 168, 177 (2d. Cir. 2004).  The record demonstrates that Sector is likely to prevail on its breach of contract claim.

First, there is indisputably a contract between Sector and Ethos.  Exs. 1, 2.  It is equally clear that Sector performed its obligations under the Agreement by delivering the required collateral, in the form of the SBCL worth $5.05 million and $3.25 million in cash.  Ex. 3 at 60-3; Ex. 7.  Likewise, it is indisputable that Ethos breached its obligations to deliver the first three payments of $10 million, which were due on July 20, 2023, August 31, 2023, and October 16,

---

[2] Ex. 1 at ¶ 9.14.

2023.  Ex. 2 at Ex. B; Ex. 1(a).  Indeed, Ethos has admitted as much.  Ex. 6; Ex. 3 at 1(b).  Thus, Ethos was clearly obligated to return Sector's collateral.  Ex. 1 at ¶¶ 7.4, 7.6.  However, Ethos has not returned Sector's collateral.  Ex. 3 at 1-1(b); WD Dec. at ¶ 50.

Finally, it is clear that Sector has been damaged by Ethos' breach.  Indeed, Ethos' failure to deliver the three $30 million payments and its wrongful retention of Sector's collateral has caused Sector to dismiss employees and cease operations in Canada, and Sector cannot continue to operate.  WD Dec. at ¶¶ 19-20, 58; Ex. 3 at 21, 22, 40.  This has clearly caused Sector to lose revenue and it has damaged Sector's relationships and goodwill with its employees and its bank.  WD Dec. at ¶¶10-15, 20; Ex. 3 at 21, 22, 40.  If Sector cannot operate the Mines, it will lead to the termination of the mining leases, and Sector will lose the twenty years of work and millions of dollars in investments.  WD Dec. at ¶¶ 7-22.  It is thus clear that Ethos' breach has damaged Sector, the only open question is the *amount* of damages caused by Ethos' breach.

Thus, Sector is very likely to prevail on its breach of contract claim.

## 2. Sector Will Suffer Irreparable Harm in the Absence of Injunctive Relief

As a general rule, irreparable harm exists where "there is a threatened imminent loss that will be very difficult to quantify at trial."  *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 812 (citing cases).  Here, Sector has demonstrated that it has suffered and will continue to suffer irreparable harm in the absence of injunctive relief.

It is well-settled that the "loss of reputation, good will, and business opportunities" constitutes irreparable harm.  *Register.com, Inc.*, 356 F.3d at 404.   Indeed, the loss of goodwill is not "readily quantifiable."  *FTI Consulting, Inc. v. PricewaterhouseCoopers LLP*, 8 A.D.3d 145, 146 (1st Dep't 2004).  A contractual breach that threatens a movant's business, and the "forfeiture of its [ ] investment" and "the loss of goodwill built up" over several years constitutes

15

irreparable harm. *Second on Second Café, Inc. v. Hing Sing Trading, Inc.*, 66 A.D.3d 255, 272-3 (1st Dep't 2009) (citing cases). Thus, when a movant demonstrates that a breach has caused an "immediate loss, and failure of [its] business and consequent loss of [its] good will, and termination of employment for [its] workers," it has "establish[ed] irreparable harm warranting injunctive relief." *Avon Co. v. Fareva Morton Grove, Inc.*, 2022 WL 2208156, at *8 (S.D.N.Y. June 21, 2022) (citing *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 906 (2d Cir. 1990)).

Here, Sector has been forced to shut down operations in Canada and curtail operations in Colombia, resulting in diminished relationships with its employees, consultants, and the relevant mining authorities. WD Dec. at ¶ 58; Ex. 3 at 21, 40. In addition, Ethos' continued wrongful possession of Sector's collateral has impaired Sector's relationship with its bank, JPM. WD Dec. at ¶ 58; Ex. 3 at 22. Further, EWB has refused to cancel the SBLC. WD Dec. at ¶ 47. Thus, Sector cannot rectify this situation on its own. If Sector is not able to recoup its collateral, and cannot operate, it will lose its leases. WD Dec. at ¶¶ 19-21. Thus, if Sector cannot regain control of *its own collateral,* it will lose twenty years of work and millions of dollars in investments. WD Dec. at ¶¶ 7-22. Sector has therefore demonstrated that it will suffer irreparable harm in the form of the loss of goodwill, business relationships, and employees, which warrants injunctive relief. *See Register.com*, 356 F.3d at 404; *Avon Co.*, 2022 WL 2208156, at *8.

Second, "[c]ourts in this circuit have granted preliminary injunctions in cases seeking monetary relief if the 'non-movant's assets may be dissipated before final relief can be granted.'" *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 814 (citation omitted). Here, there is a substantial risk that Ethos' assets and Sector's own collateral "will disappear during the proceedings and become unavailable to creditors by the time of final judgment." *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 814.

Indeed, Ethos has conducted itself in a way that suggests that, if given the opportunity, it will dissipate or hide Sector's collateral and its own assets.  For more than three months, Ethos repeatedly assured Sector that it had initiated wire transfers, only to blame its failure to deliver the funds as promised on difficulties of sending wire transfers.  More recently, Ethos has repeatedly claimed that it had reduced or released the SBLC, and then claimed its failure to do so was caused by EWB.  Ethos' excuses are patently unbelievable and, as relevant here, they are more reflective of an effort to defraud than simple commercial failures.  Ethos' machinations and diversions, which have persisted over four months, provide compelling evidence that Ethos has or is likely to secret or transfer Sector's collateral.  "In such cases, injunctive relief is appropriate because 'assets plaintiff seeks are likely to disappear unless the application is granted.'" *Westchester Fire Ins. Co.*, 177 F. Supp. 3d at 814 (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 147 F.R.D. 66, 68 (S.D.N.Y. 1993)); *see also Bao*, 2022 WL 704023, at *2.

Sector has thus provided compelling evidence that it will suffer irreparable harm, in the form of the loss of its business, investments, goodwill, and an unsatisfiable award, if the Court does not provide injunctive relief.

### 3.      The Balance of Hardships Clearly Tips in Sector's Favor

"A court must consider the balance of hardships between" the movant and non-movant, "and issue an injunction only if the balance of hardships tips in the [movant's] favor."  *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 625 (S.D.N.Y. 2010).  Here, the balance of hardships tips heavily in Sector's favor.

Sector is clearly entitled to its collateral and, as explained above, if Sector cannot operate its business, it will suffer the loss of goodwill, millions of dollars of investments, and its very

existence will be threatened.  In addition, if past is prologue, there is a substantial likelihood that Sector's collateral will disappear while it arbitrates its claim.  This favors injunctive relief.

In contrast, an injunction will not cause any cognizable harm to Ethos or EWB.  Indeed, Ethos was contractually obligated to return Sector's collateral when it failed to cure its breach. Ex. 1 at ¶ 7.6.  It has admitted as much. Ex. 6.  Likewise, EWB, which holds Sector's collateral as a custodian for Ethos, has no right to retain Sector's collateral.  Thus, compelling Ethos and its custodian, EWB, "to comply with contractual obligations," which Ethos voluntarily accepted, is "not the sort of 'damage' that is compensable at law."  *Rex Med.*, 754 F. Supp. 2d at 627.  As such, the balance of hardships weighs heavily in favor of granting injunctive relief.

### 4. The Public Interest and the Balancing of the Equities Weigh Heavily in Favor of Injunctive Relief

Finally, the public interest weighs strongly in favor of granting Sector's request for injunctive relief.  As a threshold matter, "[t]he public has an interest in the enforcement of contractual obligations and prevention of fraud."  *Jet Experts*, 602 F. Supp. 3d at 645 (quoting *Rex Med.*, 754 F. Supp. 2d at 626).  Because New York is the "preeminent commercial center of the United States, if not the world," New York courts "have long deemed the enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law."  *159 MP Corp. v. Redbridge Bedford LLC*, 33 N.Y.3d 353, 359 (2019); *accord Avon Co.*, 2022 WL 2208156, at *9.

Here, the Agreement requires Ethos to return Sector's collateral in the event of a default, which is defined as a failure to deliver the required funds on the due date(s) and failure to cure within 10 days.  Ex. 1 at ¶¶ 7.4, 7.6.  Further, Ethos has admitted its default and its obligation to return the collateral.  Ex. 3 at 1b, Ex. 6.  The public interest "is thus served by forcing [Ethos] to

perform [its] obligation" to return Sector's collateral.  *Jet Experts,* 602 F.Supp.3d at 645; *Avon Co.*, 2022 WL 2208156, at \*9; *159 MP Corp.*, 33 N.Y.3d at 359.

Further, "there is no countervailing public policy favoring defendants who have not acted in good faith." *Jet Experts*, 602 F. Supp. 3d at 645.  Ethos systematic effort to retain Sector's collateral, despite its admitted breach, "borders, if it does not cross, the line of fraud." *Id.*  "The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense."  *Rex Med.*, 754 F. Supp. 2d at 626.

In addition, there is "a strong federal policy favoring the arbitration of disputes," which is furthered by enjoining parties from irreversibly altering "the status quo before the arbitrators are able to render a decision in the dispute."  *Blumenthal*, 910 F.2d at 1053.  There is no public interest in allowing Ethos to continue to use Sector's collateral – or dissipate it – while Sector fulfills its obligation to arbitrate.  Rather, an injunction will serve the public interest by ensuring that any arbitration award is not turned into "a hollow formality."  *Id.*

In sum, the public interest in enforcing contracts and preventing fraud weighs heavily in favor of granting injunctive relief.

**5.    The Arbitration Award to Which Sector Is Clearly Entitled Will Be Rendered Ineffectual Without Injunctive Relief**

The Court should grant Sector's motion for injunctive relief because such relief is necessary to ensure that any arbitration award is not "rendered ineffectual."  CPLR § 7502(c). "Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute."  *Blumenthal*, 910 F.2d at 1053. Thus, "temporary restraining orders and preliminary injunctions may be, and frequently are, granted in aid of arbitration claims where necessary to avoid irreparable injury."  *Rex Med.*, 754 F. Supp. 2d at 621.

Here, any arbitration award will be rendered ineffectual if the Court does not award injunctive relief.  As already explained, there is a very strong likelihood that Sector will succeed on the merits.  However, Sector cannot continue to operate its business without access to its own collateral and there is a very substantial likelihood that Ethos will dissipate Sector's collateral during the pendency of an arbitration proceeding.  Thus, an injunction is necessary to prevent irreparable harm to a party who is clearly entitled to a favorable arbitration award.   In other words, this is the quintessential case where injunctive relief is necessary to ensure that the inevitable arbitration award is not rendered "ineffectual."

### 6.       The Court Should Not Require Sector to Post a Bond

Under Rule 65(c), "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court," and, therefore, the "court may dispense with the filing of a bond." *Clarksen Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (citations omitted).  Thus, district courts have "wide discretion" and may "dispense with the bond requirement where there has been no proof of likelihood of harm" to the party to be restrained.  *Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (citations omitted).

Here, Respondents will not suffer any harm if the Court issues injunctive relief prohibiting them from dispensing of Sector's collateral.  Simply stated, Ethos was required to return Sector's collateral when it failed to cure its breach.  Ex. 1 at ¶ 7.6.  Ethos has admitted as much and claims that it has attempted to do so, but has been thwarted by EWB's mistakes.  Ex. 6; Ex. 1(b).  A restraining order that compels "[Ethos] to comply with contractual obligations" that it voluntarily accepted, "is simply not the sort of 'damage' that is compensable at law."  *Rex Med.*, 754 F. Supp. 2d at 627.  Likewise, a restraining order that prevents Ethos and EWB from

dissipating *Sector's collateral*, to which they have no claim, is not a damage that is recognized by the law.  Therefore, the Court should not order Sector to post any security.

## CONCLUSION

In sum, the record contains ample evidence to support the traditional requirements for injunctive relief and demonstrates that the inevitable arbitration award in Sector's favor will be rendered ineffectual in the absence of injunctive relief.  Therefore, Sector respectfully requests the Court to issue a temporary restraining order and preliminary injunction that: (1) enjoins EWB and Ethos from making any draws on the SBLC; (2) enjoins EWB and Ethos from making any withdrawals from any Ethos account at EWB until Ethos provides proof that it has returned Sector's $3.25 million in cash collateral; and an injunction that (3) orders Ethos and EWB to cancel the SBLC.

Dated:  November 3, 2023

**SKARZYNSKI, MARICK & BLACK LLP**

*/s/ Janene Marasciullo*

Janene Marasciullo
John Treat
One Battery Park Plaza, 32nd Floor
New York, NY 10004
(212) 820-7700
jmarasciullo@skarzynski.com
Our File No. 25156

*Counsel for Sector Resources, Ltd.*

4874-8249-4605,