# EXHIBIT A

NB6RSECh

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECTOR RESOURCES LTD,

4                   Petitioner,

5            v.                          23 Civ. 9728 (ER)

6   ETHOS ASSET MANAGEMENT, INC.
    AND EAST WEST BANCORP INC.
7   A/K/A EAST WEST BANK,,
                                         TRO Hearing
8
                    Respondent.
9
    ------------------------------x
10                                       New York, N.Y.
                                         November 13, 2023
11                                       2:00 p.m.

12  Before:

13                  HON. EDGARDO RAMOS,

14                                       District Judge

15                       APPEARANCES

16  SKARZYNSKI MARICK & BLACK LLP
         Attorneys for Petitioner
17  BY:  JANENE MARIE MARASCIULLO
         DOUGLAS GIOMBARRESE
18
    LINKLATERS LLP
19       Attorneys for Respondent Ethos Asset Managment, Inc.
    BY:  ROBIN NUNN (By Telephone)
20
    PRYOR CASHMAN LLP
21       Attorneys for Respondent East West Bancorp Inc a/k/a East
         West Bank
22  BY:  JEFFREY ALBERTS
         MICHAEL LEVISON
23       STEPHANIE PAOLA CHERY

24

25

NB6RSECh

| | |
|---|---|
| 1 | (Case called) |
| 2 | MS. MARASCIULLO:  Your Honor, may it please the Court, |
| 3 | my name is Janene Marasciullo.  I represent Sector.  Here with |
| 4 | me is Douglas Giombarrese. |
| 5 | MR. GIOMBARRESE:  Good afternoon, your Honor. |
| 6 | THE COURT:  I'm sorry who? |
| 7 | MR. GIOMBARRESE:  Douglas Giombarrese. |
| 8 | MR. ALBERTS:  Good afternoon, your Honor.  Jeffrey |
| 9 | Alberts from Pryor Cashman, and appearing at the counsel table |
| 10 | from my firm are Michael Levison and Stephanie Chery on behalf |
| 11 | of East West Bank. |
| 12 | THE DEPUTY CLERK:  And counsel for Ethos, please state |
| 13 | your name for the record. |
| 14 | MS. NUNN:  (Unintelligible) |
| 15 | THE COURT:  Ms. Nunn, you are breaking up quite a bit, |
| 16 | and we're unable to understand what you are saying. |
| 17 | MS. NUNN:  Robin Nunn counsel for Ethos Asset |
| 18 | Management. |
| 19 | THE COURT:  Are you on a speaker phone, Ms. Nunn? |
| 20 | Because I can barely understand what you are saying.  It's not |
| 21 | a volume thing.  It's a -- I can't understand what you are |
| 22 | saying because of the connection. |
| 23 | MS. NUNN:  (Unintelligible) |
| 24 | THE COURT:  I have no idea what you just said. |
| 25 | MS. NUNN:  (Unintelligible) |

NB6RSECh

1          THE COURT:  I say again, I have no idea what you just

2     said.

3          THE DEPUTY CLERK:  She's going to pick up the phone

4     and dial in.

5          THE COURT:  Okay.

6          MS. NUNN:  Hi, this is Robin, counsel for Ethos Asset

7     Management.  Can you hear me?

8          THE COURT:  That's a little bit better.  Why don't we

9     see if we can proceed.  This matter is on for a hearing on

10    plaintiff's motion for preliminary injunction.  Ms. Nunn is

11    joining us by telephone, and Ms. Nunn, I'm going to ask in

12    advance that when you speak, given the difficulties that we

13    sometimes have with telephone conferences, I will endeavor to

14    ask you fairly precise questions.  I will ask that you be as

15    concise as you possibly can, and if you find yourself speaking

16    for more than a minute or so, you should stop and make sure

17    that I'm not trying to interject a question.  Because

18    otherwise, it could be a long and very unpleasant hearing for

19    me and, therefore, for all of you.  So, with that, let me begin

20    by noting that I have received the parties' papers, including

21    declarations, and I note for the record that based on Sector's

22    response to EWB's papers that there is at least a change in the

23    ask for the preliminary injunction.

24          Ms. Marasciullo, why don't you tell me how it is that

25    your request for preliminary injunction has changed?

NB6RSECh

1          MS. MARASCIULLO:  Your Honor, after reviewing the

2     papers from East West Bank, we understand that the

3     representations that Ethos made that it could cancel that

4     letter of credit and had the power to do so, those

5     representations are not accurate.  So having reviewed East West

6     Bank's opposition, what we're asking the Court to do is two

7     things.  We're asking the Court to restrain both East West Bank

8     and Ethos Asset Management from removing any of the $812,000

9     that is in the East West Bank account.

10          THE COURT:  How much?

11          MS. MARASCIULLO:  $812,000 of our $3.25 million.

12     That's what is left.

13          THE COURT:  And you said there were two things.

14          MS. MARASCIULLO:  Correct.  The other thing we would

15     ask, your Honor, is restrain Ethos from making any more

16     withdrawals on the line of credit that they have from East West

17     Bank.  It's my understanding that if Ethos does not make any

18     more withdrawals on that line of credit, that there should not

19     be any -- I will let counsel from East West Bank correct me if

20     I'm wrong, but my understanding is if there are no more draws

21     by Ethos on the letter of credit, there shouldn't be any draws

22     on the standby letter of credit that --

23          THE COURT:  I'm going to ask you, Ms. Marasciullo, to

24     move the microphone close to you.

25          MS. MARASCIULLO:  To let me rephrase.

NB6RSECh

1              It is my understanding that if Ethos does not drawdown

2      on the line of credit that it has from East West Bank, that

3      East West Bank will not drawdown on the standby letter of

4      credit that my client has provided.  So, since I can't under

5      the law ask you right now to enjoin East West Bank from drawing

6      on the standby letter of credit, I'm asking you to enjoin Ethos

7      from drawing down on the line of credit that they have with

8      East West Bank and that should protect our standby letter of

9      credit.

10             THE COURT:  Okay.  Let me turn to Mr. Alberts.

11     Because as I understand East West Bank's position on the

12     standby letter of credit, the bank is the only beneficiary to

13     that standby letter of credit?

14             MS. MARASCIULLO:  That is correct.

15             THE COURT:  And as I understand the position with

16     respect to the account which holds the monies that Sector

17     deposited, East West Bank has the right to offset amounts in

18     that account?  Am I correct, Mr. Alberts?

19             MR. ALBERTS:  With two qualifications, your Honor.

20             THE COURT:  You can be seated.

21             MR. ALBERTS:  With two qualifications, your Honor.

22     The first being, I just want to clarify that Sector has several

23     times suggested that the funds that are currently in the DDA,

24     the direct deposit account, aren't the funds that Sector

25     deposited.  They've never introduced any evidence of that, and

NB6RSECh

1    we don't understand that to be the case.

2              THE COURT:  I'm sorry.  So are you saying that Sector

3    never deposited any monies into that account, or are you saying

4    that any monies that were deposited into that account are

5    fundable and mixed with the other funds in that account, and

6    therefore, you are not able to segregate?

7              MR. ALBERTS:  Closer to the latter.  Specifically, our

8    understanding is that Sector transferred the $3.25 million into

9    the account on June 6 this year.

10             THE COURT:  Okay.

11             MR. ALBERTS:  But at the end of that month,

12   $3.25 million had been transferred out of the account.  There

13   are funds currently in the account but they appear to be the

14   remainder of money that was deposited in the second half of

15   October, and we have no way of knowing that they are somehow

16   connected to Sector.  But based on Sector's description of the

17   transaction, our understanding is that they are not.  So for

18   purposes of understanding potential implications of taking

19   funds out of the account with respect to Sector, I think it's

20   important to keep in mind, Sector has no special relationship

21   to those funds.  The funds don't belong to Sector.  They don't

22   appear to be traceable to the deposited made by Sector.  Sector

23   has no security on those funds, and although Sector keeps

24   referring to them as "our funds" or "our collateral," Sector is

25   just one of many creditors of Ethos that may seek to get some

NB6RSECh

1    of the money that are in that account.

2                 THE COURT:  Two questions.  First of all, if I

3    understand what you said, Sector deposited $3.25 million in

4    June of this year.  And by October of this year, 3.25 had been

5    transferred out of the account.

6                 MR. ALBERTS:  By the end of June.

7                 THE COURT:  By the end of June.

8                 MR. ALBERTS:  And by the end of that month, over

9    $3.25 million had been transferred out.

10                THE COURT:  Let me ask you this:  Were these the only

11   funds in the account, or were there other depositors other than

12   Sector?

13                MR. ALBERTS:  I believe there are other depositors and

14   other withdrawals?

15                THE COURT:  And who withdrew the amounts?  Is that

16   Ethos, if you know?

17                MR. ALBERTS:  You mean, who initiated the transfer?

18                THE COURT:  You said 3.25 went into the account in

19   June.  By the end of June, 3.25 had been withdrawn.  Who made

20   the withdrawals?

21                MR. ALBERTS:  I don't recall.  I need to check.  I

22   think it was more than $3.25 million.  Just to be clear, there

23   have been a significant amount of transfers in and out just in

24   that month and subsequent months.  There's no reason to treat

25   the funds currently in the account as being somehow traceable

NB6RSECh

1  to the deposited funds that were made by Sector.  There have

2  been many other depositors in a fairly significant amount of

3  time.

4          THE COURT:  I'm trying to ask very basic questions.

5  That account was a direct deposit account; is what you called

6  it?

7          MR. ALBERTS:  Yes.

8          THE COURT:  Were the only monies put into that

9  account, was it created to receive the deposit that Sector

10 made?

11         MR. LEVISON:  Your Honor, if I may, I can answer that

12 question.

13         THE COURT:  Okay.

14         MR. LEVISON:  The answer is no.  This is Ethos'

15 checking account at the bank.  There's numerous depositors and

16 there's numerous withdrawal entities including Ethos itself.  I

17 can just say after June, between June and now, there's been

18 over $19 million of deposits into that account.

19         THE COURT:  Okay.

20         MR. LEVISON:  As Mr. Alberts indicated, money has been

21 transferred in significant amounts, and what is left is

22 $812,000 as of today.  And that's because the bank put a freeze

23 on it after the last hearing.

24         THE COURT:  Why did the bank put a freeze on those

25 funds?

NB6RSECh

| | |
|---|---|
| 1 | MR. LEVISON:  After learning about what had happened |
| 2 | at the TRO hearing, they were -- when I reported what happened, |
| 3 | the bank determined that over $500,000 was scheduled to be |
| 4 | wired out after the hearing.  In other words, wire transfers |
| 5 | were initiated by Ethos after your Honor's hearing, so the bank |
| 6 | tried to stop it.  The wires actually went out, and then the |
| 7 | bank was able to recall it.  So there was only going to be |
| 8 | about $300,000 in the account if the bank had not clawed back |
| 9 | those transfers. |
| 10 | THE COURT:  That was a determination that was made by |
| 11 | the bank itself, correct? |
| 12 | MR. LEVISON:  Correct. |
| 13 | THE COURT:  It was not done at the request of Ethos? |
| 14 | MR. LEVISON:  No, your Honor. |
| 15 | THE COURT:  And as you sit here today, you are not |
| 16 | able to say whether any part of that $800,000 were monies that |
| 17 | were deposited by Sector in June of this year? |
| 18 | MR. ALBERTS:  Correct, your Honor. |
| 19 | MS. NUNN:  Your Honor, can I -- |
| 20 | THE COURT:  No, not yet.  Explain to me what rights |
| 21 | the bank has over the monies in that account.  So I understand |
| 22 | there's a set-off.  What does that mean? |
| 23 | MR. ALBERTS:  Well, when the bank made the loan -- or |
| 24 | line of credit loan to Ethos, and with business loans, the |
| 25 | parties agreed that the bank has a right of set-off as against |

NB6RSECh

1    monies in that account.  Meaning, if Ethos owed money to the

2    bank for whatever reason, the bank has the right under the

3    contract to set-off and to take those monies and apply it to

4    the debt.  In addition, on a monthly basis, Ethos has granted

5    the bank the right to debit the account via ACH, automatic

6    check payment, to pay the monthly loan credit that is due on

7    the line of credit.

8             THE COURT:  I take it at this point, Ethos'

9    obligations to the bank are more than $800,000?

10            MR. LEVISON:  That's correct, your Honor, as set forth

11   in the declaration, it's 6.8 million, principal.

12            THE COURT:  As I understand from your submission,

13   Sector has no right, contractual or otherwise to the funds in

14   the account?

15            MR. LEVISON:  Sector has no right.  That's correct,

16   your Honor.

17            THE COURT:  Okay.  Let me come back to you,

18   Ms. Marasciullo.  Now that this case from your perspective is

19   only about $830,000, why are we still here?  Why hasn't this

20   settled?

21            MS. MARASCIULLO:  Because I think you need to direct

22   that question to Ms. Nunn.  In terms of settled, I contacted

23   East West Bank when I got their papers.  I said to them if

24   you've administratively frozen the account, will you agree to

25   administratively keep it frozen, not taking anything out of it,

NB6RSECh

1  with respect to me.  I'm not asking for an order saying East

2  West Bank write a check to Sector for $812,000.  I'm asking for

3  the Court to restrain, and apparently we need an order to

4  restrain Ethos from taking that money.

5           THE COURT:  Do you?  Because I'll go back to the bank.

6  The bank has indicated that it has frozen that account.

7           MS. NUNN:  I --

8           THE COURT:  Not yet, Ms. Nunn.  What does that mean?

9           MR. LEVISON:  It means it's frozen so that we could

10 keep the status quo while determining what was going on.  I can

11 tell you this, the bank does not have an objection from

12 restraining Ethos from withdrawing monies from the account.

13 But the bank does object to any order that requires or

14 restrains the bank in any way, including by giving notice to

15 Sector, for the bank to set-off as against the account, should

16 it choose to do so or be forced to do so or, from debiting the

17 account from the next payment that is due.

18           THE COURT:  It's frozen now.  Does that mean if Ethos

19 were to say request a withdrawal for $100,000 or the full

20 amount, it would not be able to do so?

21           MR. LEVISON:  Not without the bank's consent.  That is

22 correct, your Honor.

23           THE COURT:  So the account is frozen at the discretion

24 of the bank, of East West Bank?

25           MR. LEVISON:  That's correct.

1          THE COURT:  And it can be unfrozen at any time at the

2     request of the bank?

3          MR. LEVISON:  That is also, correct, your Honor.

4          THE COURT:  And is Ms. Marasciullo accurate in her

5     representation that she asked you to give her, to the extent

6     that there was going to be unfrozen or any debit to the

7     account, that you give her 72-hours notice and you refused to

8     do so?

9          MR. LEVISON:  Yes.  The request was made with respect

10    to other requests, but, again, there was no resolution reached

11    with respect to the motion.

12         THE COURT:  Okay.  Ms. Nunn is there something that

13    you were trying to say?

14         MS. NUNN:  Yes, and I wasn't trying to interrupt

15    earlier.  My phone was on mute.  I would love to add a couple

16    of small points that I think are important for this

17    conversation.  One it's our position that the argument cannot

18    be made and --

19         THE COURT:  Ms. Nunn, I don't understand what you are

20    saying.  Could you slow down?

21         MS. NUNN:  So my understanding is that we are now

22    seeking a different preliminary injunction that what was

23    initially sought in the petition?

24         THE COURT:  Yes.

25         MS. NUNN:  And I am arguing that this is the first

NB6RSECh

1    time that we are hearing this new request, and that there is a,

2    basically, an unfairness factor to that.  I would also argue

3    that no transactions were initiated after the hearing last week

4    on I believe it was November 6.  Any transactions were

5    initiated prior to that, and, as in any bank account, took time

6    to come out.  So nothing was, again, done after the hearing

7    where representations were made that we would not be making any

8    withdrawals.  The account was already frozen, was my

9    understanding when I came to the hearing, my client said.  When

10    I was going in on the 6th, the account had been frozen by the

11    bank.

12          THE COURT:  I'm sorry.  Ms. Nunn, you are saying that

13    the account was frozen when you were last here?

14          MS. NUNN:  Yes, on the 6th.

15          THE COURT:  Mr. Levison, is that accurate?

16          MR. LEVISON:  I don't know the timing, if that is

17    accurate.  I know that the wires had left the bank, and the

18    bank had to recall them.

19          THE COURT:  The wires left what day?

20          MR. LEVISON:  The 6th.

21          THE COURT:  The day of the hearing?

22          MR. LEVISON:  I don't know the time but Mr. Alberts

23    told me about the hearing, and I called and found out that they

24    were trying to get wires back.

25          THE COURT:  It sounds like after.

NB6RSECh

1          MR. LEVISON:  I don't know what time of the day.  I

2    can't tell you for sure.

3          THE COURT:  Understood.  Ms. Nunn, to the extent that

4    you are saying that the request made by Sector, its amendment

5    to its preliminary injunction request, is different, and you

6    are hearing it for the first time now, I can tell you that I

7    read their papers, and in their papers, at least in response to

8    East West Bank's response, they indicated that they were no

9    longer seeking to enjoin as to the standby letter of credit.

10   Is there anything else that you wanted to say Ms. Nunn?

11         MS. NUNN:  I would, you know, also just add, since you

12   raised the point, as to why has this not settled.  The last

13   communication between the parties was a drafted settlement

14   agreement, and Ethos never made any response to that.

15         MS. MARASCIULLO:  May I address that?

16         THE COURT:  Yes, Ms. Marasciullo.

17         MS. MARASCIULLO:  Ms. Nunn did send us a settlement

18   agreement.

19         THE COURT:  When?

20         MS. MARASCIULLO:  Well, she sent us several, but the

21   terms kept changing, and the primary concern, or the primary

22   impediment to a resolution, was that we kept getting different

23   representations about what relief we could get with respect to

24   the standby letter of credit.  And, you known, it's over

25   $5 million.  It's $5,0050,000 and change.  It's more than the

NB6RSECh

1    cash.  And what Ms. Nunn offered to do was to send an email to

2    East West Bank directing them to cancel the standby letter of

3    credit, which her client doesn't have authority to do.  And we

4    had several discussions about that.  It wasn't until I had a

5    phone call with Mr. Alberts and Mr. Levison I want to say on

6    Thursday.  I don't know if it was Thursday or Wednesday.

7    Things happened very quickly last week.  But they said to me,

8    you know, Ethos doesn't have any authority on the standby

9    letter of credit.  With respect to the cash, the answer was,

10   you know, we'll pay you $250,000 immediately.  We'll pay you --

11   first, it was $1 million in 15 days, and then it was the

12   remainder in 30 days.  But we won't sign a confession of

13   judgment, and by the way, you have to give up all your claims.

14            And, your Honor, it's a significant amount of money

15   that they are asking us to give up.  Because on the

16   $10 million, there's 9 percent statutory interest plus 2

17   percent under the law.  And actually,they want our actual

18   damages, and they wanted us to give all of that up in response

19   for a promise to pay.  And then the real impediment to

20   settlement was Ms. Nunn represented to us repeatedly that Ethos

21   could cancel that letter of credit.  And when we got an email

22   from counsel for East West Bank saying Ethos can't do that.

23   Because remember, I had no idea that the debt was -- I had no

24   idea, and my client had no idea, that that standby letter of

25   credit was securing an Ethos debt.  That was never disclosed to

NB6RSECh

1   my client.  That was news to us when we got East West Bank's

2   opposition.

3        But at that point, you know, that's why settlement

4   discussions breakdown.  We would be happy to resolve this case

5   if we had any ability to negotiate and think that something was

6   going to happen.  But sitting here in court today and listening

7   that wire transfers in the amount of $500,000 were initiated on

8   November 6, I'm deeply disturbed because Ms. Nunn knew about

9   this case.  She definitely knew about it on November 5 because

10  she emailed me, but she claims that she knew about it before.

11  I don't know when she found about it.  I had no idea of

12  Ms. Nunn's existence or Linklaters involvement Sunday evening.

13  What I'm hearing right now, they get notice that we're going to

14  try to do something, and they go and try to take the money.

15        Your Honor, right there, we're entitled to an

16  injunction on the A12.  And, again, I don't want to be here

17  having a fight right now as between East West Bank and Sector.

18  I think our rights to that money are greater.  One of the

19  things I'll tell you is in the record.  I know that is strange.

20  First of all, we deposited the money.  There's no dispute about

21  that.  Mr. Yu's affidavit said that Sector deposited the money

22  into Ethos' East West Bank's account on June 6.  That's not in

23  dispute.  What is also not in dispute is my client Jeffrey

24  Dell'Orfano called Jeffrey Yu on two occasions in October --

25        THE COURT:  He called who?

NB6RSECh

```
1           MS. MARASCIULLO:  He called Jeffrey Yu, who is the
2    vice president responsible support Ethos' account.  And he
3    called Mr. Yu and said, Ethos is telling me that you are going
4    to release that standby letter of credit.  What has been done?
5    The first time Mr. Yu told Mr. Dell'Orfano, We're discussing
6    it.  That was on -- it was either October 4 or October 6.  I
7    need to look at the declaration, but it's in paragraph 47 of
8    Mr. Dell'Orfano's declaration.  Mr. Dell'Orfano called back on
9    October 13 and asked again, When are you going to release that
10   standby letter of credit?  He said, Go talk to Ethos, which is,
11   again, why we thought Ethos had control over that standby
12   letter of court.
13           Now that we're in court, we're finding out things are
14   a little bit different.  I'm not casting aspersions on East
15   West Bank.  I don't know if Mr. Yu understood by telling my
16   client to go talk to Ethos, he was signaling that Ethos
17   controlled that standby letter of credit, but we had no idea
18   that it was incumbered or to the extent to which it was
19   incumbered until East West Bank --
20           THE COURT:  I guess I'm not understanding how that is
21   possible because the standby letter of credit was issued by
22   your bank.
23           MS. MARASCIULLO:  Right.
24           THE COURT:  And as I understand it, it was issued in
25   the benefit of East West Bank.
```

NB6RSECh

1          MS. MARASCIULLO:  Right.

2          THE COURT:  And so what it is that you are not

3    understanding about the fact that if it's East West Bank's

4    authority to release it or not?

5          MS. MARASCIULLO:  Well, your Honor, Mr. Yu, who signed

6    the declaration filed by East West Bank, told my client to go

7    talk to Ethos.

8          THE COURT:  Right and?

9          MS. MARASCIULLO:  That -- your Honor, let me do this

10   by analogy.  You have to understand, my client did not

11   understand what Ethos had done.

12         THE COURT:  Putting that aside, did your client

13   understand what your client had done?

14         MS. MARASCIULLO:  No, I don't think my client did

15   understand what they had done, your Honor, candidly, you know.

16   But the issue here is:  Imagine that I have a home equity line

17   of credit on my home.  I might have one.  I have a home equity

18   line of credit.  If I don't draw down on it, if I don't

19   actually borrow money, I can go into my bank and terminate it

20   at any time.  That's the representation that we were getting.

21   Ethos was telling us, we can terminate this.  We can terminate

22   the standby letter of credit at any time.  There are emails to

23   that effect where Mr. Santos emailed my client and said, I

24   directed East West Bank to terminate the standby letter of

25   credit.

NB6RSECh

1          This is a little bit of sideshow because I'm not

2    asking you anymore to prohibit East West Bank from drawing on

3    that standby letter of credit because I recognize that the law

4    doesn't allow me to make that request.  What I'm asking you to

5    do is to restrain Ethos from drawing down on the $14 million

6    line of credit that that standby letter of credit secures.

7    Because if they don't draw on the $14 million letter of credit,

8    East West Bank shouldn't need to make draws on my client's

9    standby letter of credit.  This is not a perfect situation,

10   but, your Honor, Ethos took our collateral and it's gone except

11   for $812,000.

12          THE COURT:  Well, maybe.  Mr. Levison?

13          MR. LEVISON:  A couple things, your Honor.  With

14   respect to the new request to restrain Ethos from drawing down

15   on its line of credit with East West Bank, that's not in any

16   papers as far as I recall.  I don't know that the bank has an

17   objection to that, but I just want to make clear that even if

18   Ethos is restrained from making additional borrowings from the

19   bank, that has nothing to do with whether or not the bank is

20   going to drawdown on the standby letter of credit from J.P.

21   Morgan.  The standby letter of credit, which was granted to the

22   bank in favor to the bank at the behest of Sector, secures the

23   line of credit.  And if that line of credit goes into default,

24   or when it matures at the end of December, the bank is, of

25   course, within its rights to drawdown on the standby letter of

NB6RSECh

1    credit, notwithstanding the fact that there are no additional

2    borrowings under the line of credit.  I also want to add that

3    it doesn't make sense to me that Sector says they don't

4    understand that this standby letter of credit was to secure a

5    loan from East West Bank to Ethos.  It says it on the face of

6    the standby letter of credit.  It says, specifically, "This

7    letter of credit is issued to support the credit banking

8    facility granted to Ethos Asset Management, Inc., by East West

9    Bank."  That's on the first of the letter of credit.

10           Second, with respect to the demand deposit account,

11   there's simply no evidence to suggest that the $812,000 that

12   remains in the demand deposit account has any relationship to

13   Sector.  The $3.25 million that was deposited five months ago

14   is very likely gone.  Millions of dollars have gone in and out

15   of that account since the initial deposit in June, millions,

16   $19 million.  If there's been $19 million in deposits, and you

17   are down to $800,000, it's very clear that millions have gone

18   out.  To say it's very clear that it's Sector's money, there's

19   no facts to support that.  Again, the bank does not object to

20   an order restraining Ethos from withdrawing that money however,

21   the bank must be allowed to withdraw those funds to the extent

22   necessary to make a monthly payment and/or to reduce the debt

23   upon maturity.

24           THE COURT:  And that's consistent with the documents

25   that created that account, correct?

NB6RSECh

1      MR. LEVISON:  Correct, your Honor.  Consistently,

2  certainly.

3      THE COURT:  I'm sorry?

4      MR. LEVISON:  Yes, consistent.

5      THE COURT:  Yes.

6      MR. LEVISON:  I just want to also clarify for the

7  record, I do not know when the request for the transfers that

8  were clawed back was actually made.  I don't know when the

9  initial request was.  I meant to say and I want to clarify for

10  the record, that I only found out about it after the hearing,

11  and I know that the transfers were clawed back after the

12  hearing.

13      THE COURT:  Okay.  Ms. Marasciullo, there's also some

14  additional facts that I suspect you take issue with that were

15  put before me in Ethos' papers.  One, apparently, they are

16  flush with cash; I think I'm remembering a number like

17  $600 million quoted in the papers.  And two, there's a growing

18  concern that they are very active, and therefore, it seems the

19  premise of the application, which is that Ethos — and I'll put

20  it as neutrally as I can — Ethos went into this knowing that it

21  could not provide the financing, took the collateral and is

22  using it for its own ends and has no intention or ability to

23  pay back that collateral.

24      MS. MARASCIULLO:  Your Honor, I can't speak to Ethos'

25  ability to pay, but if they have $699,000, I don't

NB6RSECh

1    understand --

2            THE COURT:  Million.

3            MS. MARASCIULLO:  You're right.  $699 million in cash

4    and securities — that's the representation — I don't understand

5    why they are asking me -- why they don't repay the loan and get

6    our standby letter of credit canceled and give us our

7    $3.25 million back.  But my concern, your Honor, isn't that

8    they don't have money, my concern is they'll move it, and

9    they'll move it away from our ability to execute on a judgment.

10   I'll respectfully submit that everything we've heard today,

11   including their effort to transfer $500,000 out, is consistent

12   with that.

13           THE COURT:  Let me ask Mr. Levison one other question.

14   Is Ethos in default with respect to any payments that it owes

15   to the banks, or is it in arrears with respect to anything it

16   owes to the banks?

17           MR. LEVISON:  There's no payment default.

18           THE COURT:  So there's no need for you to drawdown on

19   the letter of credit or offset the account as we sit here?

20           MR. LEVISON:  As we sit here today, your Honor, no.

21           THE COURT:  So Ms. Marasciullo, let me ask a different

22   question.  Part of why I think — and we'll hear from Ms. Nunn,

23   hopefully clearly — part of why you're saying they are telling

24   me that they didn't pay the tranches as they were scheduled or

25   why they say they don't owe you any money is because it was a

NB6RSECh

1    significant part of the agreement that was not met by you.

2    This positive verification provision, whatever that may be.  Is

3    any of that accurate?

4            MS. MARASCIULLO:  No, it's not, your Honor.  First of

5    all, they know that we deposited $3.25 million, and that's not

6    in dispute, because I've given you the direction and Mr. Yu

7    from East West Bank has confirmed that the money was deposited.

8            THE COURT:  I understand that.

9            MS. MARASCIULLO:  And with respect to the standby

10   letter of credit, the party that was supposed to verify the

11   standby letter of credit pursuant to the agreement was East

12   West Bank, and East West Bank has done so.  And, in fact,

13   Mr. Yu's declaration tells you that East West Bank has verified

14   the standby letter of credit.  But, your Honor, more damning

15   than all of that is the fact that for three months, when my

16   client wrote to Ethos and said, When are you going to make the

17   first delivery of the first $10 million, they never said to us,

18   We were not able to verify your collateral.  They said to us,

19   The money is on the way, repeatedly in writing.  So the idea

20   that some verification didn't happen, I think, is nonsensical.

21           THE COURT:  Let me ask you this --

22           MS. MARASCIULLO:  Can I add one more thing?  It's a

23   little bit off topic, but it relates back to your last

24   question.

25           THE COURT:  Very well.

NB6RSECh

```
 1              MS. MARASCIULLO:  In Mr. Santos' declarations, again,
 2     my concern, and the reason we filed the request for injunctive
 3     relief, is because we think the assets are going to get
 4     dissipated.  And by the way, we have filed for arbitration now.
 5     We think any arbitration order will be rendered ineffectual if
 6     the assets are gone, and that is a legitimate concern.
 7     Mr. Santos, in paragraph -- in the latter half of his
 8     declaration says that he's going to sue Sector for enforcing
 9     its contractual rights and that he does not accept that
10     Sector -- that we should pay Sector $3.25 million and cancel
11     the standby letter of credit.  That's in the last paragraph of
12     his declaration, which is docket number 30.  Your Honor, he's
13     telling all of us that even if we go get an award, not only are
14     we not getting damages, we're not getting our collateral back.
15              THE COURT:  But he posits that in a litigation, sort
16     of, posture.  He's saying, Look, we're not going to reward
17     Sector by giving it exactly what it wants when it absolutely
18     failed to comply with our agreed dispute provisions in the
19     agreement.
20              MS. MARASCIULLO:  Well, respectfully, at this point,
21     we have.  We always intended to.  Our concern was, on
22     October 30, Mr. Santos sent my client an email, and it's in the
23     record.  He sent an email on October 30 saying, We've directed
24     East West Bank to cancel the standby letter of credit, and we
25     have initiated a wire transfer for the first $10 million.  And
```

NB6RSECh

1    that money never showed up, and that's also in the record.

2              THE COURT:  Okay.  So --

3              MS. MARASCIULLO:  You know, when you look at the

4    panoply of facts, when you look at, you know, all of the

5    circumstances, your Honor, I don't think any rational person

6    could sit here and say, you know the idea that the money is

7    going to be dissipated is not credible.  The money has been

8    dissipated and it's going continue to get dissipated.

9              And we have somebody who is, you know -- he's not even

10   a permanent resident of the United States.  I don't know how

11   we're going to execute on a judgment when we get it, and I have

12   no doubt — no doubt — that we're going to get an arbitration

13   award in our favor.  The only question is whether or not my

14   client will be around to enforce it or whether Ethos will be

15   around to pay.  Because Mr. Levison just told you that they've

16   transferred $19 million in and out of that account.

17             THE COURT:  And Mr. Levison also told me that as far

18   as he is aware, Ethos is not under any payment default.

19             MS. MARASCIULLO:  They are certainly on a payment

20   default to us of $3.25 million.

21             THE COURT:  Let me ask you this, Ms. Marasciullo:

22   Again, the papers before me have some financial statement that

23   indicate that Ethos has north of $600 million.  Do you have any

24   reason to believe that those documents are --

25             MS. MARASCIULLO:  Untruthful?  Yes, I do.  One, when I

NB6RSECh

1    look at that financial statement, and I've looked at lots of

2    them, I've never seen a bank account where the last four digits

3    are sequential.  That was the first thing that jumped out at

4    me.  I don't believe the Ethos East West Bank account is on

5    there.  The last four digits, when you see the last four

6    digits, I know what the Ethos West Bank account number is.

7    That number is not on there.

8           THE COURT:  I'm sorry.  I don't know what precisely it

9    is you are talking about.  What are you talking about?

10          MS. MARASCIULLO:  When you look at exhibit M --

11          THE COURT:  I don't have exhibit M.

12          MS. MARASCIULLO:  Do you want me to hand it up?

13          THE COURT:  Sure.

14          MS. MARASCIULLO:  My notes are in there.  Can I open

15   that?

16          THE COURT:  If you can take out just exhibit M, I'm

17   happy to take just exhibit m.

18          MS. MARASCIULLO:  That is exhibit k.  I have a couple

19   questions about exhibit k.  Preliminarily, Mr. Santos did not

20   authenticate exhibit K; Ms. Nunn did.  I know New York lawyers

21   tend to authenticate things, unless they works for Ethos,

22   unless she has really intimate knowledge, I wouldn't

23   authenticate a client's financial statement.  But when I look

24   at those accounts, those don't look like normal bank accounts

25   in the sense that they are very sequential when you look at the

NB6RSECh

1    last four digits of those accounts.  That's the first thing.

2              THE COURT:  So the bank account numbers?

3              MS. MARASCIULLO:  Yes, the account numbers do not

4    appear to be --

5              THE COURT:  What if they were opened on the same day?

6              MS. MARASCIULLO:  I don't think they would be like

7    that, your Honor.  But be that as it may, I received an email,

8    your Honor.  I'm still authenticating it, but I received an

9    email and it's from someone who used to work for Ethos, who

10   knows about this and is embarrassed by it, giving me a bunch of

11   account numbers, very detailed information, none of those

12   account numbers are on that.  And I've got those here, too.

13   I'm not going to file those in the record.

14             THE COURT:  So this is -- so the record is clear, I'm

15   looking at exhibit k, document 30-11 on the docket.  And

16   exhibit k purports to be Ethos Asset Management, Inc. balance

17   sheet as of September 30, 2023.  On page 1, it lists assets,

18   and beneath that it lists bank accounts.  And it sets forth the

19   following bank account numbers, I guess ending, maybe or maybe

20   the entire number 1005, 1006, 1007, 1008, and then it continues

21   with 1010, 1011, 1012, and similarly.  Those various accounts

22   total up to $699,374,331.95.  And Ms. Marasciullo is expressing

23   her lack of satisfaction in these numbers, one, because the

24   fact that they appear to be consecutive, many of them, and two,

25   because they were -- what was the word that you used by

NB6RSECh

1   Ms. Nunn, that these documents were --

2               MS. MARASCIULLO:  They were authenticated by Ms. Nunn,

3   not Mr. Santos or anybody employed by Ethos.

4               THE COURT:  Authenticated by Ms. Nunn.  Okay.  And

5   then you said there was a third thing, that you are in contact

6   with a former Ethos employee, who is familiar with Ethos' bank

7   accounts and was embarrassed that these types of documents were

8   presented to you in this litigation.

9               MS. MARASCIULLO:  That's not what I meant to convey.

10              THE COURT:  Okay.

11              MS. MARASCIULLO:  I have an email.  I'm happy to bring

12  it up there.  I have not filed it on the docket, but I have an

13  email with what purports to be a list of Ethos' bank accounts

14  and none of the account numbers on this email match what is on

15  that document.  There's one other thing which is, you know,

16  last week when we were in, your Honor.  You said to me Ms. Nunn

17  filed a letter saying she would grant Sector the relief it was

18  seeking.  I was thrilled.  I would have much -- as much as I

19  enjoy appearing in court, I would have much rathered have

20  worked this out.  The emails I got were, we can't perform right

21  away.  We'll give you $250,000 today.  We'll give you a million

22  in 15 days, and then we'll give you the last 225 in 30 days,

23  and then it became 40 days and then it was 60 days.  None of

24  this adds up.  I'd be happy to show you this with the proviso I

25  haven't had a chance to authenticate this.

NB6RSECh

1          THE COURT:  I'll look in a second.  Do you have

2    copies, and have they been provided to the parties?

3          MS. MARASCIULLO:  No, your Honor because, number one,

4    I haven't authenticated.  And, number two, I was concerned that

5    the money would be transferred if I disclosed them.

6          THE COURT:  Let me get back to this other question.

7    Because I don't know there's this positive verification that

8    Ms. Nunn keeps emphasizing in her papers.  Is that a term of

9    art is that a situation where EW Bank had to verify that it

10   received the standby letter of credit or what so far as you

11   know?

12         MS. MARASCIULLO:  What the agreement says is that

13   party A, which is Ethos, party A's bank will verify the standby

14   letter of credit.  I believe East West's affidavit said that

15   they did that.  But the standby letter of credit was issued by

16   J.P. Morgan, which is a large financial institution.  I don't

17   think there's any worry that they aren't going to back it up.

18         THE COURT:  One of the reasons I tell lawyers to sit

19   down is so that I see the reaction of the other side.  And the

20   other side reacted when you said that they verified.  So,

21   Mr. Levison, what is your perspective?

22         MR. LEVISON:  Two things, your Honor.  One is this

23   concept of verification is foreign to me.  I did read in the

24   agreement between Ethos and Sector.  Again, east West Bank is

25   not a party to this and is a stranger to this agreement.  It

NB6RSECh

1    says that after party A's receiving bank receives the Swift

2    MT760 from the party B's issuing bank and will carry out a

3    verification procedure.  There's no mention of East West Bank

4    at all.  So to suggest that East West Bank has to verify this

5    is, it's just not in the agreement.  And in the declaration,

6    there's nothing about Jeffrey Yu stating that the bank verified

7    it.  It talks about the bank received a standby letter of

8    credit.  Again, the bank made a loan to Ethos.  In a condition

9    to making that loan, it was required that a standby letter of

10   credit be granted in its favor.

11          THE COURT:  Were you indifferent as to who issued that

12   standby letter of credit?

13          MR. LEVISON:  Correct, your Honor.

14          THE COURT:  So it could have been Ethos as well?

15          MR. LEVISON:  It could have been Ethos.  It could have

16   been some other partner.

17          MS. MARASCIULLO:  That's not what the loan agreement

18   says.  The loan agreement between East West Bank and Ethos says

19   it has to be from a bank acceptable to East West Bank.

20          MR. LEVISON:  That's correct.

21          THE COURT:  But it doesn't need to be the standby

22   letter of credit made at the request of any other party,

23   whether it's Sector or anyone else, right?

24          MS. MARASCIULLO:  Right.  Let me just make one other

25   point.  Mr. Yu does say that the standby letter of credit is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NB6RSECh

1    valid and still in force.

2              THE COURT:  I would imagine if you receive a standby

3    letter of credit from J.P. Morgan that it's likely going to be

4    valid.

5              MS. MARASCIULLO:  Right.  And so I -- this whole

6    concept of positive verification, ask Ms. Nunn to show you an

7    email where Mr. Santos complained that there was a problem with

8    the standby letter of credit.  She wouldn't be able to because

9    he never did.  In fact, what he did was send emails to my

10   client saying the money was on the way.

11             THE COURT:  Okay.  Ms. Nunn, that's a fair question.

12   As I indicated, you emphasize at various points in your papers

13   that before the tranches could be released, Ethos had to

14   receive a "positive verification" concerning a standby letter

15   of credit.  Where do you get that information from?

16             MS. NUNN:  That is in section 4.1 of the agreement.  I

17   believe East West Bank pointed it out --

18             THE COURT:  Ms. Nunn, I do apologize.  Can you please

19   slow down so that we can understand what you are saying.

20             MS. NUNN:  I'm sorry.  In the agreement between Ethos

21   and Sector, there's an article 4 financial instrument

22   procedure.  There's a section 4.1 that discusses the issuance

23   and delivery of the financial instrument.  I believe counsel

24   for East West Bank may have just referred to it.  There's

25   direct mention of positive verification and activation in that

NB6RSECh

1    section.  I would also --

2            THE COURT:  Let me ask you, Ms. Nunn, if I could:

3    What does that mean?

4            MS. NUNN:  This is essentially the procedures that

5    must be met for the agreement and where Ethos is obligated to

6    make disbursements to Sector under this agreement.

7            THE COURT:  Okay.  Let me ask you, because I'm told by

8    the bank that, first of all, it is unfamiliar with that term.

9    And I'm told by the representative from Sector that it did

10   everything it needed to do in order for the standby letter of

11   credit to be posted, which is to say, it directed its bank to

12   send a letter to EWB, and EWB acknowledged acceptance of the

13   standby letter of credit.  What more needs to be sent up into

14   the sky to finally verify sufficient to your client's

15   satisfaction that the standby letter of credit was, in fact,

16   posted for the purposes that the parties intended?

17           MS. NUNN:  That's discussed in our brief on page 4

18   under section 4.1 of the agreement, "Sector must ensure the

19   issuance of updated bank accounts, bank statements, essentially

20   proof of funds confirming --

21           THE COURT:  Ms. Nunn, you really need to make a

22   conscious effort to sound out every syllable because we're

23   having a difficult time.

24           MS. NUNN:  I'm sorry.  On page 4 of our opposition

25   brief, we described the process for positive verification and

NB6RSECh

1     activation and the steps not met by Sector with respect to this

2     agreement.  Under section 14.1 of the agreement, Sector must

3     ensure the issuance of an updated bank statements confirming

4     the financial capacity of Sector and the willingness of

5     Sector's issuing bank to issue a standby letter of credit in

6     its provision of Swift MT760 in the form agreed by Ethos.  It

7     further states that after Ethos' receivings bank receives the

8     swift MT760 from Sector's issuing bank, it will carry out a

9     verification procedure.

10          THE COURT:  Who will carry out?

11          MS. NUNN:  There are a few other things --

12          THE COURT:  I'm sorry.  Who will carry out the

13    verification procedure?

14          MS. NUNN:  Ethos.

15          THE COURT:  Ethos will carry out a verification

16    procedure?  Are you saying that Ethos did not carry out a

17    verification procedure?

18          MS. NUNN:  Under certain circumstances, Ethos was

19    unable to receive updated bank statements confirming financial

20    capacity of Sector and was also unable to verify certain

21    assets.

22          THE COURT:  So now I'm hearing that it was Ethos that

23    was required to undertake positive verification procedures, and

24    it was unable to do so because it did not receive or could not

25    verify certain bank information concerning Sector?

NB6RSECh

1          MS. NUNN:  Unlike Sector's arguments today, these are

2     not new arguments that I'm raising at oral argument here.  I'm

3     reading from page 4 of our opposition brief.

4          THE COURT:  Yes, I'm reading from page 4 of our

5     opposition brief.  And it sounds like what you are saying to me

6     now is that the positive verification procedure and activation,

7     it was incumbent upon Ethos to undertake certain steps and that

8     Ethos was not able to do that.  Is that what you are saying to

9     me now?

10          MS. NUNN:  Section 4.1 is a fairly lengthy provision.

11     There are various roles for various parties in it, so I don't

12     want to simplify it down to Ethos just needed to verify an

13     account.  That's not what the agreement says.  And part of the

14     problem of, you know, this preliminary injunction hearing we're

15     having, and one of the things I would like to correct on the

16     record is, you know, I disagree vehemently with a number of the

17     allegations being made about Mr. Santos' declaration, about the

18     discussions being had in settlement and about, you know,

19     various things that have transpired with respect to Mr. Santos

20     trying to move funds after the hearing.  I mean, none of this

21     is stuff is true and is not appropriate for the forum.

22          We should be in mediation, and I'm grateful that

23     Sector has finally followed the contract, the bargain

24     agreement, and filed for mediation.  You know, it's sort of --

25     and part of the problem of this hasty rush to a preliminary

NB6RSECh

1    injunction hearing is that it's very difficult to understand

2    the nuances and provide, obviously, all the documents to show

3    all the problems that occurred underneath this agreement.  If

4    Sector indeed really did believe that they would be successful

5    on the merits, why did they not file a mediation request months

6    ago?  We would be done with this procedure by now?  Instead,

7    only after the Court and Ethos said numerous times that the

8    appropriate way to go about seeking relief that they hope to

9    gain here is to follow the dispute provision in this agreement

10   and go to mediation.

11          THE COURT:  Yes, I take that point, Ms. Nunn.  But let

12   me ask you this:  In your papers, first of all, you indicate

13   that from your perspective, Ethos was under no obligation to

14   release the funds that it had agreed to lend Sector because

15   there was never this positive verification procedure that was

16   completed.  And what Sector tells me is that, Well, you know

17   they never said that before and what we have on the record,

18   what they've submitted, are communications and emails from

19   Mr. Santos when Sector requested the release of the funds.  And

20   he never said, Well, I can't release the funds because you

21   haven't positively verified or we haven't positively verified.

22   We'll release the funds.  I've made the arrangements to release

23   the funds.  The funds are in the mail.  You'll get them as soon

24   as, you know, the bank releases them.  And now you are saying

25   something different.  So what is your explanation for that?

NB6RSECh

1          MS. NUNN:  Yeah, I mean, I think that Ethos has been

2     very straightforward and has tried to work with Sector in order

3     to be in the midst of good faith and productive negotiations

4     between the two.  And they have obviously, you know, always

5     taken the position that they would like to happily return the

6     $3.5 million, as well as if the standby letter of credit could

7     not be released, $5 million, as long as there's an agreement

8     signed between the parties.  That has always been Ethos'

9     position, and as I started off this conference, we have yet to

10    even hear back from Sector on that.

11          We agreed upon, obviously, the terms, and every time

12    that we get close, we can't seem to get it done here, which is

13    why I think mediation is necessary at this point.  There's no

14    argument on Ethos' part that they are not willing to reach a

15    compromise and try and go our separate ways.  But the fact of

16    the matter is this ex parte motion, filed in the midst of good

17    faith and productive notions between Ethos and Sector, is an

18    end run to get around the contract provisions that exist in the

19    agreement between Ethos and Sector.

20          THE COURT:  Let me ask you this, Ms. Nunn.  Ms. Nunn,

21    let me ask you this:  Again, I get your point that Sector

22    didn't file for arbitration, at least not in the first

23    instance.  Ms. Marasciullo, has presented arguments concerning

24    the balance sheets that were provided by Ethos in connection

25    with this litigation, and has, frankly, questioned the

NB6RSECh

1     authenticity of these documents.  It's a serious allegation.

2     I'll just leave it at that.  Did you want to respond to that?

3              MS. NUNN:  Yes, I have a few things I want to respond

4     to, and that is at the top of the list.  I must admit that it

5     was my idea to redact.  Ethos provided us everything.  Their

6     taxes, their financial statements, everything without any

7     redactions.  It was my idea that I never -- it never crossed my

8     mind that anyone would be looking at the numbers and saying

9     that they are too sequential.  We removed the actual bank

10    account numbers.  Those are not his bank account numbers.  I

11    thought that that would kind of go without saying.  But in the

12    abundance of caution, I don't want something that was done in

13    order to protect Ethos to come across in some sort of

14    fraudulent, you know, misrepresentation.  I did not --

15             THE COURT:  I'm sorry.  So now you are saying that the

16    numbers, the bank account numbers that are provided in the

17    Ethos Asset Management Inc. balance sheet as of September 30,

18    2023, aren't actual bank account numbers but rather numbers

19    that you created or were created at your direction for purposes

20    of this litigation?

21             MS. NUNN:  I did not change the total numbers.  The

22    numbers beneath, the bank account numbers are not his actual

23    bank account numbers.  Those are indeed -- were, I guess, sort

24    of changed at the -- at the -- at the firm is my understanding.

25             THE COURT:  At the what?

NB6RSECh

```
 1              MS. NUNN:  I'm sorry.  The total numbers, the numbers
 2     to the right, I did not touch.  Those are the numbers that were
 3     provided, but anything that is in reference to a bank account
 4     number --
 5              THE COURT:  Yes?
 6              MS. NUNN:  -- that is something that we redacted.
 7              THE COURT:  Again, you are using the word "redacted,"
 8     but if you redact the first however many digits, the remaining
 9     digits are still sequential.  So are you saying that you put in
10     proxy numbers in place of the actual bank account numbers, like
11     John Doe bank account numbers?
12              MS. NUNN:  I'm looking down this sheet, and I don't
13     believe that these numbers represent numbers that were
14     provided.  So I guess I should say, there was a bank account
15     number next to those numbers if that makes any sense.
16              THE COURT:  No.
17              THE DEFENDANT:  So where it says 105, 106, 107, 123,
18     1600, 1700 --
19              THE COURT:  Yes, I have those.
20              MS. NUNN:  Those are not account numbers.
21              THE COURT:  These are not account numbers?
22              MS. NUNN:  Correct.  Those are not account numbers.
23              THE COURT:  I've used the term John Doe numbers.
24     You've used the term redacted, but those numbers were made up,
25     correct?
```

NB6RSECh

1          MS. NUNN:  Correct.

2          THE COURT:  Who were they made up by?

3          MS. NUNN:  I would say probably our legal assistant

4    team.  Can I double check that?

5          THE COURT:  One of the reasons I tell lawyers to sit

6    down, as I've mentioned, is I can see the reaction.  One of

7    disadvantages that you have by not being here is that you can't

8    see my reaction, and you should know that I'm a little

9    perplexed at the explanation that you've given.  I understand

10   that you don't want to give actual account numbers.  We

11   frequently redact those, but when we do that, it's clear that

12   they are redacted or you might just put bank number XX,

13   whatever it may be.  But these numbers appear to be made up for

14   no good reason, and you didn't actually tell the parties that

15   these were not actual account numbers; is that correct?

16         MS. NUNN:  I did not tell the parties that these were

17   not actual numbers.  We tried to show the numbers to show Ethos

18   was entirely solvent.  I'm not entirely sure, but I believe it

19   was more information on this balance sheet than what we have

20   provided to the Court.  I guess I could not speak to how or

21   with the -- I don't have the original document in front of me

22   right now to tell you what was actually with certainty on there

23   and what we --

24         THE COURT:  It may be helpful now, Ms. Marasciullo,

25   for me to see the email that you have.

NB6RSECh

1              MS. MARASCIULLO:  Yes, your Honor.

2              MS. NUNN:  Your Honor, can I correct a few more things

3    if no one is speaking?

4              THE COURT:  Sure.  But, again, speak slowly.  Speak

5    slowly.

6              MS. NUNN:  I will speak very slowly.  I never

7    represented that I could email East West Bank and cancel the

8    standby letter of credit.  I do not have any ownership of Ethos

9    and no ability to do such a thing like that.

10             MS. MARASCIULLO:  Why are the emails saying that?

11             THE COURT:  No, no, no.  I'm sorry.  Ms. Nunn, what

12   was it that you just said?

13             MS. NUNN:  I never represented that I could email East

14   West Bank and cancel the standard letter of credit.

15             THE COURT:  You never represented that you could

16   cancel the standby letter of credit?

17             MS. NUNN:  Yes, yes.  There were a few things that

18   were being said by Sector's counsel that were alleged towards

19   me that I just wanted to clarify.  I did not say that I could

20   do that.

21             MS. MARASCIULLO:  I never meant to indicate that

22   Ms. Nunn could do it.  I have emails from Ms. Nunn saying that

23   Ethos could do it.  Your Honor, I did a very bad job of

24   redacting an email from my client to me.  That's the unredacted

25   email I got.

NB6RSECh

1          MS. NUNN:  Could I also continue, your Honor, with a

2     few other things very slowly?

3          THE COURT:  Sure.  Slowly.

4          MS. NUNN:  This is a dispositive account, as I believe

5     Ethos accurately described.  Money goes into this account,

6     money goes out.  This was not an account that was earmarked for

7     Sector as East West Bank has alluded to.  This is -- there was

8     nothing in the agreement that states that this account would be

9     kept with $3.25 million for Sector in it.  There are regular

10    transactions coming and going, deposits being made, withdrawals

11    being made, that have absolutely nothing to do with this matter

12    at hand.

13          THE COURT:  Okay.

14          MS. NUNN:  I just wanted to make sure that that was

15    absolutely clear, that the deposit account was like any other

16    account that one might have.

17          THE COURT:  Okay.

18          MS. NUNN:  I think it's clarified by East West Bank,

19    also, that we did not, after the hearing, make any withdrawals

20    out of the account.  If anything further needs to be stated on

21    that, let me know.  There's no proof or evidence that that

22    indeed was done.  Just to, you know, put a pin in that, the

23    burden obviously is not on Ethos in this preliminary injunction

24    hearing as we all know.  The burden is on Sector in this case

25    to provide affirmative evidence establishing that a failure to

NB6RSECh

1    issue an injunction as demanded would cause irreparable harm.

2    An injunction is obviously an extraordinary act, and in the

3    face of an entity that has hundreds of millions of dollars,

4    does not seem appropriate.  The arguments that have been made

5    are based on a monetary one, which is obviously insufficient in

6    a preliminary injunction to seek this sort of relief.

7            As discussed at the TRO, there's no actual or imminent

8    harm to plaintiff, and if we -- while Ethos has obviously tried

9    to proceed amicably and in good faith to reach an agreement, we

10   have been unable to, and that is by no means on the fault of

11   Ethos.  The payment schedule that Sector described was

12   something that the parties actually agreed to; whereas, Ethos

13   was asked to put on paper and provide to them, which they did

14   immediately, and then heard nothing.  I urge the Court to keep

15   in mind that this all transpired as a sort of end run around

16   the parties' contract, that neither defendant was given notice

17   or served ever in this case.  And they have never attempted to,

18   and they have really tried, as far as I can tell, to turn this

19   Court into its pursuit of relief despite the fact that there's

20   no immediate or irreparable harm and no reason to conclude that

21   the mediation that will take place in the next 30 days would

22   not result in the relief that they desire.

23           THE COURT:  Okay.  Thank you, Ms. Nunn.  What I have

24   is an email of -- can I indicate the names, Ms. Marasciullo?

25           MS. MARASCIULLO:  I would prefer that you didn't

NB6RSECh

1    because I -- we've already been threatened.

2              THE COURT:  I'm sorry.  Who has been threatened?

3              MS. MARASCIULLO:  It is my understanding that Ethos

4    has been out there -- I'm not using the word threatened in a

5    legal sense.  We've been on the receiving end of unpleasant

6    communications.  Let's put it that way.

7              THE COURT:  From whom or what types of parties?

8              MS. MARASCIULLO:  Well, from Ms. Nunn, and I

9    understand -- I've been contacted by several lawyers in the

10   last couple of days who have experienced similar treatment.

11   Meaning, they've handed over collateral to Ethos with the

12   understanding that Ethos would make a loan, and Ethos has not

13   made a loan.  People have been reaching out to me about this.

14   I suspect, based upon what I've heard, that transfers were

15   initiated.  Ms. Nunn's partner told me that they knew about

16   this case on Saturday.  I don't know when those transfers were

17   initiated out of the East West Bank account, but I'm not

18   surprised by it, and I would rather not see that money move.

19             I'm here to get relief from my client, and I would say

20   I'm looking at an email from Ms. Nunn dated November 9 saying,

21   "Ethos will send an email to EWB today releasing the SBLC."

22   That was at 11:58 Thursday morning, and then a couple hours

23   later, we heard from East West Bank indicating that Ethos

24   doesn't have the ability to release the SBLC because it's

25   incumbered.  We did not know that.

NB6RSECh

1        I would like to take a step back to address the issue

2   of the verification process that Ms. Nunn is talking about.  I

3   just want to address two things, if your Honor will indulge me?

4        THE COURT:  Okay.

5        MS. MARASCIULLO:  Number one, the standby letter of

6   credit is issued by J.P. Morgan, who has to honor it.  So the

7   idea that there needs to be a verification by Ethos of Sector's

8   assets doesn't make any sense with respect to the standby

9   letter of credit because it's not Sector that issued it as

10  everybody has told me.  It's J.P. Morgan.  So verifying

11  Sector's assets is irrelevant.  That's number one.  Number two,

12  that's not what the agreement says.  Number three, there's a

13  form for the standby letter of credit in the agreement and

14  that's the form in which it was issued.  So I think that's a

15  little bit of a frolic and a detour.

16       And perhaps I'm on one right now by bringing this up,

17  but I am concerned that reading the name of the person that

18  sent that to me, because, your Honor, I deliberately didn't

19  file a fraud claim or accuse anybody of fraud when I filed

20  this.  We said at the outset that we were going to pursue

21  arbitration.  I don't know why we're talking about that because

22  we have filed an arbitration.  But I would point out that

23  7502(c) allows the arbitration to be commenced.  That's the

24  language of the statute.  We didn't hide from the Court the

25  fact that there was an arbitration provision.  We said it.  We

NB6RSECh

1      were going to pursue on it, and now we have.

2              We're not here, as I said last week, seeking ultimate

3      recovery on the merits or ultimate recovery on our claim.

4      We're seeking the return of our collateral.  And what I've

5      heard here today is Ms. Nunn tell you that this is a wealthy

6      company with, you know, $700 million in cash in bank accounts.

7      East West Bank has told you they've moved $19 million to their

8      account.  On the day that we had a hearing, they tried to take

9      out another $500,000.  The concern that I have is that my

10     client will not live to get through an arbitration.  Now,

11     Ms. Nunn and Ethos and East West Bank can say, Well, that's not

12     monetary relief.  It's not monetary relief in two

13     circumstances.  It's not monetary relief when, one, there's a

14     real concern that the assets are going to be dissipated.  I

15     think that's is a legitimate concern.  I don't think anybody

16     who sat and listened to the evidence and read the pleadings

17     could have any doubt about that.

18             Number two, they are destroying my client's goodwill.

19     Your Honor, nobody has said that there isn't case law saying

20     when a business faces an existential threat to its goodwill

21     that that is not irreparable harm.  Nobody has said that

22     because it is irreparable harm.  When East West Bank said I

23     haven't carried the burden, that I offered you conclusions,

24     I've offered a ten-page affidavit that explains in incredible

25     detail what the problem is.  The problem is we shut down our

NB6RSECh

mines in Canada.  We've laid off people in Canada.  We are

looking to layoff people in Colombia.  It's not a simple cash

flow problem.  My client has been working on these mines and

developing them over a period of 20 years.  They've developed

relationships with banks and mining authorities in two

countries.  They've developed relationships with people on the

ground in two countries, and now all of that is getting

destroyed because a business that claims to have $699 million

in assets won't give us our $8.25 million in collateral back.

Now, Ms. Nunn might say, Oh, we didn't have an

obligation to pay you the $10 million.  I don't think her

interpretation of the contract passes the laugh test candidly.

But I'm not here asking you to give me relief on the claim that

I filed an arbitration.  I'm here asking you to tell a party

that has absconded with our collateral, that is managed by

someone who is not even a permanent resident of the United

States, to put our money -- to not withdraw any more money out

of account at East West Bank and not drawdown on that line of

credit so that we won't be on the hook on the standby letter of

credit that backs up the line of credit that my client wasn't

aware of.

I want to mention one more thing, East West Bank has

told you a number of times that I should have known about their

loan because it's in the standby letter of credit.  You know

what else in the standby letter of credit?  Our agreement.

NB6RSECh

1   It's on line 45(L) of the standby letter of credit so.  I mean,

2   it's very difficult to sit here and to listen to, You should

3   just trust me.  I'm just going to dangle you out infinitely

4   into the future.  You haven't acted fast enough.  You delayed,

5   so, therefore, you can't show irreparable harm, but you acted

6   prematurely because you have to go to arbitration.  This is not

7   something anybody took lightly.  We listened and heeded what

8   East West Bank said.  What is before the Court at this point is

9   an entity that indisputably has control of my client's

10  $8.25 million, that according to them has the ability to repay

11  it, and instead of taking the steps necessary to repay it, on

12  the morning of the hearing initiated $500,000 in wire

13  transfers.

14          MS. NUNN:  Your Honor, can I please comment very

15  briefly to some of that?

16          THE COURT:  Not yet.  Ms. Nunn, no.  What quibble I

17  would make of what you just said, Ms. Marasciullo, as I

18  understand it, the client -- if you are including in your

19  $8.5 million that Ethos supposedly has control over, it doesn't

20  have control over the standby letter of credit.

21          MS. MARASCIULLO:  Your Honor, it's funny you say that

22  because Ms. Nunn sent me multiple emails telling me that Ethos

23  could cancel it, and that's why I should settle the case.  If

24  we thought Ethos could cancel it, we might not be having this

25  conversation.

NB6RSECh

```
1              THE COURT:  Let let's put aside what Ms. Nunn said,

2     and you or Mr. Levison tell me if I'm wrong; Ethos doesn't have

3     control over the $5 million line of credit.

4              MS. MARASCIULLO:  I think if Ethos paid down the $6.8

5     money on the line, then we could probably reach an agreement,

6     and according to Ms. Nunn, they obviously have an ability to do

7     that.

8              MS. NUNN:  Your Honor?  At some point?

9              MS. MARASCIULLO:  If there were no withdrawals or

10    there was no balance on the line of credit that Ethos has with

11    East West Bank, there would be no need for that standby letter

12    of credit.  So the idea that we haven't tried to work this out,

13    we've tried.

14             THE COURT:  Ms. Nunn, you want to say anything?

15             MS. NUNN:  Your Honor, I honestly can't sit here

16    anymore and listen to this.  First, we started this soliloquy

17    with, I guess, implying that certain threats were made by

18    myself against Ms. Marasciullo.  I have no idea what she is

19    talking about.  I have only seen her with us in the Court here.

20    I have only corresponded via email and with other partners from

21    my law firm on the phone.  I have never, ever, ever in my life

22    made any sort of threat towards to Ms. Marasciullo or her

23    clients.  And I find it deeply, deeply offensive, what she's

24    implying to this Court, and it goes to the sheer falseness of

25    this whole TRO preliminary injunction.
```

NB6RSECh

1              My client, Ethos Asset Management, is a U.S. firm.

2     Regardless of the board or the founder's national origin, it is

3     a U.S. firm.  Second, I have never — again, I thought I made

4     this clear before — said that I can email East West Bank and

5     cancel the standby loan of credit.  In order to prove that, I'm

6     happy to show you the last version of the settlement agreement

7     which states, "We will cancel the standby letter of credit,

8     release it, or pay $5 million depending on what East West Bank

9     tell us is available."  Again, I've never done that.

10             The hearing on the 6th and the allegation that my

11    client, after the hearing, went to East West Bank trying to

12    remove funds is, again, false.  There is no evidence whatsoever

13    after this has been put forward that even makes that even

14    possible.  I'm very shocked at the level that we're going to in

15    this proceeding to act as if we've not been operating under

16    good faith to desperately get this settlement agreement signed,

17    which Ethos has been at the table from day one trying to get

18    done.  And only because Sector went behind their back hoping

19    that Ethos would not find out about this filing and show up in

20    court to prevent the TRO that was denied has this proved

21    difficult.

22             THE COURT:  Okay.

23             MS. MARASCIULLO:  Your Honor, can I just clarify one

24    thing?

25             THE COURT:  Sure.

NB6RSECh

1          MS. MARASCIULLO:  I didn't say that Ms. Nunn

2     threatened anyone in a legal way.  I said that Ethos has done

3     things, and Ethos has done things.  Ethos, I have spoken to at

4     least one lawyer who told me that he's in the midst of the

5     mediation.  He cannot name his client because he has -- I know

6     from what he has told me that it is accurate.  I have heard

7     from other parties, like I said, who have been told not to

8     provide information.  That email that you have is not

9     solicited.  I'm concerned about -- I'm concerned about the

10    party that sent us that email.

11         THE COURT:  Let me just --

12         MS. MARASCIULLO:  That was unsolicited and out of the

13    blue.

14         THE COURT:  I understand.  You have provided the

15    Court, Ms. Marasciullo, with evidence of two other lawsuits --

16         MS. MARASCIULLO:  Yes.

17         THE COURT:  -- that have been brought against Ethos.

18    They seem to allege conduct similar to the conduct that you are

19    alleging here, which is to say, an agreement was reached, the

20    deal was structured such that the lender provided 20 or

21    25 percent collateral and Ethos was thereafter to provide

22    funding in a series of tranches, as happened here, and in both

23    of those prior instances, one of which was filed in the state

24    court of Texas, I believe --

25         MS. MARASCIULLO:  Yes.

NB6RSECh

1          THE COURT:  -- one of which was filed in state court

2     here in New York.

3          MS. MARASCIULLO:  Yes.

4          THE COURT:  The lender provided the cash collateral

5     and thereafter, no financing followed, and that is what is

6     happening here.

7          MS. MARASCIULLO:  Yes.

8          THE COURT:  So now, you are stating on the record that

9     you have heard from others with apparently similar stories.

10    Are these apart from the entities that filed the lawsuits?

11         MS. MARASCIULLO:  Yes, they are.  They are apart from

12    the entities that filed the lawsuit.  There's another -- yes,

13    that is correct.

14         THE COURT:  And the email that you provided me, and I

15    will only characterize it to this extent, is that it lists four

16    accounts, four bank accounts.  Two I recognize as American

17    banks; two I don't recognize as foreign banks.  And it simply

18    lists places where Ethos apparently has accounts.  It doesn't

19    have the amount of money in any of those accounts.

20         MS. MARASCIULLO:  It doesn't have the amount of money.

21    It has the details though.  It has the account numbers and the

22    routing numbers.

23         THE COURT:  Yes.  That's the email that was provided

24    to me just so the record is clear.

25         MS. NUNN:  Your Honor?

NB6RSECh

1          THE COURT:  It does have the name of the person who

2    sent the email, and it was sent to Sector.

3          MS. MARASCIULLO:  That is correct.  And just to be

4    clear, I have heard from a lawyer representing another company

5    and I have heard from another business owner.  And then there's

6    a third company that did not file a lawsuit but there was a

7    bankruptcy.  It was referenced in the Beyond Limits complaint,

8    and I'm going to -- it's a complicated name, but it's like the

9    Idaho Health Exchange, and there are reported media reports

10   about it.  It's the same circumstance.  They provided

11   collateral.  They were supposed to get a loan, and they did not

12   provide collateral.  I mean, they did not get the loan.  This

13   is not an isolated event.

14          MS. NUNN:  Your Honor?

15          THE COURT:  Yes.

16          MS. NUNN:  I will speak slowly.  None of these cases

17   sought emergency TROs or preliminary injunctions, and they are

18   not an appropriate remedy under the contracts.  The company one

19   that we're discussing that is the state court case in Texas,

20   Travis County, was a start-up company in Texas court in 2022,

21   alleged various claims.  It was, of course, brought in the

22   wrong forum after a motion to compel, moved to arbitration.  It

23   was appropriately moved to arbitration, and within a few weeks,

24   it ceased to exist.  There's no allegation that Ethos

25   absconded, that Ethos refused to pay a judgment, that Ethos

NB6RSECh

1    went bankrupt.  Nothing on the record is other than the two

2    parties -- Advantage, is what the client is called, misfiled

3    the complaint, much like this, in court, and it was eventually

4    resolved.  And there was no judgment whatsoever against Ethos.

5    I'm not exactly sure where the allegations that Ethos is

6    judgment proof are coming from.  Similarly, Beyond Limits,

7    which is an artificial intelligence start-up, has failed to

8    serve even Ethos in their latest complaint that was awkwardly

9    filed in New York state court for an alleged breach of the

10    agreement.

11            Considering that Ethos has been in business for so

12    many years, naming three complaints against it in the entire

13    lifetime of the company, to me, seems slightly ridiculous.

14    None of these other companies sought TROs or PIs because it's

15    clearly inappropriate.  All of the cases did not follow the

16    provisions of the agreement, and both Beyond Limits, in this

17    case, these are plaintiffs who did not feel the need to provide

18    notice or provide the other side a copy of the complaint.  None

19    of the facts were consistent with the plaintiff getting

20    judgment and Ethos refusing to pay or being unable to pay the

21    amount ordered by the Court.

22            There's none of them feature injunction or freezing on

23    their bank accounts.  There's nothing even close to what Sector

24    contends is negligence in order to bring Ethos to the table.

25    In fact, the record reflects on the docket sheet that Ethos was

NB6RSECh

1    proactively involved in all of these cases and quite

2    successfully.

3           THE COURT:  Okay.  So --

4           MS. NUNN:  And just for the last part, I don't know

5    who this person is that alleges that they are an Ethos'

6    employee and is sending bank account numbers to Sector.  I find

7    this all very suspicious.  I can't see it.  I don't know who

8    it's from.  I just -- I am not sure.  I object to it, you know,

9    coming in as evidence and being considered as damning to Ethos

10   as, I guess, some employee saying that they have bank accounts.

11   I'm not exactly sure what it is alleging, but I find that it's

12   problematic.

13          MS. MARASCIULLO:  Well, your Honor, this is not ideal

14   for anybody, but the fact of the matter is, there's no dispute

15   that Ethos got my client's collateral.  There's no dispute that

16   it has dissipated yet, and that's why we're here.  There's also

17   no dispute that we filed for an arbitration.

18          THE COURT:  Okay.

19          MS. MARASCIULLO:  You know, the issue is whether or

20   not my client will live to see the end of an arbitration, or if

21   when it gets to the end and it prevails, if there's anything to

22   execute on.  That's the real concern that brought us here.

23   That has been the concern all along.  I'm back to Ethos is now

24   taking the position that they never had an obligation to pay

25   the -- it wasn't $10 million.  They've missed three tranches of

NB6RSECh

1    $10 million.  That's utterly inconsistent with what they told

2    us they were doing.  As recently as October 30, Carlos Santos

3    sent my client what he claimed was a wire transfer number from

4    Credit Suisse.  Now the money never showed up just like the

5    standby letter of credit was never canceled, and they don't

6    have an ability to cancel it.

7        THE COURT:  This is how I'm thinking about it and then

8    we'll take a break.

9        This is a hypothetical, so I'll try to make it clear.

10   Let's say Ms. Nunn borrowed money from Ms. Marasciullo, but

11   there was $100.  And let say Ms. Nunn separately borrowed money

12   from me.  Let's say it's $1,000.  Ms. Nunn is refusing for

13   whenever reason to pay back Ms. Marasciullo.  However, Ms. Nunn

14   has paid me back $700.  It sounds to me, Ms. Marasciullo, like

15   what you are asking the Court to do is to say, you, Ramos, the

16   Court, tell Ramos to pay Ms. Marasciullo the money that

17   Ms. Nunn owes her.  What is wrong with what I just described?

18       MS. MARASCIULLO:  I candidly did not follow your

19   hypothetical.

20       THE COURT:  I'm the bank.  I'm East West Bank, yes.

21       MS. MARASCIULLO:  I'm not asking East West Bank to pay

22   us anything, your Honor.  I'm asking you to enjoin --

23       THE COURT:  East West Bank --

24       MS. MARASCIULLO:  -- enjoin Ethos from drawing down,

25   taking any money out of the account that has the $812,000 in it

NB6RSECh

1  or drawing down on the line of credit they have with East West

2  Bank.  And I'm asking you to enjoin East West Bank -- actually

3  asking you to do what East West Bank has already done, which is

4  put a freeze on the account.  They put a freeze on the account,

5  you know, after the court hearing.  They think it's appropriate

6  because they did it.

7         MS. NUNN:  The Court hearing --

8         MS. MARASCIULLO:  I'm not asking you to order anybody

9  to pay me.  I'm asking you to put an injunction in place that

10  prohibits Ethos from moving its assets.

11         THE COURT:  But the way that you are doing it is

12  saying, Court direct Ramos to keep $100 that Ms. Nunn owes me;

13  whereas, it's my money.  I can do whatever I want.

14         MS. MARASCIULLO:  It's not the bank's money.  The bank

15  doesn't have title to that money.

16         THE COURT:  Mr. Levison?

17         MS. MARASCIULLO:  He's not custodian of that money.

18  They are holding it for Ethos.

19         THE COURT:  Mr. Levison, what you did you think of my

20  hypothetical?

21         MR. LEVISON:  I think it makes the point.  If I could

22  sum up to make it, short and sweet?

23         THE COURT:  Sure.

24         MR. LEVISON:  Sector has not asserted a claim against

25  East West Bank.  Notwithstanding the fact that Sector

NB6RSECh

desperately tries to bring up one in its reply papers by saying

there's a type of unjust enrichment claim against East West

Bank, it's never been asserted.  Let's put that aside for a

second.  If you note that there's no claim against East West

Bank, that means that there could be injunction against East

West Bank because you can't show it on the merits.  You can't

show irreparable harm.

Let's assume there was a magic complaint that was

filed, and there was a claim against East West Bank of unjust

enrichment, it would be dismissed its face.  You can't have it

on unjust enrichment because it can't possibly be unjust.  The

bank lent money.  The bank is entitled to set-off against this

account in the contract.  They are entitled take this and pay

itself back.  Now, again, the bank does not object to this

Court entering an injunction and enjoining Ethos from

withdrawing money.  That's fine, but the bank cannot be

prohibited from exercising its contractual right to these

monies.  There's no relationship to Sector.  Sector has no

superior right over that account or anybody else, any other

creditor.

MS. MARASCIULLO:  But your Honor -- sorry.

MR. LEVISON:  What the petitioner is attempting to do

is fit a square peg into a round hole.  It's just not a -- if I

could just finish --

MS. MARASCIULLO:  Your Honor --

NB6RSECh

```
 1              THE COURT:  Ms. Marasciullo, please wait.

 2              MR. LEVISON:  That's not what we're here about.  We're

 3    here for an application for a preliminary injunction that has

 4    been changed now twice, right, from the papers to what was said

 5    in reply to now an oral argument.  We're now at a completely

 6    separate request.  The bottom line is this:  The petitioner has

 7    not met its burden of proof as against the bank.  The bank

 8    should be free to exercise its rights.

 9              MS. MARASCIULLO:  Your Honor, may I respond just

10    briefly?

11              THE COURT:  Very briefly.

12              MS. MARASCIULLO:  Very briefly.  First of all,

13    Mr. Levison is right that theoretically we could seek an

14    attachment except for the fact that East West Bank is in

15    California, and as your Honor just issued an opinion in the

16    case, I can't get an order attachment from a New York court for

17    a bank in California.  However, pursuant to 7025(c) and section

18    6200 or 633 of the CPLR courts frequently order grant relief

19    against banks who are not defendants again who no claim is

20    asserted.  I disagree strongly with Mr. Levison I could in fact

21    assert against the bank I would rather not.  I would rather

22    just protect the assets.  The bank doesn't have a greater

23    interest in that money than we do.  The banks own affidavit

24    establishes that we deposited $3.25 million into an account at

25    East West Bank and Ethos has taken it.  The bank's papers also
```

NB6RSECh

1    establish --

2          MS. NUNN:  Your Honor --

3          MS. MARASCIULLO:  -- that Ethos has a line of credit

4    with the bank.  Right now, it's drawn down $6.8 million.  The

5    bank hadn't told you what other standby letter of credits they

6    have other than they have other standby letter of credit

7    securing that amount of money.  I don't know what the situation

8    with those is.  Nobody has sued Ethos with respect to those as

9    far as I know.  None of the lawyers that have called me have

10   told me that have made that claim.  So, you know, the bank is

11   here saying there's security.  My burden is to show that I have

12   a claim on which I'm substantially likely to succeed.  I

13   undeniably have an excellent claim against Ethos.  The bank

14   admits it.  I've undeniably met --

15         THE COURT:  I don't think the bank has said that.  I

16   think they said even if you are successful against Ethos --

17         MS. NUNN:  Your Honor, can I --

18         MS. MARASCIULLO:  Be that as it may, I don't need to

19   have -- if I was in here on an order of attachment, nobody

20   would be saying that I need to have a claim against the bank

21   where I was seeking an attachment.  That's the first thing.

22   The second thing is I don't think there's really much room to

23   say that we haven't shown that we're suffering irreparable

24   harm.  Mr. Dell'Orfano's affidavit stands before the Court

25   unchallenged.  He has clearly explained to the Court and in

NB6RSECh

great detail what the harm to Sector's goodwill has been, what

the harm of its relationship to its own bank has been, how its

own operations have stopped in Canada.

THE COURT:  Yes, but they are still not entitled to

that money until the legal process has played out through the

arbitration.

MS. NUNN:  Correct.

MS. MARASCIULLO:  Your Honor, I'm not asking you --

everybody else is telling you what I'm asking you for.  I'm

asking to you enjoin Ethos from taking money out of A12.  I'm

not asking you to order anybody to pay me or my client.  I'm

asking you to have that money frozen.  East West Bank has

already frozen it.  They've already frozen it.

MS. NUNN:  Your Honor?

MS. MARASCIULLO:  The second thing is I'm asking for

an order to have East West Bank enjoined from taking further

draws on its line of credit that it has from East West Bank,

because if they don't draw on that line of credit, East West

Bank is not going to need to draw on the standby letter of

credit, and that gives me some of the relief that we need.

THE COURT:  Okay.

MS. MARASCIULLO:  And honestly, your Honor, I mean the

thing that is kind of lost in the mix here, the thing that

doesn't make any sense to me is why a company that allegedly

has $699 million in ready, available cash can't pay down the

NB6RSECh

standby letter of credit or can't pay down their line of credit
with East West Bank and get the standby letter of credit
released, which I the emails here.  I have a million of them
saying we're going to get it released.

        MS. NUNN:  Your Honor, can I please --

        THE COURT:  No.

        MS. MARASCIULLO:  And also, why they can't just give
us our collateral back.  I can't emphasize this enough, your
Honor.  You know, your analogy is that I'm trying to get money
out of the bank.  I respectfully submit, your Honor that the
more appropriate analogy might be I get mugged.  My colleague
that is with me runs after the mugger and says, you know, give
me her wallet back.  Says, I'll give you 50 bucks.  Go away.
That's what happened here.  They took our money.  There's no
dispute.  They have our money.

        I'm not asking you even to order them to give our
money back.  I'm asking you to make sure that they are not able
to ensure that they were trying to do on Monday.  I'm not
making that allegation.  East West Bank told you they did that.
They don't really have a dog in the fight in between Ethos and
my client, but Ethos is clearly transferring money around.
It's not a risk of dissipation of assets.  And it's the fact of
dissipation of assets.  It's the fact that my client has been
put over the barrel by someone who has taken our collateral,
not performed and saying, I'm not giving your collateral back.

NB6RSECh

1    That's where we are.

2            I know this is inconvenient for everybody.  I'd much

3    perfect to work this out, but I don't have a willing partner.

4    I have East West Bank saying notwithstanding the fact that

5    we've frozen this money, we object to what you are doing.  And

6    I have Ethos saying, we want to settle, but they won't give me

7    a settlement agreement that is meaningful.  They will not do

8    it.  The settlement offers that I've gotten are, We'll cancel

9    the standby letter of credit.  I have got multiple emails

10   telling me that.  I kept saying, Can you do it?  Is it

11   incumbered?  And I got a run around, and I finally got an email

12   from East West Bank saying, No, we're not going to cancel the

13   standby letter of credit.  So it's more important to get the

14   cash back or to get -- I mean, I misspoke again.  I'm not

15   asking you to order them to give us the cash back.  I'm asking

16   them to freeze that account.

17           THE COURT:  Okay.  Thank you.  Ms. Nunn you have a

18   minute.

19           MS. NUNN:  Yes, I'll be very fast.

20           THE COURT:  No, no.  Don't be fast.  You just have a

21   minute.

22           MS. NUNN:  I would like to point out that the

23   representations that Sector's counsel are making are not true

24   as far as most of what I've heard today.  I can provide you a

25   copy of the last settlement that I sent to them that was

NB6RSECh

unanswered, and it by no means says that we will cancel the

standby letter of credit and that is the only form of relief.

They put a provision in that they agreed to that said that if

for some reason East West Bank was unwilling or unable to do

it, we would pay them $5 million and we provided everything we

asked for and we could not get them to sign the agreement.

Second, we've not taken any money away from Sector.

We've not dissipated any accounts.  This is, as we've discussed

all this hearing, a deposit account.  Money flows in, money

flows out.  It is not Sector's account.  We're not taking money

from Sector.  We are not -- there was a representation made

that we all agree, including Ethos, on a number of bases about

their being an inability to pay, and us perhaps not being able

to be brought forward to pay any judgment that came up.

There's nothing whatsoever on the record that even comes close

to the conclusion that any injunctive relief they seek in any

way would remedy their alleged injuries.

If this were a request to order Ethos to pay

collateral, there might actually be some nexus, but they've not

shown how the requested relief will prevent any of the alleged

injury; namely, injury to reputation and the loss of leases.

In fact, we now know the money is not even in that account.  So

to me, this case makes absolutely no sense on the basis of the

balance of the hardships.  The injunction in public interest is

that we obviously have an arbitration agreement.  Counsel

NB6RSECh

1    stated that they had filed an arbitration request.  That is not

2    true.  They actually filed a mediation request only after

3    several occasions where we asked:  Why we're not in mediation

4    in this case?  We have, I think, made the point over and over

5    that the most compelling factor of the four that they are

6    required to meet is the likelihood of irreparable harm here.

7    This is extraordinary relief that they are seeking.  It's not

8    just a casual to freeze someone's bank account, all of their

9    bank accounts with the bank.  And there is no proof that there

10    will be any type of irreparable harm if indeed the preliminary

11    injunction is not met and the parties continue on through

12    mediation.

13         And finally, the likelihood of success on the merits,

14    it's very clear that the parties do not agree on the facts of

15    this case and what was required under the contract and what was

16    the steps that would be needed to get the funds that were

17    required to be released in this agreement.  I think that is

18    something that is not a slam dunk for their side, and I think

19    that it is something that would have to be explored in a

20    mediation in terms of whether Sector breached the agreement or

21    whether Ethos breached the agreement.  There's a lot of

22    flowing, you know, allegations that we all agree -- Ethos

23    agrees, you know, East West Bank says, and they are just not

24    true.  I just want to emphasize to please, please pay attention

25    to the language to what is actually going on here.  I think

NB6RSECh

1    your example was fantastic.  I just don't see any world in

2    which a preliminary injunction could be granted under these

3    circumstances.

4              THE COURT:  Okay.  Thank you.  We'll take a few

5    minutes.  Don't go far.  Ms. Marasciullo, here are your

6    documents back.

7              MS. MARASCIULLO:  Thank you, your Honor.

8              (Recess)

9              THE COURT:  Ms. Nunn, are you with us, yes or no?

10   Ms. Nunn?

11             MS. NUNN:  Yes, I am with you.  Can you hear me?

12             THE COURT:  Yes, we are back and Ms. Marasciullo has

13   indicated she has something to share.

14             MS. MARASCIULLO:  Your Honor, I just got off the phone

15   with an Assistant U.S. Attorney in San Diego who reached out to

16   me over the weekend.  He advises me that Carlos Santos was

17   taken into custody today in Newark.  He is apparently appearing

18   in Newark for a hearing.

19             THE COURT:  He has been arrested?

20             MS. MARASCIULLO:  Yes.

21             THE COURT:  He is appearing in the Southern District

22   of New York?

23             MS. MARASCIULLO:  Apparently, he is appearing --

24             MS. NUNN:  Your Honor --

25             MS. MARASCIULLO:  I went outside and called him, and

NB6RSECh

said -- I asked him what the status was because he told me to

put on a Google alert yesterday when I spoke to him.  So I

called him to ask if there are any updates, and he told me that

Mr. Santos was taken into custody.

          MS. NUNN:  Your Honor?

          THE COURT:  In New York, as far as you know?

          MS. MARASCIULLO:  In Newark.

          THE COURT:  Newark, New Jersey?  Okay.  I'm sorry.

Madam court reporter was right.  Ms. Nunn?

          MS. NUNN:  I have obviously not spoken to my client

right now.  I have been on the phone entirely with you-all.  I

have no relationship with the AUSA's office, and no one has

called me.  I find this all very, very, very suspicion, the

email from Ethos employees, the calls from the AUSA's office.

We were talking about a preliminary injunction here.  I do not

have any, you know, information on what Sector's counsel is

reporting, but I do not think that regardless of whether he has

been picked up for -- I don't know what -- or this email from

this employee that came to her.

          I do understand that Sector's counsel has been

reaching out to others.  In fact, Sector has told me that if

they lost this preliminary injunction, that they were going to

do whatever they could to reach out to whoever they could to

bring actions against Ethos.  And I am not sure what this all

about, but none of this changes the four requirements of an

NB6RSECh

1    injunction and that Ethos Asset Management had more than enough

2    funds to proceed through mediation in the next 30 days and

3    satisfy any judgment that --

4            THE COURT:  Ms. Nunn, can I just stop you there for a

5    second?  Depending on what charges have been brought against

6    Mr. Santos, this could dramatically affect the Court's analysis

7    certainly of the likelihood of success.  Because if, as

8    plaintiff suggests, Mr. Santos never intended to provide the

9    financing that was negotiated with the collateral that was

10   provided, then that would certainly cause any court to take

11   that into consideration and would; probably result in a finding

12   by the Court that the plaintiff has established likelihood of

13   success on the merits.  The other factor is --

14           MS. NUNN:  That is one factor.  Assuming that that is

15   true and the arguments could be made in the first instance at

16   an oral argument now at the end of our proceeding.  Let's

17   assume that is true.  The statute still requires that all four

18   preliminary injunctions be established by, you know, actual

19   evidence.

20           THE COURT:  And Ms. Nunn -- Ms. Nunn, please,

21   Ms. Nunn?

22           The statute does not require that they be weighted

23   equally, and so this is what I think we need to do:  I think we

24   need to get some additional information.  Because, look,

25   there's a lot of federal laws, as I have come to learn, to my

NB6RSECh

1    chagrin, since taking the bench and a lot of federal criminal

2    laws.  We're working under the assumption, I think, all of us,

3    that Mr. Santos was taken into custody in connection with a

4    fraud affecting the business operations of Ethos.  If it was

5    for some other reason, then the analysis concerning likelihood

6    of success may not be as affected so strongly.  But assuming

7    that it was in connection with the operations of Ethos, then,

8    yeah, it's important.

9              So it would be important for me to know what the

10   allegations are and what the restraints are.  If Mr. Santos was

11   taken into custody and if he is released on bail, it is likely

12   that there will be substantial restraints on his liberty, and,

13   in particular, substantial restraints on his ability to run the

14   business including his ability to maintain any control over his

15   accounts.  So, you know, the FBI may have given Ms. Marasciullo

16   what she came here asking for, which is a restraint on the

17   dissipation those assets.  And because I do not want to issue

18   an opinion in light of these very emergent activities, what I

19   would want to do is direct the parties to advise me as soon as

20   they are able concerning the status of Mr. Santos' arrest, the

21   nature of the charges against him, including the complaint that

22   was filed.  That would be a matter of public information.  It

23   should be available this afternoon if it was arrested.  There

24   may be a press release from the Department of Justice.

25             MS. MARASCIULLO:  I literally just got off the phone

NB6RSECh

1    with the Assistant U.S. attorney.

2            THE COURT:  I know and my understanding of how this

3    works is they would not have shared with you prior to his

4    arrest.  In other words, he is giving you historical

5    information and not telling you that he will be arrested.  And

6    so, go find out what happened.  Let me know.  That information

7    should be available today, and we'll get back together perhaps

8    by phone.  Okay?

9            So I think I'll leave it at that, and I will wait to

10   hear from you-all.  So we are adjourned, but Ms. Nunn, don't

11   get off the phone just get.  I did want to ask a question.

12   Good evening, all.  We're adjourned.

13           MS. MARASCIULLO:  Thank you, your Honor.

14           MR. ALBERTS:  Thank you, your Honor.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25