UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECTOR RESOURCES LTD *and* SECTOR CAPITAL CORPORATION,

Plaintiffs,

*– against –*

ETHOS ASSET MANAGEMENT, INC., CARLOS MANUEL DA SILVA SANTOS, *also known as Carlos Santos*, *and* EAST WEST BANCORP, INC., *doing business as East West Bank, Inc.*,

Defendants.

**OPINION & ORDER**

23-cv-9728 (ER)

RAMOS, D.J.:

Sector Resources Ltd. ("Sector") and Sector Capital Corporation ("Sector Capital") filed a fourth amended complaint ("FAC") on August 21, 2025, asserting claims against Carlos Manual da Silva Santos ("Santos"), Ethos Asset Management Inc. ("Ethos"), and East West Bankcorp, Inc. ("EWB"). Doc. No. 151. With respect to EWB, Plaintiffs assert claims of RICO conspiracy, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, fraud, unjust enrichment, conversion, aiding and abetting conversion, and replevin. *Id.* Before the Court is EWB's motion to dismiss all claims against it and for costs. Doc. 178. For the reasons stated below, the motion to dismiss for failure to state a claim is GRANTED and the motion for costs is DENIED. Plaintiffs will be given an opportunity to file an amended complaint for the following counts: RICO conspiracy, fraud, conversion, aiding and abetting fraud, and aiding and abetting conversion.

## I. BACKGROUND[1]

This lawsuit arises from Plaintiffs' claims that they were defrauded by Ethos and Santos, founder and chief executive officer of Ethos (collectively, "the Ethos Defendants"). According to Plaintiffs, Ethos and Santos operated a multimillion-dollar Ponzi scheme from July 2020 to November 2023 that worked as follows: (1) Santos identified businesses in need of funding; (2) Ethos offered loans to prospective borrowers in exchange for collateral of 20–25% of the loan amount up front; (3) to induce a borrower to provide the collateral, Santos made financial misrepresentations about Ethos, including falsified bank records, and promised that Ethos would only use the collateral in the event of a borrower's default; (4) Santos used the borrower's collateral to obtain cash advances from a line of credit with EWB and used the funds to release collateral paid by other borrowers and to pay for personal expenses; (5) when Santos failed to deliver on the promised loans to borrowers, Santos made additional misrepresentations to deter them from terminating their agreements with Ethos, demanding that their collateral be returned, or engaging in litigation; and (6) Santos used confidentiality agreements and arbitration provisions to conceal the fraud. Doc. No. 151 ¶¶ 1, 2, 27, 30–37. Plaintiffs allege that they were among the companies that were defrauded by the scheme.[2]

### A. Ethos' Line of Credit with EWB

In October 2022, Santos requested that EWB issue a line of credit to Ethos with a credit limit of $20 million backed by credit in the form of standby letters of credit

---

[1] The following facts are taken from Plaintiffs' FAC, Doc. No. 151, documents incorporated by reference by the FAC, and documents integral to the FAC.

[2] Plaintiffs allege that among other companies similarly victimized were Entvantage Corporation, Beyond Limits, Inc., Green Glycols B.V., and ST Properties. *See e.g.* Doc. No. 151 ¶¶ 44–51.

("SBLC"). Doc. No. 151 ¶ 331. In an October 22, 2022 email, EWB first vice president, Jeffrey Yu advised Santos that EWB needed financial documents including tax returns for the last three years to underwrite the line of credit. *Id.* ¶¶ 118, 332. Santos provided Ethos' 2019–21 financial statements as well as Ethos' 2019 and 2020 tax returns. *Id.* ¶ 333–34. Santos told EWB that it could not provide the 2021 tax return as it had not yet been filed. *Id.* On October 26, 2022, another EWB representative, Joseph Han, asked Santos and other Ethos employees a series of questions about the tax returns and financial statements, including why issued capital increased from $1,000 to $718,819,855 between February and December 2021. *Id.* ¶ 336; Doc. No. 151-12. That same day, Santos responded to EWB to explain the discrepancies. Doc. 179-5 at 27–31.[3]

Also that day, EWB sent a template SBLC to Santos, which includes the following: "We hereby issue our irrevocable [SBLC] number _________ for account of [Ethos] in favor of [EWB]." Docs. 151 n.7; 151-3 at 19.[4]

On October 31, 2022, Yu told Santos that he had proposed to EWB that Ethos' line of credit be $14.88 million, as requests over $15 million required a different level of approval. Doc. No. 151 ¶¶ 335, 340. According to a November 4, 2022 email, EWB would collect between 3.5–7% interest on any cash advanced under this line of credit. *Id.* ¶ 138.

---

[3] Though Plaintiffs only mention EWB's email to Santos and not his reply, the emails are incorporated by reference. *Kulick v. Gordon Property Group*, LLC, No. 23 Civ. 9928 (KPF), 2025 WL 448333, at *4 (S.D.N.Y. Feb. 7, 2025) ("Where a complaint directly refers to specific emails in an email chain, a court can consider the email chain as incorporated by reference in the complaint.")

[4] Plaintiffs only provide the template SBLC included on their final loan agreement with Ethos, dated March 29, 2023. *See* Doc. No. 151-3. However, Plaintiffs allege that the template in their final loan agreement was the same one that EWB provided Ethos in October 2022. *See* Doc. No. 151 ¶ 423.

On November 15, 2022, Han emailed Santos saying "[w]e have presented the proposal to our credit supervisors. Though there appears to be no concern over the credit, one of our credit officers would like us to expand our due diligence . . . " Doc. No. 151-12 at 7. Han again requested that Santos provide information concerning Ethos' capital injections and loans mentioned in the financial statements. *Id.* In a November 17, 2022, email, Santos responded by stating that the capital injections originated from his personal bank account and provided details as to a loan agreement between himself and Ethos. Doc. No. 151-12 at 8–9. Santos attached notes from Ethos' board meeting discussing the transfers, copies of certain brokerage accounts, and the loan agreement between himself and Ethos. *Id.* After EWB requested additional bank statements to substantiate the claims, Santos refused saying that his "personal account is not related with my business" and that EWB's "request is in fact not even acceptable." Doc. No. 151-12 at 11.

Yu eventually told Santos that he did not need to provide the documents requested by Han, except for Ethos' 2021 tax return. Doc. No. 151 ¶ 337. Despite the fact that Santos did not provide Ethos' 2021 tax return, in a November 21, 2022, email, Yu told Santos that EWB had approved "the concept" of the line of credit and told Santos "when you have a deal that needs to be presented, please send all the information and we will prepare underwriting and evaluation on a case by case basis." *Id.* ¶¶ 338–39. In emails exchanged over the next couple of days, Yu confirmed that EWB's approval of the line of credit was conditional and dependent on "specific deal[s] which require[] satisfactory [know your customer] and due diligence on the specific project[s]." *Id.* ¶ 340. On November 23, 2022, Santos advised EWB that Ethos had multiple deals ready for review. *Id.* ¶ 342.

On December 20, 2022, Santos requested that EWB provide a cash advance based on an SBLC provided by CTR, a company to whom Ethos had granted a loan. *Id.* ¶ 84. Santos explained that Ethos planned to use the cash advance to make payments to three other borrower companies. *Id.* ¶ 84. Santos included the following diagram to demonstrate the plan. *Id.*




In this email, Santos included Ethos' loan agreement with CTR, which stated that CTR's SBLC could only be 1ent of CTR's default on the loan from Ethos. *Id.* ¶ 85. Despite the fact that CTR had not defaulted on the loan, EWB approved the request, allowing Santos to obtain a cash advance from its line of credit. *Id.* ¶ 86.

A business loan agreement dated December 29, 2022 specifies the terms of Ethos' ability to borrow money from EWB, including a "revolving line of credit." *See* Doc. No.

51-2.[5] The agreement defines Ethos as the "Borrower" and EWB as the "Lendor," and allows Ethos to request a maximum of $14,800,000 cash advances. *Id.* Under the agreement, Ethos was required to maintain an irrevocable SBLC equal to, at least the amount of cash advanced. *Id.* Further, it stated that EWB "may cancel or reduce the amount of the [SBLC]" either of its own accord or upon request by Ethos. *Id.*

As it had done with CTR's SBLC in December 2022, on January 6, 2023, Santos requested EWB provide a $9.31 million cash advance based on an SBLC provided by a different company, Green Glycol. *Id.* ¶ 96. Santos sent EWB a PowerPoint which demonstrated that Ethos planned to use the cash advance to pay other borrowing companies, including CTR. *Id* ¶¶ 96, 347. The PowerPoint included the following diagram:

[5] Though not attached the FAC, Plaintiffs incorporate this agreement by reference. *See* Doc. No. 151 ¶¶ 7, 260-61.




Similarly to the CTR loan agreement, Green Glycol's agreement with Ethos stated that Ethos would not execute the SBLC for any reason other than Green Glycol's default on the loan. *Id.* EWB approved Ethos' request for a cash advance. *Id.* ¶ 97.

### B. Plaintiffs Are Induced to Enter a Loan Agreement with Ethos

Plaintiffs identify themselves as family-run companies in the mining business, owned by William Dell'Orfano and his sons. Dell'Orfano owns 100% of Sector Capital's shares and serves as president, director, and chairman. *Id.* ¶¶ 65–66. Dell'Orfano owns 52% of Sector while his sons collectively own 48% of Sector. *Id.* Dell'Orfano and one of his sons "run Sector." *Id.*

In October 2022, Dell'Orfano and one of his sons were introduced to Ethos as a potential source of financing. *Id.* ¶ 65. Later that month, they signed a confidentiality

agreement and Ethos provided a brochure describing the process of obtaining financing. *Id.* The brochure stated that Ethos required prospective borrowers and their guarantors to submit extensive documentation; that borrowers were required to provide collateral worth 20% of the value of the loan; and that Ethos would provide its own due diligence documentation including financial documents and client references. *Id.* ¶ 68.

In November 2022, Plaintiffs began providing Ethos with the requested information. *Id.* ¶ 69. On November 23, 2022, Sector advised Ethos that Sector Capital would act as a guarantor for any loan granted to Sector, and that Sector Capital would arrange the 20% collateral in the form of an SBLC. *Id.* Ethos requested documentation regarding Sector Capital and that the parties enter a formalized agreement. *Id.*

In a letter dated December 14, 2022, Ethos told Sector that it had been pre-approved for a loan. *Id.* ¶ 73. In that letter, Ethos stated that Plaintiffs' collateral would be "used as a guarantee if [Sector] fail[ed] to fulfill a contractual commitment to Ethos." *Id.*

On December 20, 2022, Plaintiffs met with Santos and other Ethos employees on a Zoom call, on which Santos made multiple misrepresentations: Santos claimed that Ethos had a proprietary trading algorithm which generated capital for Ethos to loan clients money around the world; that Ethos adhered to strict ethical standards; that Ethos could make a $50 million dollar loan to Sector; and that Ethos would only use the collateral if Sector defaulted on its obligations to repay the loan. *Id.* ¶ 75. Plaintiffs allege that none of these statements were true. *Id.* ¶ 76. With respect to the collateral, Plaintiffs allege that Ethos planned to immediately use the collateral to secure a cash advance on a line of credit with EWB. *Id.* ¶ 78. During further negotiations over the next several months, the Ethos Defendants repeated these misrepresentations. *Id.* ¶ 79.

On December 22, 2022, Santos sent Plaintiffs a draft loan agreement for $50 million provided that Plaintiffs provided a $10 million SBLC (the "Sector SBLC"). *Id.* ¶ 80. The draft agreement stated that Ethos had not used corporate funds for any unlawful expense or payment, that the Sector SBLC could only be used to mitigate damages caused by a potential default, and the Sector SBLC had to be delivered in a format acceptable to EWB. *Id.* ¶¶ 80–83. Santos also sent Plaintiffs the template SBLC that EWB had provided him in October 2022. *Id.* 117.

In an email also on December 22, 2022, Dell'Orfano requested that Ethos confirm that the Sector SBLC would not be used for any purpose other than ensuring Sector's obligation to pay the loan. *Id.* ¶ 89. In emails dated December 28 and 29, 2022, Ethos' chief legal officer, Leandro Fernandes, responded, with Santos cc'd, confirming that the Sector SBLC would only be accessed if Sector defaulted on its loan. *Id.*

On January 13, 2023, Fernandes provided Plaintiffs with a second draft of the loan agreement, which contained the same material provisions as the December draft and the template SBLC that EWB initially provided Santos. *Id.* ¶¶ 91, 117.

On February 10, 2023, Santos sent Plaintiffs two documents which were purportedly Ethos' 2020 and 2021 financial statements. *Id.* ¶¶ 42, 107. Both documents falsely inflated Ethos' assets and income and falsely stated that Ethos had been audited by an accounting firm. *Id.* ¶ 42. Santos later admitted that he provided these financial reports to induce Sector to execute the loan agreement and provide the SBLC collateral. *Id.* ¶ 110.

On February 11, 2023, Ethos employees introduced Plaintiffs to two "purportedly satisfied" Ethos clients, and later that month Dell'Orfano spoke with both clients who

told Plaintiffs that their companies received funding from Ethos and that Ethos was reliable. *Id.* ¶ 114.

In reliance on the representations made during their meetings and other communications in December 2022 and January 2023, Sector agreed to execute a loan agreement with Ethos. *Id.* ¶ 116.

**C. Ethos Requests a Cash Advance Based on Plaintiffs' Forthcoming SBLC.**

Plaintiffs requested that their bank, J.P. Morgan, issue a draft SBLC using the EWB template that Ethos provided Plaintiffs. *Id.* ¶ 117. J.P. Morgan issued a draft SBLC which identified Plaintiffs as the "Obligors" and the draft loan agreement as the "underlying transaction" to the SBLC. *Id.*

On March 1, 2023, Santos provided Yu and EWB senior vice president, Li Zhang, a copy of the SBLC from J.P. Morgan. *Id.* at ¶ 118. Yu asked to "have a chat" to "learn more about the content." *Id.* Also on March 1, 2023, Santos emailed J.P. Morgan and Plaintiffs, stating that the Sector SBLC was acceptable to Ethos and EWB. *Id.* ¶ 119. Yu was cc'd on the email and did not object. *Id.*

On March 21, 2023, Santos discussed Ethos' proposed transaction with Plaintiffs, Yu, and Zhang. *Id.* ¶ 120. During those discussions, Santos told EWB that Ethos planned to seek an immediate cash advance based on Plaintiffs' Sector SBLC to increase the limit on their line of credit. *Id.* In a March 22, 2023 email to EWB, Santos further discussed this plan and explained that Ethos intended to use the cash advances to make payments to nine other companies. *Id.* ¶ 121. Santos included the following PowerPoint slides:







*Id.* The next day, Yu emailed Santos stating that he and Zhang reviewed the flow chart, "understand it well," and were preparing a memo for management review. *Id.* ¶ 125.

On March 23, 2023, Han requested Ethos' 2021 tax return. *Id.* ¶ 157; Doc. No. 151-12 at 12. Yu and Zhang were cc'd on that email. *Id.* That same day, Yu emailed Ethos and Santos requesting information as to the investments Ethos planned to engage in with EWB financing. *Id.*

In a March 26, 2023 email to EWB, Santos identified Plaintiffs as being the source of the Sector SBLC and delivered a copy of the unexecuted loan agreement between Ethos and Plaintiffs. *Id.* ¶ 126. The agreement stated that the Sector SBLC could only be used if Sector defaulted on its loan. *Id.* That same day, Santos also provided EWB with the identities of each of the payee entities identified in the PowerPoint slides. *Id.* ¶ 127.

Plaintiffs allege that this communication demonstrates that EWB knew that the Sector SBLC was in exchange for a $50 million loan from Ethos; that Ethos had represented that the Sector SBLC would only be used if Sector defaulted on its loan; that Plaintiffs had not defaulted on the loan as it was still unexecuted; and that Ethos planned to use the Sector SBLC for an immediate cash advance anyway. *Id.* ¶¶ 128–30. They further allege that, the PowerPoint diagrams that Ethos sent EWB bear the "hallmarks of a Ponzi scheme" and therefore, EWB knew that the cash advances were being used to operate a Ponzi scheme. *Id.* ¶¶ 132–34.

On March 27, 2023, Yu emailed Santos acknowledging receipt of the materials and stating that based on the information provided, he and Zhang would continue to work on the memo for management review. *Id.* ¶ 135.

### D. Plaintiffs Execute the Loan Agreement and the SBLC is Issued to EWB.

The final loan agreement (the "Loan Agreement") that Ethos provided Plaintiffs is dated March 29, 2023, and signed by Sector. *See id.* ¶ 139; Doc. No. 151-3. The Loan Agreement included the same alleged misrepresentations as the December 2022 and January 2023 draft agreements: that neither Ethos nor its directors used corporate funds for any unlawful purpose and that the SBLC could only be executed following Plaintiffs' default on loan repayment. Doc. No. 151 ¶¶ 139–41. Plaintiffs allege that Santos, Ethos, and EWB knew these terms were false at the time, and Plaintiffs relied on these misrepresentations in ultimately executing their agreement. *Id.* ¶¶ 144, 147.[6]

Also like the December 2022 and January 2023 draft agreements, attached to the Loan Agreement was the template SBLC that EWB provided to Ethos in October 2022. *See* Doc. No. 151-3 at 19; Doc. No. 151 ¶ 423. With respect to the SBLC, Section 3.3 of the Loan Agreement reads: "In consideration for the funds provided by [Ethos] . . . [Sector] shall issue a [SBLC] to [Ethos] substantially in the form attached hereto. . ." Doc. No. 151-3 at 3–4. Section 3.4 imposes requirements as to the SBLC, including that "the issuing bank, the verbiage, and the format of the [SBLC] shall be agreed to by the Parties. The draft of the [SBLC] is attached hereto . . . and is a part of this Agreement." *Id.* Further Section 7.3 reads: "Following an Event of Default by [Sector] . . . [Ethos] will be entitled to execute the [SBLC] to mitigate the damages caused by the default. Under no

---

[6] On March 28, 2023, Yu emailed Santos, asking Santos to explain a discrepancy between his 2022 financial statement, which stated Ethos had $1 billion in cash despite the fact that the reported bank accounts contained approximately $500 million in cash. *Id.* ¶ 158; Doc. No. 151-12 at 13. Ethos responded stating that it had only provided some of its bank statements to prove financial liquidity, but that it had additional bank statements that it did not share. *Id.*

circumstances, other than default by [Sector] may [Ethos] execute the [SBLC]." *Id.* at 12.

The attached SBLC template itself reads, "we hereby issue our irrevocable standby letter of credit . . . for account of [Ethos] in favor of [EWB]." *See id.* at 19. It also includes a section which allows EWB to demand payment from the issuing bank where "the amount claimed . . . covers unpaid indebtedness . . . due to [EWB] arising from the granting of banking facilities to [Ethos]." *Id.*

On April 5, 2023, J.P. Morgan sent the Sector SBLC to EWB. *Id.* ¶ 152. The Sector SBLC identifies J.P. Morgan as the issuer and EWB as the beneficiary. *See* Doc. 179-2 at 3.[7] It further states that "this [SBLC] is issued to support the credit/banking facilities granted to [Ethos] by [EWB]." *Id.* at 4. It further reads, "[e]xcept as expressly stated herein, this undertaking is not subject to any condition or qualification. The obligation of [J.P. Morgan] under this [SBLC] is the individual obligation of [J.P. Morgan] and is in no way contingent upon reimbursement . . ." *Id.* at 3.

**E. Ethos Continues with its Alleged Ponzi Scheme**

On April 6, 2023, Yu emailed Ethos that EWB had received the Sector SBLC from J.P. Morgan, and in emails dated April 6 and April 11, 2023, EWB invited Ethos to make a cash advance from their line of credit based on the Sector SBLC. *Id.* ¶ 153. Plaintiffs allege that EWB knew that the Sector SBLC was only to be used in the event of Plaintiffs' default, and that it was impossible for Plaintiffs to have defaulted because the first payment under the loan was not due for another several weeks. *Id.* ¶ 155.

[7] The Sector SBLC is not attached to the FAC, but Plaintiffs incorporate it by reference. *See* Doc. No. 151 ¶ 423.

On April 11, 2023, Santos requested that EWB issue a cash advance of $3.33 million based on Plaintiffs' SBLC and advised EWB that it intended to use the money to make a payment to a different Ethos borrower. *Id.* ¶ 159. EWB approved this cash advance. *Id.* ¶ 160.[8]

On April 17, 2023, Zhang emailed Santos again requesting that he "let [EWB] know Ethos' 2021 Tax Return status," to prevent a potential delinquent reporting status. *Id.* ¶ 157; Doc. No. 151-12 at 14. On April 25, 2023, Han asked Santos to explain why Ethos' 2022 financial statement reported over $1 billion in cash while the combined balance of Ethos' bank accounts totaled less than $500 million in cash. *Id* ¶ 158; Doc. No. 151-12 at 15. On April 26, 2023, Santos responded to the question, attaching an additional account which contained approximately $300 million and stating that he'd share the remaining statements for the remaining amounts. *See* Doc. 179-7 at 5–6.[9]

On April 27, 2023, Han again requested Ethos' 2021 tax return, because EWB "need[ed] it to move forward with the loan proposals." Doc. No. 151 ¶ 157; Doc. No. 151-12 at 16. Santos told EWB that it had not yet filed the 2021 tax return. Doc. No. 151 ¶ 157.

Also on April 27, 2023, Ethos requested that EWB issue a second cash advance of $1.2 million based on the Sector SBLC, and Ethos advised EWB that it intended to use

---

[8] The FAC does not explicitly state when this cash advance was approved.

[9] Plaintiffs allege that Santos never provided bank account statements to explain this discrepancy. *Id.* ¶ 158. However, as detailed above, EWB provides the email chain in which Santos at least partially provides information accounting for the discrepancy. *See* Doc. 179-7. The Court may take reference of the full email chain. *See Kulick*, 2025 WL 448333, at *4 ("Where a complaint directly refers to specific emails in an email chain, a court can consider the email chain as incorporated by reference in the complaint.").

the money to pay another Ethos borrower. *Id.* ¶ 160. EWB ultimately approved this cash advance. *Id.*[10]

Between May 8 and 9, 2023, Han again asked Santos to provide Ethos' 2021 tax return and a 2022 auditor-complied financial statements. *Id.* ¶ 164. Santos told EWB that Ethos' 2021 tax return had not yet been filed and initially refused to provide the financial statements. *Id.* On May 11, 2023, Santos provided fabricated financial statements to EWB with a forged signature of Carly Thompson, an employee of an external auditing firm. *Id.*

That same week, EWB refused to raise Ethos' credit limit above $14.8 million. *Id.* ¶ 165. Santos responded by asking that EWB "release" almost $5 million of the Sector SBLC. *Id.* ¶ 166. EWB granted the request, and on May 17, 2023, it sent a message to J.P. Morgan to reduce the face value of the SBLC collateral without providing any reason for the request. *Id.* ¶ 167–68. Plaintiffs allege that EWB did not provide J.P. Morgan an explanation because it knew Ethos was engaged in fraud. *Id.* ¶ 168. Plaintiffs allege that the reduction in the Sector SBLC was done to induce Plaintiffs to provide cash collateral, separate from the SBLC. *Id.* ¶ 169.

In emails and calls between May 15–17, 2023, Santos falsely told Plaintiffs that EWB had rejected $4.9 million of the Sector SBLC due to the failure of First Republic Bank and requested that Plaintiffs provide $3.25 million in cash collateral as a substitute. *Id.* ¶ 170.[11] On June 6, 2023, Plaintiffs sent Ethos $3.25 million in cash. *Id.* ¶ 179.

[10] While the FAC states that Ethos asked for cash advances on April 11 and 27, 2023, and that EWB approved those requests, it does not state the date that EWB approved the requests.

[11] Plaintiffs assert that their reliance on Santos' misrepresentation about First Republic Bank was reasonable, as First Republic Bank had failed on May 1, 2023, shortly after the failures of Silicon Valley Bank and Signature Bank in March 2023. *Id.* ¶¶ 176–77.

Sometime between May 11, 2023 and the end of spring 2023, the Department of Homeland Security contacted Carly Thompson, whose signature had allegedly been forged by Santos on the Ethos 2022 Financial Statement. *Id.* ¶ 200. Plaintiffs allege that EWB learned about the forged signature at that time and learned that Santos and Ethos were the subjects of a grand jury investigation.

On July 20, 2023, EWB approved another request by Santos to withdraw the last $150,000 available on Ethos' line of credit with EWB. *Id.* ¶ 201. On July 26, 2023, EWB representatives again asked Ethos to explain the discrepancies between the available cash reported in its financial statement as compared to its bank statements. *Id.* ¶ 199; Doc. 150-12 at 18.

Under the Loan Agreement, Ethos was required to deliver $10 million loan payments to Sector on July 20, 2023, August 31, 2023, October 16, 2023, November 29, 2023 and January 12, 2024; however, Ethos never provided any such payments. ¶ 180.[12] Throughout July and August 2023, Santos and other Ethos representatives falsely told Plaintiffs that Ethos possessed the capital and had taken actions to make the loan payments but there were unforeseen delays with their bank processing the transfer. *Id.* ¶¶ 180–184. Plaintiffs allege that these misrepresentations were material to their decision to grant Ethos more time to deliver the loan. *Id.* ¶ 188.

### F. EWB Closes Ethos' Line of Credit

On August 11, 2023, Zhang advised Santos that EWB was closing Ethos' line of credit and demanded that Ethos repay its debts with EWB. *Id.* ¶ 202. In an August 18,

[12] Separately, Plaintiffs allege that Ethos was required to deliver its first loan payment to Sector by May 5, 2023; however, it failed to do so. *Id.* ¶ 163.

2023 email, Zhang requested that the line of credit be repaid within four weeks and stated:

> Per our phone discussion, we've been challenged by the auditors on company's books and records during their routine reviews. As you know, in banking practice our lending cannot be solely relying on the [Sector SBLC], which is our last source of the loan repayment. Currently, we don't want to trigger the [Sector SBLC] and we would like to get your support, and not to make the issue more complicated. However, it doesn't mean this is the end of our relationship.

Doc. 150-12 at 19. In an email dated August 21, 2023, Santos reminded EWB that Ethos had provided all of the contracts underlying the SBLCs from multiple borrowing companies (not just the Sector SBLC) and documents concerning how Ethos intended to use the cash advances. Doc. No. 151 ¶ 203. On August 23, 2023, Zhang told Santos that Green Glycol's bank had sent a request to cancel its SBLC, but that EWB would not release the SBLC unless Ethos paid off its loan against the Green Glycol SBLC. *Id.* ¶ 204.

In an email dated September 15, 2023, Zhang emailed Santos :

> As of 9/15/2023, there is still a loan outstanding of $11,800,000. Per our communication this Monday on 9/11/2023, Ethos will make the following loan repayments:
>
> - $5,000,000 loan repayment this week.
> - Another $5,000,000 loan repayment [] to pay off the remaining balance of $6,800,00 completely next week.
>
> Up to this moment, we have not received the loan repayment per above schedule . . . Please note that our audit tracking team has been following up this matter with me closely. They've suggested that it will be easier to draw on the SBLCs to offset the delinquent loan repayment. Please consider the matter as Urgency. . .

Doc. No. 151-12 at 20.

### G. Sector Declares Ethos in Default of the Loan Agreement

Through early September 2023, Santos continued to tell Plaintiffs that he had initiated the transfer of the loans pursuant to the Loan Agreement. *Id.* ¶ 190. In an email dated September 12, 2023, Santos told Plaintiffs and J.P. Morgan that he had requested

that EWB reduce the Sector SBLC by $3 million. *Id.* ¶ 192. In a September 16, 2023 email, Santos claimed that the reduction was delayed because EWB wanted to modify the wording of the request. *Id.* Each of these representations was false. *Id.*

On September 26, 2023, Sector notified Ethos that it was in default. *Id.* ¶ 195. Three days later, Fernandes responded on behalf of Ethos. *Id.* ¶ 196; Doc. 4-9. He stated that Ethos had not rejected their obligations and had attempted to make the loan deliveries, but the banks had caused delays. *Id.* ¶ 196; Doc. 4-9. Fernandes reaffirmed that it had instructed EWB to release $4 million of the SBLC and stated that Ethos would release the entire SBLC collateral if Plaintiffs terminated the Loan Agreement. *Id.* Plaintiffs allege that these false assurances were designed to deter them from initiating legal action. Doc. No. 151 ¶ 198.

Also in an email dated September 26, 2023, Santos told Plaintiffs that he had just finished a conversation with EWB and that he had directed EWB to reduce the SBLC collateral by $4 million. *Id.* ¶ 192. However, that representation was false. *Id.*

Rather than requesting that EWB reduce the Sector SBLC, on September 26, 2023, Santos requested that EWB reduce the SBLC provided by Green Glycol. *Id.* ¶ 194. In that email to Yu, Santos proposed making $10.34 million in payments in September and October 2023. *Id.* ¶¶ 206–07. This money would be used to reduce Ethos' debt on the EWB line of credit, and in exchange Santos proposed that EWB make a corresponding reduction to Green Glycol's SBLC. *Id.* Yu responded that the proposal was "workable." *Id.* ¶ 207.

In an October 4, 2023 call, Dell'Orfano asked EWB to confirm that Ethos had directed them to cancel the SBLC. *Id.* ¶ 209. In the FAC, Plaintiffs at one point allege that

Yu stated that the reduction of the Sector SBLC was "under discussion," and at another point state that EWB was "actively considering a request from [Ethos] to cancel the [Sector SBLC]." *Id.* ¶¶ 209, 487. Plaintiffs allege that this was a knowingly false statement, because, while Santos had directed Yu to reduce Green Glycol's SBLC, no such request had been made with respect to the Sector SBLC. *Id.* ¶ 211–12. That same day, EWB reduced Green Glycol's SBLC by $ 3 million. *Id.* ¶ 215.

On October 13, 2023 Dell'Orfano called Yu again and asked when EWB would reduce the Sector SBLC, to which Yu responded that EWB had not received any instructions from Santos. *Id.* ¶¶ 213–14. Plaintiffs allege that this statement was knowingly false, because EWB had received instructions concerning Green Glycol's SBLC collateral. *Id*. ¶¶ 214–15.

Plaintiffs allege that in the phone calls on October 4 and 13, 2023, Yu improperly failed to disclose: (1) that Ethos and EWB agreed to use the Sector SBLC for cash advances on Ethos' line of credit with EWB; (2) that EWB had terminated EWB's line of credit because Ethos had overdue debts; (3) that EWB told Ethos that it would not reduce any SBLC collateral until its debts on the line of credit were paid off; (4) that EWB agreed to reduce Green Glycol's SBLC; and (5) that EWB "was in the process of implementing its agreement to reduce Green Glycol's SBLC, and thus, was not considering a request to cancel [the Sector SBLC]." *Id.* ¶ 216. Plaintiffs allege that EWB made these misrepresentations and omissions because EWB's best opportunity to recover on Ethos's debts was through the SBLCs, and further if Plaintiffs discovered that the SBLCs had been fraudulently induced, Plaintiffs would have the right to challenge the SBLC. *Id.* ¶¶ 220–21.

In emails dated October 16 and 20, 2023, Santos told Plaintiffs that he had directed Credit Suisse to issue a $10 million payment. *Id.* ¶ 224. His October 20, 2023 email also stated that he was preparing a confirmation of EWB's release of the SBLC. *Id.* Four days later, Santos emailed Plaintiffs that EWB had mistakenly released the wrong SBLC. *Id.* ¶ 227. In an email dated October 30, 2023, Santos provided what he claimed was a wire transfer number and reiterated that EWB had released the wrong SBLC. *Id.* ¶ 228. These representations were false. *Id.* ¶¶ 225, 227–28.

In an October 31, 2023 email, Sector terminated the Loan Agreement with Ethos and demanded immediate return of the Sector SBLC. *Id.* ¶ 230. In a November 3, 2023 email, Santos refused to return the Sector SBLC. *Id.* ¶ 231.

**H. Sector Files the Instant Action**

Sector filed a complaint against Ethos and EWB for breach of contract and an emergency motion for a temporary restraining order ("TRO") and preliminary injunction in aid of arbitration on November 3, 2023. Docs. 1, 4. Sector sought an injunction preventing Ethos and EWB from making any draws from the Sector SBLC, preventing Ethos and EWB from making withdrawals from Ethos accounts with EWB, enforcing the cancellation of the Sector SBLC, and enforcing the return of Sector's cash collateral. Doc. 4-13.[13]

After a hearing before the Court on November 6, 2023, the Court denied the TRO and scheduled a show cause hearing for a preliminary injunction for one week later. Doc.

[13] On November 5, 2026, Ethos filed a letter opposing motion for injunctive relief. See Doc. 12. According to an email exhibit attached to the letter, Ethos wrote that there was no irreparable harm because "Sector is simply seeking a monetary amount which Ethos can easily satisfy." Doc. 12-1 at 4.

13. Also on November 6, 2023, Ethos initiated five wire transfers out of its EWB account for a total of $537,520. Doc. No. 151 ¶ 238; 51-1 ¶ 45.[14]

On November 8, 2026, EWB filed an opposition to Sector's motion for a preliminary injunction. Plaintiffs claim that EWB's opposition contained two misleading statements: (1) EWB stated "if the facts as alleged by Sector in its Petition are true, Sector may have been wrongfully induced by Ethos to cause the issuance of the [Sector SBLC]," despite the fact that EWB knew the facts alleged in the petition were true, Doc. No. 151 ¶¶ 240–41, Doc. 21 at 5; and (2) that in a supporting declaration dated November 8, 2023, Yu declared that "EWB lacks knowledge regarding why Sector agreed to cause [J.P. Morgan] to issue the [Sector SBLC] in favor of EWB" despite the fact that EWB had access to the Loan Agreement between Sector and Ethos which outlined the purpose of the Sector SBLC, Doc. No. 151 ¶¶ 242–44, Doc. 22 ¶ 29.[15]

On November 9, 2026, Sector filed a reply in which it voluntarily withdrew its request to enjoin EWB's draw on the Sector SBLC. *See* Doc. 28 ("Having reviewed EWB's Opposition, which plainly states that Ethos cannot either draw on or cancel the [Sector] SBLC and in reliance upon EWB's Opposition, Sector withdraws its request for an injunction prohibiting Ethos and EWB from drawing on the [Sector] SLBC."). Sector still sought an injunction preventing EWB from accessing Ethos' account with EWB. *Id.*

[14] According to a November 22, 2023 declaration by Yu, EWB administratively froze Ethos's EWB account and successfully clawed back $500,000 of the outgoing wire transfers. Doc. No. 51-1 ¶¶ 45–47. Yu's November 22, 2023 declaration is incorporated by reference into the FAC. *See* 151 ¶ 238.

[15] On November 9, 2026, Ethos filed its opposition to Sector's motion for a preliminary injunction which also allegedly included misrepresentations including that Ethos had over $699 million in cash and that Sector was not entitled to relief because the Sector SBLC could not be "verified." Doc. No. 151 ¶ 247–50.

During the November 13, 2023 show cause hearing, the parties learned that federal law enforcement had arrested Santos the day before. *Id.* ¶ 252. Prior to making a ruling, the Court requested that the parties advise it as to the status and nature of the arrest. Doc. 49-8.

On November 15, 2023, Sector filed Santos' criminal complaint on the docket in the instant case. *See* Doc. 35-1; *see also United States v. Santos*, No. 23-CR-2507 (RSH) (S.D. Cal. May 16, 2025). The criminal complaint accused Santos of wire fraud and conspiracy to commit wire fraud, and in part accused Santos of submitting false and fraudulent documents to EWB to obtain a $14.8 million line of credit. *See* Doc. 35-1.[16]

Also on November 15, 2023, EWB sent Ethos a notice of event of default because of Santos' arrest and criminal charges; allegations made by Sector in the instant case; and allegations made by a different Ethos borrower in a case in New York state court. *See* Doc. No. 51-6. The notice states that Ethos' line of credit with EWB was terminated and that Ethos' $6,800,000 debts to EWB were immediately due and payable. *Id.*[17] Three hours after EWB notified Ethos of its default, it submitted a draw demand to J.P. Morgan requiring that it pay the full value of the Sector SBLC by November 20, 2023. Doc. No. 151 ¶ 262; Doc. No. 151-9.

Prior to EWB's request to J.P. Morgan, Plaintiffs had requested that EWB provide them with 72 hours notice of any draw demands on the Sector SBLC; however, EWB did not tell Plaintiffs directly. Doc. No. 151 ¶ 264. Instead, Plaintiffs learned about the draw request on November 17, 2023, when J.P. Morgan informed Plaintiffs that EWB had

---

[16] The criminal complaint refers to EWB a "U.S. Financial Institution 1."

[17] Plaintiffs allege that EWB was required to allow Ethos 15 days to cure any purported default but did not do so. Doc. No. 151 ¶ 261.

demanded payment. Doc. No. 151 ¶ 264. Later that day, Plaintiffs left a voice mail for EWB stating that they objected to the demand because the Sector SBLC was the product of fraud. *Id.* ¶ 265. That same day, EWB wrote a letter to the Court informing it that it demanded payment from J.P. Morgan under the Sector SBLC. *See* Doc. 46. The letter states that this demand was made in light of (1) Sector's November 9 reply brief withdrawing its request for an injunction on EWB's draw on the Sector SBLC, and (2) Sector's representation at the November 13 hearing that it was no longer seeking to prohibit EWB's draw on the Sector SBLC. *Id.* Plaintiffs allege that this letter inaccurately suggested that Sector did not object to EWB's demand for payment. Doc. 151 ¶ 266.

Sector filed a renewed request for a TRO and preliminary injunction on November 20, 2023, in part arguing that because the Sector SBLC was the product of fraud and because EWB was on notice of Ethos' fraud when it demanded payment of the Sector SBLC, EWB was not a holder of the collateral in due course and the Court should enjoin EWB from drawing on the Sector SBLC. Doc. 49-2. That same day, the Court denied the renewed TRO and scheduled a show cause hearing on November 27, 2023 to consider the preliminary injunction. Doc. 50. Also on November 20, 2023, J.P. Morgan delivered approximately $5 million to EWB pursuant to the Sector SBLC. Doc. No. 151 ¶ 268.

On November 22, 2023, EWB opposed Sector's request for injunctive relief, and Yu submitted a declaration stating that EWB lacked knowledge as to why Sector agreed to provide the Sector SBLC, and that EWB took the Sector SBLC in good faith and without knowledge of Ethos' wrongdoing. Doc. No. 151 ¶ 270. Plaintiffs allege that

both claims were false. *Id.* ¶¶ 271–72. On November 27, 2023, after a show cause hearing, the Court denied Sector's request for a preliminary injunction in part because, by the terms of the SBLC, EWB was a beneficiary of the J.P. Morgan issued SBLC and therefore was allowed to draw upon it; because there was nothing to suggest that EWB was involved in Ethos' fraud; and because the issue was moot as J.P. Morgan had already sent the money to EWB. Doc. 57 at 40–42.

On November 30, 2023, J.P. Morgan withdrew approximately $5 million from Sector Capital's J.P. Morgan account to satisfy Plaintiffs' obligation to reimburse J.P. Morgan. Doc. No. 151 ¶ 277. Plaintiffs allege that they have repeatedly demanded that EWB return their collateral, but EWB has refused. *Id.* ¶¶ 637–38.

On February 9, 2024, Sector filed an amended complaint, which, in part, added Santos as a defendant. Doc. 62. On April 3, 2024, Sector filed a notice of voluntary dismissal pursuant to Rule 41(a)(1)(A)(i) with respect to EWB, which the Court entered on April 5, 2024. Docs. 80, 82. On July 8, 2024, Sector filed a second amended complaint, which added Sector Capital as a plaintiff and only named Santos and Ethos as defendants. Doc. 92.

On November 14, 2024, Plaintiffs filed a third amended complaint against Santos, Ethos, and EWB. Doc. 103. At a conference before the Court on February 5, 2025, the case was stayed pending Santos' criminal sentencing. On May 21, 2025, Plaintiffs wrote the Court indicating that Santos had been found guilty but requesting that the stay continue until the completion of a restitution hearing in connection with Santos' criminal matter. Doc. 140. The Court granted the request on May 22, 2025. Doc. 141.

On August 21, 2025, Plaintiffs filed the FAC. Doc. No. 151. In the FAC, Plaintiffs assert the following claims: RICO violation against Santos; RICO conspiracy against EWB; fraud against Ethos and Santos; aiding and abetting fraud against EWB; breach of contract against Ethos; breach of fiduciary duty against Ethos and Santos; aiding and abetting breach of fiduciary duty against EWB; an independent fraud claim against EWB; unjust enrichment against Santos and EWB; conversion against Santos and EWB; aiding and abetting conversion against EWB; and replevin against EWB. *Id.* ¶¶ 282–656.

On September 26, 2025, Plaintiffs filed proposed clerk's certificates of default as to Santos and Ethos. Docs. 171, 173. The corresponding Clerk's certificates of default were issued on September 30, 2026. Docs. 176, 177.

On October 20, 2025, EWB filed a motion to dismiss and for costs, which was fully briefed on February 6, 2026. Docs. 178, 183, 184.[18] In its motion, EWB argues that every claim against it should be dismissed with prejudice for failure to state a claim pursuant to Rules 9(b) and 12(b)(6), or that alternatively the complaint should be dismissed for violating Rule 8(a). Doc. 180. Further EWB argues that it is entitled to an award of costs pursuant to Rule 41(d) because Sector voluntarily dismissed the action against EWB for tactical reasons, only to bring substantially similar allegations again in the FAC . *Id.*

[18] After EWB's motion was fully briefed, on May 22, 2026, Plaintiffs sought leave to depose Santos out of a concern that Santos would be transferred to Portugal to serve his sentence. *See* Doc. 187. In a conference held on May 28, 2026, the Court directed the parties to submit a bifurcated discovery plan, with discovery with respect to Santos to be completed within three months.

## II. LEGAL STANDARD

### A. Motion to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* However, this "flexible plausibility standard" is not a heightened pleading standard. *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted). And "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150,

155 (2d Cir. 2006)). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

**B. Heightened Pleading Standard of Rule 9(b)**

Beyond the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity. *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 319–20 (2007)). Specifically, Rule 9(b) requires a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *DiMuro v. Clinique Laboratories*, LLC, 572 Fed.Appx. 27, 30 (2d Cir.2014) (quoting *Mills v. Polar Molecular Corp*., 12 F.3d 1170, 1175 (2d Cir.1993)). Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *See U.S. ex rel. Kester v. Novartis Pharmaceuticals Corp*., 23 F.Supp.3d 242, 252 (S.D.N.Y.2014).

**C. Motion for Costs under Rule 41(d)**

Federal Rule of Civil Procedure 41(d) provides:

> Costs of a Previously Dismissed Action. If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court:
>
> > (1) may order the plaintiff to pay all or part of the costs of that previous action; and

(2) may stay the proceedings until the plaintiff has complied.

Fed. R. Civ. P. 41(d).

"For an award under Rule 41(d)(1), the second action must be 'predicated on the same facts,' even if the 'two actions involve different theories of recovery or distinct forms of relief." *Paulo v. Agence France Presse*, No. 21 Civ. 11209 (JLR) (SLC), 2023 WL 7691694, at *4 (S.D.N.Y. Oct. 17, 2023), *R&R adopted sub nom*.

An award under Rule 41(d)(1) may be issued where a second action is "predicated on the same facts," even if the "two actions involve different theories of recovery or distinct forms of relief." *Preferred Freezer Servs., LLC v. Americold Realty Tr.*, No. 19 Civ. 2926 (VSB), 2020 WL 774132, at *2 (S.D.N.Y. Feb. 18, 2020) (citing *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 23–24 (2d Cir. 2018)). In deciding whether to award costs under Rule 41(d), courts consider the plaintiff's motives in dismissing the initial action and the presence of bad faith, given Rule 41(d)'s "clear and undisputed [purpose] as a deterrent to forum shopping and vexatious litigation." *Horowitz*, 888 F.3d at 25 (citations omitted). Because of this deterrence function, courts may award attorneys' fees as part of Rule 41(d) costs along with normal litigation expenses. *Id.* at 25–26. Finally, courts in this Circuit often limit costs and attorneys' fees to "compensation for work that cannot be used in a second . . . action." *See, e.g.*, *Preferred Freezer*, 2020 WL 774132, at *3, 4; *Pelczar v. Pelczar*, No. 16 Civ. 55 (CBA) (LB), 2017 WL 3105855, at *2 (E.D.N.Y. July 20, 2017); *Adams v. N.Y. State Educ. Dep't*, 630 F. Supp. 2d 333, 346 (S.D.N.Y. 2009).

## III. DISCUSSION

Plaintiffs assert claims of RICO conspiracy, fraud, conversion, aiding and abetting fraud, aiding and abetting conversion, aiding and abetting breach of fiduciary duty, unjust enrichment, and replevin/wrongful draw. For the reasons discussed below, the claims are dismissed. Plaintiffs will, however, be granted leave to file an Amended Complaint to replead RICO conspiracy, fraud, conversion, aiding and abetting fraud, and aiding and abetting conversion.

### A. RICO Conspiracy Claim

To establish a RICO conspiracy, a plaintiff must show that "(i) the defendants agreed to form and associate themselves with a RICO enterprise; (ii) the defendants agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise; and (iii) if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Elsevier, Inc. v. Grossman*, No. 12 Civ. 5121 (KPF), 2013 WL 6331839, at *11 (S.D.N.Y. Dec. 5, 2013) (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244–45 (2d Cir. 1999)). Plaintiffs allege that EWB conspired with Santos and Ethos to facilitate a Ponzi scheme in violation of the RICO statute, 18 U.S.C. § 1962(d). Doc. 151 ¶ 308. EWB moves to dismiss, claiming that Plaintiffs fail to allege an agreement. Doc. 180 at 34. The Court finds that Plaintiffs have not set forth sufficient facts to state a RICO conspiracy claim.

Assuming without deciding that EWB's issuance of cash advances with knowledge of the Ethos Ponzi scheme would have constituted racketeering activity, the dispositive issue is whether Plaintiffs have properly pleaded the elements of an agreement. A plaintiff must allege "specific facts tending to show that each of the defendants entered into an agreement" and not simply that each defendant committed acts that would qualify as predicates without regard to whether those acts were committed in furtherance of the conspiracy. *Jingle Kids USA, LLC v. In Colour Capital, Inc.*, No. 22

Civ. 7089 (JHR) (SLC), 2023 WL 5016496, at *11–12 (S.D.N.Y. June 6, 2023), *report and recommendation adopted*, No. 22 Civ 7089 (JHR) (SLC), 2023 WL 6389080 (S.D.N.Y. Oct. 2, 2023). Plaintiffs "must allege some factual basis for a finding of a conscious agreement among the defendants." *Board of Managers of Trump Tower at City Center Condominium by Neiditch v. Palazzolo*, 346 F.Supp.3d 432, 463 (S.D.N.Y., 2018) (citing *Picard v. Kohn*, 907 F.Supp.2d 392, 400 (S.D.N.Y. 2012)). RICO conspiracy claims that contain only "conclusory, boilerplate allegations as to the existence of the relevant agreement" are routinely dismissed. *Jingle Kids USA, LLC,* 2023 WL 5016496, at *11. Nonetheless, agreement to join the conspiracy may be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing. *Palazzolo*, 346 F.Supp.3d at 463.

Plaintiffs claim that they have alleged sufficient facts of EWB's knowledge and involvement for this Court to infer an agreement among the defendants. EWB, they point out, "tactfully proposed" that Santos seek a lower credit level to avoid triggering a different, and ostensibly more onerous, approval process. Doc. No. 151 ¶ 335. They allege EWB improperly approved the line of credit despite Santos' failure to provide a 2021 tax return and discrepancies in Ethos' financial statements. *Id.* ¶¶ 339–341. EWB had received, on multiple occasions, Santos' diagrams of the flow of funds from a lender's SBLC, to an EWB cash advance, to Ethos, and to project investments – diagrams which Plaintiffs claim bear the "hallmarks of a Ponzi scheme." *Id.* ¶¶ 132–34, 344–45, 353; Doc. No. 151-5 at 4. And most importantly, according to Plaintiffs, EWB was in possession of a draft of the Ethos-Sector agreement stating that the SBLC could not be executed upon unless Plaintiffs defaulted on their obligation to repay Ethos. *Id.* ¶ 354; Doc. No. 151-6 at 4, 12 (§§ 3.3, 7.3). A short time later, EWB nonetheless approved Ethos' requests for cash advances based on the Sector SBLC. Doc. No. 151 ¶ 366.

EWB asserts it is yet another victim of the Ethos Defendants. Doc. No. 180 at 34. EWB references Santos' indictment which alleges that Santos made "material fraudulent,

false, misleading, and deceptive representations to U.S. financial institutions to obtain loans and lines of credit." Doc. No. 151-1 ¶ 21. Specifically, Santos submitted fraudulent documents to EWB to obtain the $14.8 million line of credit. *Id.* ¶ 25(i). EWB counters that it "unwittingly facilitate[d] a Ponzi scheme without intending to conspire to engage in racketeering activity." Doc. No. 180 at 35.

While status in the enterprise or knowledge of wrongdoing can permit an inference of agreement to join the conspiracy, Plaintiffs fail to furnish either. Plaintiffs claim that EWB must have known of the Ethos Ponzi scheme because they were in possession of the draft Ethos-Sector agreement which included the limitation on execution of the SBLC. Doc. No. 151 ¶ 463. However, that language merely limits when *Ethos* can execute upon the letter of credit, not EWB. Doc. No. 151-6 at 4, 12 (§§ 3.3, 7.3). The agreement's language limits execution, but not necessarily reliance on the SBLC for underwriting a line of credit. *Id.* Plaintiffs fail to establish that EWB knew the Ethos Defendants' actions were obvious violations of the Ethos-Sector agreement. At best, Plaintiffs allege EWB should have known about the scheme, yet ask this Court go further and infer not only actual knowledge but also an agreement.

Many of the facts pleaded by Plaintiffs actually cast doubt on the inference they ask this Court to draw. For example, Plaintiffs allege that EWB must have known about the Ethos Ponzi scheme because it had the Ethos-Sector agreement, which explicitly limited when the SBLC could be executed. Doc. No. 151 ¶ 354. But Plaintiffs allege that EWB was already preparing the cash advance for management review *before* EWB received the Ethos-Sector agreement containing this condition. *Id.* ¶ 359. And the template SBLC attached to that agreement authorized EWB to demand payment upon Ethos' default: the SBLC was issued as "security for credit/banking facilities" granted to Ethos. Doc. No. 151-6 at 20. In addition, Plaintiffs agree that EWB "repeatedly questioned" Ethos over its financial statements. Doc. No. 151 ¶ 376. And ultimately, EWB terminated the line of credit because its auditors questioned Ethos' financial

statements. *Id.* ¶ 379. This is not circumstantial evidence that indicates conscious misbehavior, but undisputed allegations that cast doubt on that inference altogether. The facts alleged by Plaintiffs do not indicate the kind of status in the organization or knowledge that can support an inference of agreement.

In sum, Plaintiffs have failed to allege that EWB agreed to a RICO conspiracy and therefore failed to allege necessary elements of the RICO conspiracy claim.

**B. Fraud**

To state a claim for fraud, a plaintiff must allege "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *ACR Systems, Inc. v. Woori Bank*, No. 14 Civ. 2817 (JFK), 2018 WL 1757019, at *4 (S.D.N.Y. Apr. 10, 2018) (citing *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 170 (2d Cir. 2015)). In addition, pursuant to Federal Rule of Civil Procedure 9(b), a plaintiff alleging fraud must state with particularity the circumstances constituting fraud. *Id.*

Plaintiffs claim that EWB committed fraud by making material misrepresentations and concealing material facts. According to Plaintiffs, EWB misrepresented material facts at two junctures: first, when Plaintiffs sought assurances that its SBLC would be canceled in October 2023, and second, during the pendency of this action. Doc. No. 151 ¶¶ 581–88. Plaintiffs have not stated a claim for fraud because they have failed to allege material misrepresentation, actual falsity, EWB's intent to induce reliance, or their own justifiable reliance.

Plaintiffs allege that over phone calls in October 2023, EWB "misrepresented and concealed material facts" designed to deceive Plaintiffs. *Id.* ¶ 576. During those phone calls, EWB stated it was "considering" reducing the value of Plaintiffs' SBLC, and a few days later, that it had not yet received instructions from Santos to reduce the Plaintiffs' SBLC. *Id*. 151 ¶¶ 577–79. During those phone calls, Plaintiffs allege EWB's statements

created the "false impression" that Plaintiffs did not need to take legal action as EWB would cancel the SBLC, and that EWB actively concealed the Ethos fraud. *Id.* ¶ 584. EWB claims that the statements Plaintiffs allege are fraudulent are at worst "vague and ambiguous," and did not invite any justifiable reliance. Doc. 180 at 44.

Plaintiffs have not established that the statements in the October phone calls were material misrepresentations or even false. Plaintiffs allege that EWB contacted Ethos to discuss loan repayment in order to avoid drawing down on the SBLCs to offset that amount. Doc. No. 151-12 at 19–20. Plaintiffs allege that, because Ethos first asked EWB to reduce the Green Glycol SBLC, EWB's representations to Plaintiffs were false. Doc. No. 151 ¶ 194. But Plaintiffs fail to demonstrate how the reduction of the Green Glycol SBLC renders the EWB statements false. Plaintiffs next argue that EWB's statement that it had not received "any instructions" from Santos was false because EWB had received instructions to reduce the Green Glycol's SBLC. *Id.* ¶¶ 214–15. However, Plaintiffs admit that this statement was a response to the question of when EWB would reduce the SBLC. *Id.* ¶¶ 213–14. Plaintiffs agree that EWB had not received instructions to reduce the Sector SBLC. *Id.* ¶¶ 211–12. That EWB received instructions from Santos on an unrelated matter does not convert this statement into a material misrepresentation.

Plaintiffs also fail to allege that EWB intended to induce reliance on these statements. At the time these statements were made, Plaintiffs had already issued the SBLC. *Id.* ¶ 152. By its own terms, the SBLC was irrevocable. Doc. No. 151-3 at 19. From EWB's perspective, Plaintiffs' reliance made no difference to its ability to draw down on the SBLC. Doc. No. 184 at 14–15. The claim that EWB misrepresented facts to induce Plaintiffs' reliance and prevent them from taking legal action is entirely conclusory. Further, it is contradictory: Plaintiffs admit that EWB told them they had no instructions to reduce the value of their SBLC. Doc. No. 151 ¶ 579.

Plaintiffs also fail to allege that they justifiably relied on these statements. To start, the statements do no more than state that reduction of the SBLC is being

considered. *Id.* And Plaintiffs do not seriously contend they relied on these statements, as they were already attempting to have the SBLC cancelled at that time and instituted legal proceedings shortly thereafter. *Id*.

Next, Plaintiffs claim that EWB filed "misleading and false pleadings" in this action. *Id.* ¶ 588. Both of the alleged misrepresentations relate to EWB's claims that it lacked knowledge of the Ethos Ponzi scheme. *Id.* ¶¶ 589–90. Plaintiffs claim that these misrepresentations led EWB to defeat their request for injunctive relief, which permitted EWB to ultimately draw down the SBLC. *Id.* ¶¶ 589–90. However, Plaintiffs make only conclusory allegations that these statements were false, and their own immediate and subsequent attempts to seek injunctive relief demonstrate that Plaintiffs did not rely on these representations.

Finally, Plaintiffs allege a series of omissions. They contend that, when it became aware of the Ethos Defendants' fraud in March of 2023, EWB failed on multiple occasions to disclose this fact to Plaintiffs or their bank. *Id.* ¶¶ 563, 567. A fraud claim may be predicated on omissions or acts of concealment where the defendant had a duty to disclose material information. *Wiedis v. Dreambuilder Investments, LLC*, 268 F. Supp. 3d 457, 466 n.3 (S.D.N.Y. 2017) (citing *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (2003)). Here, Plaintiffs allege that EWB had had a duty to speak because it was a counterparty to Plaintiffs in a transaction and possessed "superior knowledge, not readily available to [Plaintiffs] and [knew] that [Plaintiffs were] acting on the basis of mistaken knowledge." Doc. No. 183 at 52 (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Even assuming that Plaintiffs established that they and EWB were counterparties, Plaintiffs fail to show that EWB had superior knowledge or that they were laboring under mistaken knowledge. Plaintiffs' own allegations are fatal: they acknowledge that the December and January drafts of their agreement with Ethos, as well as the final, executed version, all contained EWB's template SBLC "which demonstrates that Santos sought the SBLC from Plaintiffs to obtain a cash advance" from

the line of credit. Doc. No. 151 ¶ 423. The draft language made it clear that the SBLC secured EWB against *Ethos'* defaults. Doc. No. 151-6 at 20. Plaintiffs have failed to establish that EWB had any knowledge of Santos' misrepresentations to Plaintiffs indicating the contrary. As a result, Plaintiffs fail to show the kind of imbalance in knowledge that could create a duty on behalf of EWB and underlie a fraud claim based on concealment.

### C. Conversion

Under New York law, to plausibly allege a conversion claim, a plaintiff must show: "(i) the property subject to conversion is a specific identifiable thing; (ii) plaintiff had ownership, possession or control over the property before its conversion; and (iii) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Urban Engineers of New York, D.P.C. v. Urban Engineers, Inc.*, No. 24 CIV. 6249 (KPF), 2026 WL 861649, at *17 (S.D.N.Y. Mar. 27, 2026) (citing *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA*, 698 F. Supp. 3d 663, 679 (S.D.N.Y. 2023)).

Plaintiffs claim that, because EWB allegedly knew Santos had obtained their collateral via wire fraud, EWB was not entitled to the collateral[19] tendered by Plaintiffs and converted those amounts. Doc. No. 151 ¶¶ 622–623. EWB contends that Plaintiffs fail to allege their dominion and ownership over the property, that Plaintiffs admit EWB merely exercised its bargained-for contractual rights to the property, and that the alleged seizure of cash is not specifically traceable to the cash collateral. Doc. No. 180 at 54–55.

[19] The FAC's conversion claim against EWB does not distinguish between the collateral provided in cash and the collateral secured via SBLC. However, Plaintiffs seek $8.3 million in damages for this claim, a sum equal to the cash collateral and the SBLC amount drawn down. *See* Doc. No. 151 ¶ 627. Plaintiffs' opposition to the motion to dismiss clarifies that the conversion occurred both when EWB "made the concealed draw demand and seized Plaintiffs' cash." Doc. No. 183 at 56.

*1. Conversion of cash collateral.*

Plaintiffs assert that they sent the $3.25 million in cash collateral to an Ethos account at EWB via wire transfer on June 6, 2023. Doc. No. 151 ¶ 373; Doc. No. 22 ¶ 35. All parties agree that EWB seized a $812,000 balance from the Ethos account on or about November 15, 2023. *Id.* ¶¶ 519–20, 622, 634; Doc. 180 at 24, 55. Plaintiffs claim that the conversion occurred on the date of seizure, and that but for EWB's seizure, the funds would have been forfeited to the government. Doc. No. 151 ¶¶ 519–20. EWB contends Plaintiffs cannot sustain a conversion claim because (1) the funds allegedly converted were not specific or identifiable, (2) Plaintiffs lacked ownership, possession, or control over the funds before conversion, and (3) EWB's dominion over the property was authorized because it was an exercise of its contractually bargained-for right. Doc. No. 180 at 54–55.

Generally, funds deposited in a bank account are not sufficiently specific and identifiable, in relation to the bank's other funds, to support a claim for conversion against the bank. *Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146, 148 (2d Cir. 1998) (per curiam); *see also Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x 622, 627 (2d Cir. 2012) (summary order). If the allegedly converted property cannot be described or identified in the same manner as a specific chattel, "such as when a customer of a bank deposits funds into an account at the bank," it is not the proper subject of a conversion action. *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) (citing *High View Fund, L.P. v. Hall*, 27 F.Supp.2d 420, 429 (S.D.N.Y. 1998)). However, it has also been held that a specific sum of money wired to a specific bank account by a non-customer is a "specifically identifiable property for which a claim of conversion can be brought." *218 Broadway, LLC & Pentalon Construction, Inc., v. J.P. Morgan Chase Bank, N.A., et al.*, No. 25 Civ. 7386 (LJL), 2026 WL 2364628, at *10 (S.D.N.Y. Aug. 14, 2026) (citing

cases). Here, Plaintiffs were non-customers who made a deposit with EWB and the deposited funds are specific and identifiable.

EWB next asserts that Plaintiffs failed to allege their dominion and ownership over the property before the alleged conversion. Doc. No. 180 at 54–55. "Upon deposit of funds at a bank, the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it, a mere chose in action." *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 560 (2d Cir. 1976). For this reason, when a bank misuses a depositor's money, the depositor's remedy typically lies in contract and not in tort. *218 Broadway, LLC* at *10 (citing *Newbro v. Freed*, 409 F. Supp. 2d 386, 395–96 (S.D.N.Y. 2006)). Here, there is no contract between Plaintiffs and EWB governing the wire transfer. But the facts of this case well illustrate the difficulty for Plaintiffs in alleging ownership of the remaining funds in the Ethos account before the conversion. Plaintiffs must allege that EWB converted their money, but have not alleged any facts that would allow this court to trace the provenance of the $812,000 seized by EWB. In fact, they allege that at least four other companies were victims of the Ethos Ponzi scheme. Doc. No. 151 ¶¶ 44–51. By Plaintiffs' logic, any victim who lost a minimum of $812,000 to the Ethos Defendants might bring a conversion action alleging their ownership of the balance. Accordingly, Plaintiffs fail to allege *their* dominion and ownership over the $812,000 balance seized by EWB.

Finally, EWB asserts that, to the extent the $812,000 can be identified as Plaintiffs' cash collateral, Plaintiffs have failed to allege EWB's unauthorized dominion over the funds. Doc. No. 180 at 54–55. EWB contends that EWB merely exercised its bargained-for contractual rights to set off what Ethos owed when it defaulted on its line of credit. *Id*. Plaintiffs fail to rebut this claim, and in fact concede facts which defeat their claim entirely. Plaintiffs incorporate by reference EWB's agreement with Ethos, which authorizes EWB to use these accounts to set off all sums owed by Ethos. *Id.* ¶¶ 7, 260-61; *see also* Doc. No. 51-2 at 6 ("RIGHT OF SETOFF. To the extent permitted by

applicable law, Lender reserved a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account)").

In sum, Plaintiffs' conversion claim fails as to the cash collateral because Plaintiffs have not pleaded facts indicating their dominion or ownership of the cash seized, nor that EWB exercised unauthorized dominion over those funds.

*2. Conversion of SBLC.*

The FAC fails to state with particularity which acts by EWB are alleged to constitute conversion.[20] Even assuming this claim had been properly pleaded in the FAC, the conversion claim against EWB fails for several reasons.

First, Plaintiffs have not alleged that when EWB drew down on the SBLC, it exercised dominion or a right of ownership over Plaintiffs' property. Letters of credit provide a lender (the beneficiary, here, EWB) with a guaranteed means of payment from a creditworthy third party (the issuer, J.P. Morgan) in lieu of relying solely on the financial status of a borrower (the applicant, Plaintiffs). *Milky Whey, Inc. v. HSBC Bank USA, N.A.*, 728 F.Supp.3d 308, 312 (S.D.N.Y., 2024). The SBLC provided a guaranteed payment from J.P. Morgan, not Plaintiffs, who were the obligors. Doc. No. 151 ¶ 117; Doc. No. 151-3 at 19. Plaintiffs admit that it was J.P. Morgan which delivered payment on EWB's demand. Doc. 151 ¶ 268. There has been no showing that EWB exercised ownership rights over any monies belonging to Plaintiffs.

Second, Plaintiffs have failed to allege that EWB acted without authorization. A letter of credit is independent from the underlying transaction that gives rise to it, as it is "the complete separation between the underlying commercial transaction and the letter of credit that gives the letter its utility in financing transactions." *TC Skyward Aviation U.S., Inc. v. Deutsche Bank AG, New York Branch*, 557 F.Supp.3d 477 (S.D.N.Y., 2021) (citing *Marino Indus. Corp. v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 115 (2d Cir. 1982)).

[20] Plaintiffs' opposition to the motion to dismiss states, for the first time, that EWB converted Plaintiffs' collateral when EWB made a draw demand on the SBLC. Doc. No. 183 at 56.

For this reason, letters of credit are strictly enforced pursuant to their terms and an issuer's duty to pay is absolute where a beneficiary's request complies with the terms. *Id.* (citing *Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 816 (2d Cir. 1992)). Plaintiffs have not shown that EWB violated the terms of the SBLC or its agreement with Ethos for the line of credit. In fact, the SBLC expressly permits EWB to make a demand to represent and cover "unpaid indebtedness… due to East West Bank, arising from the granting of banking facilities to Ethos Management Inc." Doc. No. 151-6 at 19.

Plaintiffs cite two sources in support of their conversion claim. *Iberdrola Energy Projects v. MUFG Union Bank, N.A.* involved a conversion claim against a bank for wrongful draw on a letter of credit. 218 A.D.3d 409, 410, 194 N.Y.S.3d 204 (2023). In that case, the court concluded that the plaintiff held legal title to the proceeds of the letter of credit. *Id.* Importantly, the defendant bank drew down on the letter of credit only *after* an arbitral panel had already determined that the proceeds belonged to the plaintiff. *Id.* Plaintiffs also cite *North American Airlines, Inc. v. Wilmington Tr. Co.*, which similarly involved a conversion claim against a bank for wrongful draw on a letter of credit. 171 A.D.3d 616, 617, 99 N.Y.S.3d 32 (2019). There, the court rejected the defendant's claims that it could properly draw on the letter of credit because they had failed to show damages justifying the draw. *Id.* Here, it is undisputed that the Ethos Defendants defaulted on their line of credit with EWB. Neither of these authorities can support Plaintiffs' conversion claim.

### D. Aiding and Abetting Fraud, Aiding and Abetting Conversion, and Aiding and Abetting Breach of Fiduciary Duty

Under New York law, the elements of aiding and abetting fraud, aiding and abetting conversion, and aiding and abetting breach of fiduciary duty are substantially similar. *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018). All three aiding and abetting claims require a showing of a primary violation (i.e., fraud, conversion, and

breach of fiduciary duty), actual knowledge, and substantial assistance. *See*, *e.g.*, *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (aiding and abetting fraud); *218 Broadway, LLC & Pentalon Construction, Inc., v. J.P. Morgan Chase Bank, N.A., et al.*, No. 25 Civ. 7386 (LJL), 2026 WL 2364628, at *9 (S.D.N.Y. Aug. 14, 2026) (aiding and abetting conversion); *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (aiding and abetting breach of fiduciary duty). The fundamental issue in dispute here is whether EWB had actual knowledge of Ethos' misconduct. The Court concludes that Plaintiffs have not alleged facts to support a reasonable inference that EWB knew about the underlying fraud, conversion, or breach of fiduciary duty.

*1. Aiding and Abetting Fraud.*

To establish liability for aiding and abetting fraud under New York law, a plaintiff must allege the existence of a fraud by another, the defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission. *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014). Actual knowledge, rather than constructive knowledge, is required to impose liability on an aider and abettor under New York law. *Lerner v. Fleet Bank*, N.A., 459 F.3d 273, 292 (2d Cir. 2006) (citing *Kolbeck v. LIT America, Inc.*, 939 F.Supp. 240, 246 (S.D.N.Y. 1996)). A plaintiff must allege actual knowledge with the particularity necessary to survive the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Id.* at 293. Where a plaintiff makes merely conclusory allegations that an aider and abettor had actual knowledge, they fail to plead facts with requisite particularity. *Id.* "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence." *Rosner v. Bank of China*, No. 6 Civ. 13562, 2008 WL 5416380, at 6 (S.D.N.Y. Dec. 18, 2008), aff'd, 349 F. App'x 637 (2d Cir. 2009).

Plaintiffs allege that "over the course of several months, EWB knowingly and substantially assisted the Ethos Defendants to defraud Plaintiffs by perfecting the Ethos Defendants' effort to obtain money from Plaintiffs through fraud." Doc. No. 151 ¶ 520. EWB claims that Sector fails to plausibly allege actual knowledge, agreement or assistance, both before and after the SBLC was issued. Doc. No. 180 at 36.

The alleged facts are insufficient to give rise to a strong inference of actual knowledge of the Ethos Defendants' fraudulent activity. In general, Plaintiffs point to three facts to raise an inference of EWB's knowledge: (1) the draft agreement between Ethos and Plaintiffs; (2) the PowerPoint diagrams Santos sent to EWB; and (3) EWB's allegedly incomplete vetting of Ethos' finances. Doc. No. 151 ¶¶ 84, 96, 121, 126, 131, 154, 334, 376.

Plaintiffs allege, and EWB does not dispute, that EWB had access to the draft agreement between Ethos and Plaintiffs. Doc. No. 151 ¶¶ 126, 154. The language of that agreement prohibited *Ethos* from executing upon the SBLC unless Plaintiffs defaulted on their obligation to repay Ethos. *Id.* ¶¶ 354, 643; Doc. No. 151-6 at 4, 12 (§§ 3.3, 7.3). EWB asserts that the FAC fails to allege EWB actually understood or apprehended the alleged contradictions, and that at best, EWB was on notice of fraud. Doc. 180 at 37. But, EWB adds, the SBLC attached to that same draft clearly authorized EWB to demand payment from J.P. Morgan where "the amount claimed . . . covers unpaid indebtedness . . . due to [EWB] arising from the granting of banking facilities to [Ethos]." Doc. No. 151-6 at 19. Plaintiffs do not allege facts showing that EWB had actual knowledge of this term in the agreement or that it read the agreement at all. Nor would Plaintiffs' interpretation of the agreement be obvious to any reader: the draft agreement reads that under "no circumstances, other than default by [Sector] may [Ethos] execute the [SBLC]." Doc. 151-6 at 13. Plaintiffs do not allege that EWB understood this term to apply to themselves nor that EWB understood this term to limit their ability to issue cash advances.

Plaintiffs also point to PowerPoint slides received by EWB, which they claim had "all the hallmarks of a Ponzi scheme." Doc. 151 ¶¶ 84, 96, 121, 131. EWB claims that Plaintiffs are speaking with the benefit of "perfect 20-20 hindsight," but that the PowerPoints were not straightforward and did not confirm the existence of a Ponzi scheme apart from an investment strategy. Doc. No. 180 at 31. The Court is unconvinced that the receipt of those documents necessarily implies actual knowledge of fraud to sustain an aiding and abetting fraud claim with particularity.

Plaintiffs also point to EWB's ultimate issuance of the line of credit despite the allegedly incomplete vetting of Ethos' finances. *Id.* ¶¶ 334, 376. Yet Plaintiffs incorporate by reference EWB's multiple and numerous attempts to obtain Ethos' financial documents, which cast doubt on any inference of actual knowledge. *Id.* ¶¶ 69–70, 157–58, 164, 199, 376, 449, 472, 480. In addition, Plaintiffs allege that EWB terminated the line of credit entirely due to its suspicions concerning Ethos' books and records. *Id.* ¶¶ 13, 185, 241. While Plaintiffs do allege some facts that could lead to an inference of constructive knowledge, Plaintiffs fail to allege specific facts giving rise to a strong inference of actual knowledge.

Plaintiffs' allegations do not give rise to a strong inference that EWB had the requisite actual knowledge to support his claim of aiding and abetting fraud.

*2. Aiding and Abetting Conversion.*

To establish aiding and abetting of conversion, a plaintiff must show a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance. *218 Broadway, LLC & Pentalon Construction, Inc., v. J.P. Morgan Chase Bank, N.A., et al.*, No. 25 Civ. 7386 (LJL), 2026 WL 2364628, at *9 (S.D.N.Y. Aug. 14, 2026) (citing *Weshnak v. Bank of America, N.A.*, 451 F. App'x 61, 61–62 (2d Cir. 2012) (summary order). Alleging the primary violation requires a plaintiff to show that a defendant acted without authorization and exercised dominion or a right of ownership

over property belonging to another, at minimum. *In re RetailMeNot Browser Extension Litigation*, 825 F. Supp. 3d 329, 352 (S.D.N.Y. 2026).

Plaintiffs allege that Santos converted Plaintiffs' collateral by using their SBLC to obtain immediate cash advances and fraudulently inducing Plaintiffs to provide cash collateral. Doc. No. 151 ¶¶ 169–70, 629–635. EWB, Plaintiffs claim, knew about Ethos' efforts to convert Plaintiffs' collateral. *Id.* ¶ 633. Plaintiffs claim EWB assisted the Ethos Defendants by providing cash advances on the Sector SBLC, reducing the face value of the SBLC, concealing the fact of the Ethos Defendants' conversion, and filing misleading pleadings. *Id.* ¶ 634.

Assuming without deciding that the FAC states a claim for a primary violation of conversion by Santos, Plaintiffs have nonetheless alleged insufficient facts to state an aiding and abetting claim against EWB. For the same reasons Plaintiffs failed to allege actual knowledge in the RICO conspiracy or fraud context, Plaintiffs fail to allege sufficient facts to support their position that EWB knew the Ethos Defendants intended to convert the cash collateral. The aiding and abetting conversion claim fails.

*3. Aiding and Abetting Breach of Fiduciary Duty.*

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege (1) a breach by a fiduciary of obligations to another, (2) that defendant knowingly induced or participated in the breach, (3) that plaintiff suffered damage as a result of the breach, and (4) that defendant provided substantial assistance to the primary violator. *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018). Contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit. *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011).

Plaintiff's claim for breach of fiduciary duty arises entirely out of the Ethos-Sector agreement, which they allege created a fiduciary relationship. Plaintiffs claim that when Ethos accepted their collateral under the agreement, Ethos became Plaintiffs' bailees and fiduciaries, adopting a duty to safeguard their collateral and use it only in the agreed-upon

manner. Doc. No. 151 ¶ 535. However, Plaintiffs explicitly disclaimed a fiduciary duty in their agreement with Ethos. Doc. No. 151-3 at 3 (¶ 2.1). The Agreement states that "[n]othing contained in this Agreement shall be construed as creating any… fiduciary relationship between the Parties…." *Id.*

The aiding and abetting breach of fiduciary duty claim thus fails because the contract between Plaintiffs and Ethos is clear. Plaintiffs explicitly and plainly disclaimed any fiduciary relationship with Ethos, precluding any fiduciary duty on Ethos' part. The term is enforceable and Plaintiffs fail to furnish any authority to the contrary.

**E. Unjust Enrichment**

Unjust enrichment claims sound in quasi-contract and are therefore subject to dismissal where there is an enforceable contract for events arising out of the same subject matter. *Thor 680 Madison Ave. LLC v. Qatar Luxury Group S.P.C.*, No. 17 Civ. 8528 (PGG), 2022 WL 836890, at *10 (S.D.N.Y. Mar. 21, 2022) (citing *U.S. East Telecommunications, Inc. v. US West Communications Services, Inc.*, 38 F.3d 1289, 1298 (2d Cir. 1994)). Claims for unjust enrichment may be precluded on this basis even if one of the parties to the lawsuit is not a party to the contract, so long as there is an express agreement between two parties governing the subject matter of the dispute. *Id.* at *10 (citing *American Medical Ass'n v. United Healthcare Corp.*, No. 00-Civ-2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007)). A letter of credit typically involves three separate and distinct contracts: "the contract of the bank with its customer whereby it agrees to issue the letter of credit, the letter of credit itself and the contract of sale between the buyer who is also the person who procured the bank to issue the letter of credit and the seller who accepts and acts under the letter of credit by drawing drafts thereunder." *TC Skyward Aviation U.S., Inc. v. Deutsche Bank AG, New York Branch*, 557 F.Supp.3d 477, 486 (S.D.N.Y. 2021) (citing *Venizelos, S. A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir. 1970)).

Plaintiffs claim that EWB was unjustly enriched when it demanded and received payment on Plaintiffs' SBLC. Doc. No. ¶¶ 614–618. Plaintiffs claim that EWB knew the SBLC was a product of wire fraud and that EWB misrepresented and concealed material facts to conceal the fraud. *Id.* ¶ 615. Moreover, Plaintiffs argue that EWB lacked title to the monies under the SBLC because, upon the Ethos Defendants' commission of wire fraud, all title to those amounts vested in the United States. *Id.* ¶ 617. EWB counters that the unjust enrichment claim must fail for four reasons: (1) It is not against equity and good conscious to allow another Ethos victim (EWB) to set off its losses; (2) Plaintiffs have not alleged EWB was "enriched;" (3) Plaintiffs and EWB lack the sufficiently close relationship required to allege unjust enrichment; and (4) the unjust enrichment claim is duplicative of the fraud and aiding and abetting fraud claims. Doc. No. 180 at 53–54. The Court concludes that, because EWB's draw on the SBLC was governed by a contract, this claim fails.

The unjust enrichment claim must fail because Plaintiffs themselves concede the existence of the contracts underlying the SBLC upon which their claim is predicated. They acknowledge the existence of a contract between themselves and Ethos, and the irrevocable SBLC. Doc. No. 151 ¶ 7. The FAC also references the line of credit issued by EWB to Ethos. *Id.* ¶ 10. Plaintiffs in fact reference the Notice of Default sent from EWB to Santos on November 15, 2023. Doc. No. 51-6. It is therefore undisputed that no less than three contracts existed governing when EWB could draw down the SBLC. Plaintiffs' unjust enrichment claim is thus barred.

**F. Replevin/Wrongful Draw**

Plaintiffs' final claim is styled as "Replevin/Wrongful Draw on the SBLC." *Id.* ¶ 125. As relief, Plaintiffs seek over $5 million in compensatory damages, the total amount of the SBLC which was drawn by EWB. *Id.* ¶ 132. Plaintiffs allege that EWB's draw on the SBLC was wrongful because EWB was on notice that the Ethos Defendants had fraudulently induced Plaintiffs to provide the SBLC. *Id.* ¶¶ 643–44. Plaintiffs

contend that EWB had knowledge of the Ethos Defendants' fraud at three points: (1) when EWB accepted the SBLC on April 5, 2023; (2) when EWB made cash advances based on the SBLC on April 11, 2023, and April 17, 2023; and (3) when EWB drew down on the SBLC on November 15, 2023. *Id.* ¶¶ 646–648. Plaintiffs argue that EWB's knowledge of the underlying fraud made the SBLC unenforceable. *Id.* ¶¶ 646–651.

Put simply, the authority Plaintiffs relies on does not authorize the relief they seek. Plaintiffs appear to assert two sources of authority for their wrongful draw claim, the New York Uniform Commercial Code sections 5-109 and 5-110. Neither of these provisions authorize the relief that Plaintiffs seek.

Standing alone, § 5-109 authorizes only injunctive relief and not compensatory damages. Section 109 authorizes injunctive relief against a draw down where a court finds that a draw down "would facilitate a material fraud by the beneficiary on the issuer or applicant." § 5-109(a). The provisions lay out when an issuer[21] "shall" or "may" honor[22] a draw down and when a court "may" enjoin presentation. *Id.* Plaintiffs furnish no authority for the proposition that § 5-109 authorizes compensatory damages. They rely on *Universal Marine Insurance Co. v. Beacon Insurance Co.*, which involved only injunctive relief. 581 F. Supp. 1131, 1139 (W.D.N.C. 1984). Plaintiffs also rely on *Raytheon Co. v. AES Red Oak, LLC*, in which a § 5–109(b) claim proceeded to trial, but in which the court never considered whether the U.C.C. authorized damages. 12 Misc. 3d 1184(A), at *5 (N.Y. Sup Ct. N.Y. Cnty. Dec. 7, 2005). There, moreover, Plaintiffs sought only equitable relief and not damages through its wrongful draw claim. *Id.*

---

[21] An issuer is "a bank or other person that issues a letter of credit." N.Y. U.C.C. Law § 5-102(9). The parties agree that J.P. Morgan is the issuer.

[22] To "honor" a letter of credit is to perform "the issuer's undertaking in the letter of credit to pay or deliver an item of value. Unless the letter of credit otherwise provides, 'honor' occurs: (i) upon payment, (ii) if the letter of credit provides for acceptance, upon acceptance of a draft and, at maturity, its payment, or (iii) if the letter of credit provides for incurring a deferred obligation, upon incurring the obligation and, at maturity, its performance." N.Y. U.C.C. Law § 5-102(8).

Neither of these authorities advance Plaintiffs' novel claim that this provision authorizes monetary damages.

In any event, assuming that the relief sought by Plaintiffs is authorized by § 5-109, Plaintiffs have not alleged sufficient facts to state a claim. EWB contends that § 5-109 is inapposite because EWB made a permissible demand against the SBLC and did not facilitate a material fraud on its own behalf. Doc. No. 180 at 46. Pursuant to § 5-109, relief is appropriate where a court finds that a draw down "would facilitate a material fraud by *the beneficiary*." The standard for material fraud by a beneficiary is high: relief may be ordered where the circumstances plainly forbid the beneficiary to draw down on the letter of credit, where the contract deprives the beneficiary of even a colorable right to do so, where the contract and circumstances reveal that the beneficiary's demand for payment has absolutely no basis in fact, and where the beneficiary's conduct has so vitiated the entire transaction that the purposes of the issuer's obligation would no longer be served. § 5-109 cmt. 1 (citing *Ground Air Transfer, Inc. v. Westate's Airlines, Inc.*, 899 F.2d 1269, 1272–73 (1st Cir. 1990)). Conversely, a draw down should be honored if demanded by "a holder in due course." § 5-109(a)(iii).

Plaintiffs fail to allege that EWB had no colorable right to expect its draw on the SBLC to be honored. Plaintiffs argue that they had a possessory right to their collateral and that their right was "superior to any claim that EWB had." Doc. No. 151 ¶ 652. EWB instead argues that it did no more than exercise its bargained-for contractual rights. Doc. No. 180 at 45–46. And the U.C.C. does not compare the relative strength of possessory rights – instead, the U.C.C. merely asks whether or not a beneficiary has a *colorable* right to expect that the issuing bank honor the draw demand. § 5-109 cmt. 1. It is uncontested that EWB had issued cash advances to the Ethos Defendants. Doc. No. 151 ¶¶ 11–12. It is similarly undisputed that EWB declared a default event occurred when Santos was arrested, and that the Ethos Defendants owed EWB a balance of $6.8 million at that time. *Id.* ¶¶ 260–62; Doc. No. 51-6 at 2. The facts alleged by Plaintiffs do

not give rise to an inference of material fraud on the part of EWB nor do they deprive EWB of a colorable right to draw down on SBLC.

Section 5-110 lists the warranties made by a beneficiary when a presentation is honored; Plaintiffs claim EWB breached these warranties. Doc. No. 183 at 31. Under this provision, in presenting a letter of credit for honor, a beneficiary[23] warrants to the applicant[24] that "the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." § 5-110(a)(2) (emphasis added). EWB replies that Plaintiffs have not pleaded breach of warranty in the FAC and that, even if they had, the claim fails given the merger clause in the contract between Ethos and Plaintiffs. Doc. No. 184 at 25. The FAC does not allege a breach of warranty by EWB, nor a single fact in relation. For this reason alone, any reliance on § 5-110 is misplaced.

Moreover, Plaintiffs do not allege that EWB breached any agreement it had with Plaintiffs. EWB entered into no agreement with Plaintiffs: EWB was not a party to the Ethos-Sector Agreement and EWB's mere receipt of the agreement does not suffice to show that the agreement was one "intended by them to be augmented by the letter of credit" pursuant to § 5-110. Plaintiffs rely on *Spiegel Holdings, Inc. v. Office of Comptroller of Currency of U.S.*, in which the court awarded a money judgment to plaintiff on a breach of warranty claim under the U.C.C. No. 03-225-KI, 2004 WL 1721806, at *2 (D. Or. July 30, 2004). There, the parties did in fact have an agreement

---

[23] In the U.C.C., a beneficiary is "a person who under the terms of a letter of credit is entitled to have its complying presentation honored," including a person to whom drawing rights have been transferred under a transferable letter of credit. N.Y. U.C.C. Law § 5-102(3). Plaintiffs and EWB agree that EWB is the beneficiary under the SBLC. *See* Doc. No. 180 at 13; Doc. No. 183 at 30.

[24] An applicant is "a person at whose request or for whose account a letter of credit is issued," and can include a person requesting issuance on behalf of another if the person making the request undertakes an obligation to reimburse the issuer. N.Y. U.C.C. Law § 5-102(3). Plaintiffs state that Sector is the applicant, while EWB says that Ethos is the applicant. Because it has not been alleged that the Ethos Defendants undertook an obligation to reimburse the issuer, the only applicant is Sector.

which the beneficiary had concededly violated. *Id.* at *3. *Spiegel* cannot support Plaintiffs' claim because they had no agreement with EWB.

Plaintiffs' wrongful draw claim must fail: the U.C.C. provisions relied upon by Plaintiffs to allege material fraud does not authorize damages and Plaintiffs do not allege the breach of warranty claim that could authorize damages. Nonetheless, Plaintiffs have failed to allege sufficient facts for material fraud and a breach of warranty.

**G. Costs.**

Pursuant to Rule 41(d), if a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court "may order the plaintiff to pay all or part of the costs of that previous action." Fed. R. Civ. P. 41(d). "Rule 41(d) is merely permissive, not mandatory." *Paulo v. Agence France-Presse*, No. 24 Civ. 303, 2025 WL 3002388, at *2 (2d Cir. Oct. 27, 2025) (summary order).

EWB asks the Court to award costs under Federal Rule of Civil Procedure 41(d) because Plaintiffs initially voluntarily dismissed all claims against EWB on April 3, 2024, one day before EWB was required to file its motion to dismiss the first amended complaint. Doc. No. 80. Later, Plaintiffs filed a Third Amended Complaint (and later the FAC) asserting claims against EWB. Doc. No. 121; Doc. No. 151. EWB contends that Plaintiffs sought a tactical advantage to preclude EWB from opposing Sector's proposed amendments. Doc. No. 180 at 59. Plaintiffs assert that they withdrew the prior filing because EWB refused to confer about a revised briefing schedule for an amended complaint. Doc. No. 121 at 1.

The purpose of Rule 41(d)(1) is "to serve as a deterrent to forum shopping and vexatious litigation." *Bank v. NFL Props. LLC*, No. 25 Civ. 3981 (CM), 2025 WL 2961849, at *8 (S.D.N.Y. Oct. 20, 2025), reconsideration denied, No. 25 Civ. 3981 (CM), 2025 WL 3090126 (S.D.N.Y. Nov. 5, 2025). To determine whether to award costs, courts consider factors like the plaintiff's motives and the presence of bad faith. *Horowitz*, 888

F.3d at 25 (citations omitted). Here, it is not clear that an award of costs would serve the purposes of Rule 41(d). *See, e.g.*, *Gallo v. Inter-Con Sec. Sys. Inc.*, No. 20 Civ. 4879 (KPF), 2021 WL 3913539, at *12 (S.D.N.Y. Sept. 1, 2021).

Courts in this Circuit often limit costs and attorneys' fees to "compensation for work that cannot be used in a second . . . action." *See, e.g., Preferred Freezer*, 2020 WL 774132, at *3, 4. All counts against EWB in the prior filing appear in the FAC in some form (namely, fraudulent draw/replevin, conversion, unjust enrichment, aiding and abetting fraud, aiding and abetting breach of fiduciary duty). Doc. No. 80; Doc. No. 151. For this reason, the Court declines to order Plaintiffs to pay EWB's costs.

**H. Dismissal With Leave to Amend.**

Plaintiffs request the Court's leave to file an amended complaint for any technical defects. Doc. No. 183 at 57. The Court grants this request only for the claims that are dismissed because insufficient facts have been pleaded: RICO conspiracy, fraud, conversion, aiding and abetting fraud, and aiding and abetting conversion.

As a general rule, leave to amend a complaint should be freely granted. *George v. Pathways to Housing, Inc.*, No. 10 Civ. 9505 ER, 2012 WL 2512964, at *7–8 (S.D.N.Y. June 29, 2012) (citing *Jin v. Metropolitan Life Insurance Co.*, 310 F.3d 84, 101 (2d Cir. 2002)). District courts have broad discretion in deciding whether to grant leave to amend. *Id.* (citing *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009)). However, where the amendment would be futile, denying leave to amend is proper. *Id.* An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. County of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999). Here, Plaintiffs will not be able to cure the defects for aiding and abetting breach of fiduciary duty, unjust enrichment, and replevin/wrongful draw. Because these defects cannot be cured, Plaintiffs' request to amend these claims is denied. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [plaintiff's] causes of action is substantive; better pleading will not

cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

## IV. CONCLUSION

For the reasons stated above, EWB's motion to dismiss for failure to state a claim is GRANTED, and EWB's motion for costs is DENIED. If Plaintiffs choose to file an amended complaint, they must do so by October 21, 2026. The Clerk of Court is respectfully directed to terminate the motion, Doc. No. 178. If they fail to do so, the case will be closed.

It is SO ORDERED.

Dated: September 30, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.